**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

In re:

**PREMPRO PRODUCTS LIABILITY**
**LITIGATION**

⋮
⋮
⋮
⋮
⋮
⋮
⋮
⋮
⋮

**MDL Docket No. 4:03CV1507 WRW**

*Hill v. Wyeth et al.,*
**Case No. 4-05-CV-0546-WRW**

*Scroggin v. Wyeth et al.,*
**Case No. 4-04-CV-1169-WRW**

**No. 4**

**MEMORANDUM IN SUPPORT OF**
***DAUBERT* MOTION TO EXCLUDE EXPERT TESTIMONY OF**
**DR. DONALD AUSTIN**

*Daubert* casts a skeptical eye on the expert who seeks to testify as a "jack of all trades."

"Both the Eighth Circuit Court of Appeals and the Supreme Court have made clear that a person,

although qualified as an expert in one area of expertise, may be precluded from offering opinions

beyond that expertise, or that are not founded on a reliable methodology."[1]  By training and long

experience, Dr. Austin is qualified to testify as an expert in epidemiology.  Whether for reasons

of convenience or necessity, however, Plaintiffs' counsel have encouraged Dr. Austin to offer

"expert" opinions that fall outside the bounds of epidemiology.  Dr. Austin may have studied cell

biology 35 years ago, but that does not qualify him as an expert to opine about how cancer

develops and progresses at the cellular level or about the (dis)similarities of endometrial and

breast tissue.  In a similar vein, there is now additional reason to question whether Dr. Austin's

opinions about lobular cancer arise from an accepted methodology or are the product of an

artificial, litigation-driven exercise.  Thus, although the Court in the exercise of its "gatekeeper"

---

[1]   *Medalen v. Tiger Drylac U.S.A., Inc.*, 269 F. Supp.2d 1118, 1127 (D. Minn. 2003).

function should undoubtedly open the gate to admit Dr. Austin's testimony regarding matters strictly epidemiological, it should fence him in so that he does not wander into matters concerning cell biology and industry custom and practice, about which he is not expert.

## ARGUMENT

The Court should exclude three areas of testimony:

*First,* as it did in the *Reeves* and *Rush* trials, the Court should bar Dr. Austin from testifying, based on ecological data alone (such as data from the SEER cancer registry), that hormone therapy causes breast cancer. He has conceded that the use of ecological data to prove causation is scientifically fallacious, and Plaintiffs' counsel have represented that he will not offer causation opinions of that kind.

*Second*, the Court should bar Dr. Austin from testifying concerning the biological "how to" of breast cancer development, including that hormone therapy wakes up "dormant" tumors. It should also bar him from assuming, without scientific support, that endometrial and breast tissue are alike in the way they respond to estrogen. These topics are beyond Dr. Austin's area of expertise, and the "dormant" tumor theory is an unproven and illogical theory.

*Third*, the Court should re-examine Dr. Austin's liability opinion—that Wyeth should have detected an increase in the proportion of lobular cancer in the 1980s—in light of his failure to submit it for peer-review and publication. Far from preparing his opinions for publication, as previously represented, we now know that he has done nothing, but has misrepresented his expert report to be a "manuscript" in order to secure data that would otherwise have been unavailable to him as an expert in litigation.

## I.     THE COURT SHOULD CIRCUMSCRIBE DR. AUSTIN'S CAUSATION OPINIONS.

As a preliminary matter, the Court should exclude the same causation testimony deemed inadmissible in the *Reeves* and *Rush* cases.  Dr. Austin (and his co-author, Dr. Buckley) admitted that using ecological data to show causation would be "fallacious" and not "scientifically valid."[2]  In recognition of this concession, Plaintiffs' counsel told the Court at the first *Daubert* hearing that the purpose of Dr. Austin's testimony was not to prove causation:

> Defendants repeatedly contend that the ecological studies
> conducted by Dr. Austin do not prove that CMHT causes breast
> cancer, and therefore, his opinions are unreliable.  This argument is
> a straw man defense.  ***In his report and during his deposition, Dr.
> Austin repeatedly stressed that the purpose of his analysis was
> not to prove causation***.  That is ***not*** what ecological studies are
> designed to do.[3]

The Court granted Wyeth's *Daubert* motion to exclude Dr. Austin's causation opinion, noting, "Plaintiff and Dr. Austin both concede that he could not comment on causation."[4]  To the extent that Dr. Austin seeks to reverse field and offer causation opinions based solely on ecological data, the Court should preclude them, as it did in the *Rush* trial.[5]  To the extent that Dr. Austin

---

[2]     Deposition of Dr. Donald Austin (Mar. 31, 2006) at 97:15-20; 169:23-170:11 (excerpts attached as Ex. 1).

[3]     Pls.' Mem. in Opp'n to Defs.' Mot. to Exclude Expert Test. of Dr. Donald Austin (June 29, 2006) [*Reeves* Docket No. 136; *Rush* Docket No. 203] (emphasis added).

[4]     Order (Sept. 13, 2006) [*Rush* Docket No. 283] at 9.

[5]     On the eve of the *Rush* trial, the plaintiff served two "supplemental" reports by Dr. Austin that for the first time purported to offer causation opinions (with one even titled "Causality Report").  The Court excluded Dr. Austin from testifying based on his new reports: "The only reason I can discern or divine that Plaintiff wants to put in the supplemental report of Dr. Austin is to make him a causation expert.  *This would be a 180 degree turn*."  Order (Jan. 16, 2007) [*Rush* Docket No. 473] at 1 (emphasis added).

bases his opinions on such data *in addition to* reliable epidemiological data, Wyeth does not challenge the opinions.

The Court should also preclude Dr. Austin from offering any testimony regarding specific causation—i.e., whether hormone therapy caused Scroggin's or Hill's breast cancer.  No such opinions are included in his expert reports.[6]

## II.   THE COURT SHOULD BAR DR. AUSTIN'S BIOLOGY-BASED OPINIONS.

Dr. Austin offers two biology-based opinions.  The first concerns the "promotion" of cancer in the cell; the second, the equivalence of endometrial and breast tissue.

### A.   Dr. Austin's Opinions About Cancer Development at the Cellular Level

We know from the initial bellwether trials that plaintiffs disclaim any contention that hormone therapy "initiates" breast cancer—and just as strongly resist any defense that they already have breast cancer, which hormone therapy allegedly aggravates by causing it to grow faster or bigger.  Thus, Plaintiffs describe a biological "no man's land" in which hormone therapy somehow causes breast cancer without either being responsible for the first breast cancer cell or aggravating the existence of existing breast cancer cells.

Into this "no man's land," Plaintiffs' counsel have recently invited Dr. Austin to enter and express opinions about how cancer develops in the cell.  He did not express these opinions in his initial MDL expert report, nor in the 2006 deposition taken to explore the opinions set forth in that report.  But in his March 13, 2007 deposition, taken in connection with his "supplemental" expert reports of December 2006 and January 2007, Dr. Austin for the first time offered a

---

[6]   Plaintiffs did not designate Dr. Austin as a case-specific expert, and, accordingly, his deposition has not been taken in these cases.

tripartite theory of cancer development at the cellular level involving "initiation," "promotion," and "stimulation."[7]

The Court should preclude this foray into cell biology because Dr. Austin is not expert in that specialized field. Albeit grudgingly, he admitted his lack of expertise:

> Q:     Doctor, do you consider yourself an expert on cell biology?
>
> A:     I understand cell biology, ***at least the part up until I
>        stopped really updating myself on that***, because my initial
>        master of science degree was in cell biology.
>
> Q:     And that initial master's degree was awarded when?
>
> A:     1970 or '71.
>
> Q:     ***So about 35 years ago***?
>
> A:     ***Uh-huh***.
>
> Q:     And since then that's not been a focus of your career, is
>        that right?
>
> A:     That's right.[8]

Suffice it to ask, who among us would listen to "expert" advice from someone who last updated himself on developments in the field 35 years ago? As few scientific fields have moved as fast and changed as much in the last 35 years as molecular and cell biology, they may be the last place fields in which *Daubert* would recognize the expertise of a scientific Rip Van Winkle.

Thus, when Dr. Austin purports to define "initiation," "promotion," and "stimulation" and to explain that hormone therapy does not initiate breast cancer, but promotes and then stimulates it, he is talking about cellular processes that are outside his specialized field of knowledge, which is epidemiology:

---

[7]   Deposition of Dr. Donald Austin (Mar. 13, 2007) ("Third Austin Dep.") at 131-35 (excerpts attached as Ex. 2).

[8]   *Id*. at 126:20-127:8 (emphases added).

Q.      And you would agree that that's not the normal role for an
        epidemiologist to comment about the cellular process that
        may cause cancer to go from one point to another on a
        continuum?

A.      Go from one point to another on a continuum. ***That's
        usually a biologist's task***.

Q.      ***And that's beyond your expertise***, at least today.  35 years
        ago you could have pursued a path—

A.      ***That's correct***.

Q.      —But that's not a path you took?

A.      That's correct.

Q.      You would never hold yourself out as a cell biologist
        today?

A.      I would not.[9]

In consequence of his lack of expertise, Dr. Austin's views are not grounded in evidence

reflecting what actually happens in the cell.  Rather, he is looking at epidemiological evidence

and, in effect, generating a biological hypothesis:

Q.      And tell me, sir, what credentials and what source material
        do you epidemiologists have to tell us about that level of
        cellular biology? . . .

A.      It is a conclusion based on how incidence occurs in the face
        of exposure or incidence decreases in the face of stopping
        exposure.

Q.      It is based on epidemiology?

A.      Yes.

                            *          *          *

Q.      So you are basically offering an opinion about processes at
        a cellular level based on population statistics?

---

[9]   *Id.* at 137:1-14 (emphases added).

A.      Yes.[10]

As he admits, the evidence at his disposal cannot prove his hypothesis, and he is unprepared and

unable to defend it:

Q:      Can you point to any of the references you have provided
        in your report that provides on a cellular level evidence that
        a hormone can cause an otherwise dormant, but mutated
        cell to divide for the first time and become a cancerous
        process?

A:      Any of the epidemiologic studies, no.

Q:      *Nothing in your report that we could go look at to say,*
        *this proves it*?  Your report doesn't give us that, does it?

A:      *No, you didn't ask me to prove that.  You asked me to*
        *form an opinion, and that is my opinion*.

Q:      [I]s that an opinion you are prepared to go and testify to in
        a courtroom with authorities to support it or isn't that really
        beyond your expertise?

A:      Well, I haven't prepared myself to try and defend that sort
        of an opinion. . . .

Q:      Okay.  So you don't believe that the report that you have
        provided here addresses that question, and you have not
        been asked to address that question?

A:      That's correct.

Q:      *And as you sit here today, you are not prepared to defend*
        *your opinion with any source material*?

A:      *That's right*.[11]

Dr. Austin is not even sure that his hypothesis can be tested and validated:

A.      . . . [W]e wouldn't have any way to tell how many, how
        many cancer cells have gone through step 2, the first cell

---

[10]   *Id.* at 135:2-17.

[11]   *Id.* at 135:25-36:25 (emphases added).

division and then just laid there dormant. ***We wouldn't
know any way of how to test that***.

Q.     And, certainly, you haven't found a way to test that?

A.     No.

Q.     ***And you haven't seen anyone else be able to test that
hypothesis that it even exists as a dormant entity within a
body that just stops***?

A.     ***We wouldn't have any way to know.***[12]

*Daubert* does not permit the admission of hypotheses—certainly hypotheses that the

expert is not ready and willing to defend, and did not defend with evidence in his report or at his

deposition.[13]   In short, Dr. Austin's theory is in conflict with the very definition of cancer, cannot

be tested, and is not something he is able to defend.  Such opinions are utterly unreliable and

have no place in the courtroom.

**B.     Dr. Austin's Opinions About the Equivalence of Endometrial and Breast
Tissue**

Dr. Austin opines that the so-called endometrial cancer "scare" of the 1970s should have

prompted Wyeth to conduct a definitive study of the association between combination hormone

therapy and breast cancer.  It is a curious proposition.  Dr. Austin's logic is that, ***because***

estrogen appeared to cause endometrial cancer, Wyeth should have studied whether estrogen

plus progestin caused breast cancer.  That is, because A caused B, one should have assumed that

C might cause D.  The proposition is all the more illogical because it suggests that Wyeth should

---

[12]   *Id.* at 146:5-16 (emphases added).

[13]   Dr. Austin agrees that his theory runs counter to the very definition of cancer, which is the
*unregulated growth* of abnormal cells.  *Id*. at 146:17-20; *see* Oxford English Dictionary (2d
ed. 1989) (defining neoplasm as "a new and abnormal growth of tissue in the body, *spec*. one
resulting from uncontrolled proliferation of cells"); Stedman's Medical Dictionary 1029-
1030 (25th ed. 1990) (defining neoplasm as "an abnormal tissue that grows by cellular
proliferation more rapidly than normal and continues to grow after the stimulus that initiated
the new growth ceases").  The term "dormant cancer" is an oxymoron.

have assumed that estrogen plus progestin might cause breast cancer when the scientific

community understood (correctly) that the addition of progestin to Premarin eliminated the risk

of endometrial cancer.

The point for purposes of *Daubert*, however, is not that the opinion is illogical, but that it

rests on an unproven (in fact, false) scientific premise.  That premise is that endometrial and

breast tissue are equivalent in terms of their response to estrogen—i.e., if estrogen causes

endometrial cancer, then it must also cause breast cancer.  The WHI study, however, contradicts

this premise, for the estrogen-only arm of the study showed that women who took Premarin had

a **decreased** risk of breast cancer.[14]  Dr. Austin acknowledges as much, and fails to offer any

countervailing evidence to support his premise:

> Q:      But [your conclusion about] biologic plausibility was a
>         conclusion based upon the belief that endometrial tissue
>         and breast tissue, because they are both hormone sensitive,
>         could act the same way?
>
> A:      That estrogens or—or those kinds of hormones could affect
>         them the same way, yes.
>
> Q:      And have you done any original research on that topic?
>
> A:      No, I haven't.
>
>                         *     *     *
>
> Q:      [W]ould you agree that the relative risk of endometrial
>         cancer, when exposed to [exogenous] hormones, is
>         markedly different from the reported relative risk of breast
>         cancer when associated to hormones?  That's a big
>         difference; is it not?

---

[14]   *Effects of Conjugated Equine Estrogen in Postmenopausal Women With Hysterectomy:  The
       Women's Health Initiative Randomized Controlled Trial*, 291(14) JAMA 1701, 1706 (2004)
       (attached as Ex. 3).  The premise is also contradicted by what is known about the effects of
       Tamoxifen.  As plaintiffs' experts frequently point out, Taxmoxifen prevents breast cancer
       recurrence by blocking estrogen.  But it increases the risk of ovarian cancer.

A:    The relative risk is different.

Q:    And would you agree that the literature that you did
      showed that . . . estrogen alone, was what was associated
      with the increasing rate of endometrial cancer?

A:    That's correct.

Q:    But, in fact, the Women's Health Initiative found that
      estrogen alone did not increase the risk of breast cancer?  It
      had opposite results.  That would be accurate; wouldn't it?

A:    I think they were not able to demonstrate a difference in
      that study.[15]

Because Dr. Austin cannot support his premise, and because comparison of different tissues in

the body is outside his realm of expertise in any event, the Court should preclude his opinions

based on the assumption that endometrial and breast tissue are alike and respond in the same way

to estrogen.

## III.    THE COURT SHOULD BAR DR. AUSTIN'S LITIGATION-DRIVEN OPINIONS.

When we first challenged Dr. Austin's opinions, we noted that the case law recognizes

that the lack of "normal scientific scrutiny through peer review and publication" is a sign that an

expert opinion is unreliable," and we pointed out that the opinions in his report had not been

peer-reviewed or published.[16]  The absence of peer review is a significant factor, because Dr.

Austin's opinions did not arise from his own research and teaching, but were developed solely

for purposes of litigation.[17]  His co-author, Dr. Buckley, stated that he had never seen this type of

exercise done outside of this litigation:

---

[15]   *Deutsch v. Wyeth* Hr'g Tr. (June 14, 2007) at 71:25-72:8, 72:22-73:14 (excerpts attached as
       Ex. 4).

[16]   Br. in Supp. of Defs.' Mot. to Exclude Expert Test. of Dr. Donald F. Austin (June 5, 2005)
       [*Reeves* Docket No. 92] at 17.

[17]   *In re Diet Drugs Prods. Liab. Litig.*, 2001 U.S. Dist. LEXIS 1174, at *43-44 (E.D. Pa. 2001)
       ("[S]everal courts have discounted the reliability of experts who . . . formed their opinions

Q.       . . . So, what I'm trying to find out is, have you ever even
         done that exercise outside of this litigation.

A.       No.

Q.       Have you ever seen that kind of an exercise published in
         any peer-reviewed literature?

A.       No.[18]

Dr. Austin has sought to defuse the fact that his opinions are litigation-driven by stating

that he intends to publish his opinions, and that publication is just around the corner.  Asked in

the *Reeves* trial whether his work was done exclusively for litigation, he talked about his plans to

publish:

Q:       [Y]ou . . . have readily admitted that the work that you did
         in this case was specifically for litigation, right, for this
         case?

A:       Yes.

Q:       You did not do this work for any professional endeavors or
         any academic pursuits, correct?

A:       ***Well, it's still going to be submitted for publication***, but
         that's a byproduct. The initiation was for this litigation.[19]

That was in September 2006.  Four months later, when he testified in Philadelphia, he still had

not submitted his litigation work for publication:

---

entirely within the context of litigation."); *Nelson v. American Home Prods. Corp.*, 92 F.
Supp. 2d 954, 967 (W.D. Mo. 2000) ("[I]n determining the reliability of a proffered expert's
opinion, courts have discounted the reliability of experts who formed their opinions only
within the context of litigation."); *Braun v. Lorillard Inc.*, 84 F.3d 230, 235 (7th Cir. 1996)
(*Daubert* discourages "the hiring of reputable scientists . . . to testify for a fee to propositions
that they have not arrived at through the methods . . . they use when they are doing their
regular professional work rather than being paid to give an opinion helpful to one side in a
lawsuit.").

[18]   Deposition of Dr. David I. Buckley (Mar. 27, 2006) at 39 (excerpt attached as Ex. 5).

[19]   *Reeves* Trial Tr. (Sept. 6, 2006) [*Reeves* Docket No. 437] at 2551:18-2552:1 (emphasis
       added).

Q:     But nobody has reviewed your actual data and reviewed
       your actual results.

A:     That's right.

Q:     And it has not been submitted to a scientific journal for that
       purpose.

A:     That's correct.[20]

                              *     *     *

Q:     And you have not published this analysis you've done,
       correct?

A:     It's not been published.  It's not been submitted for
       publication yet.[21]

Two months later, when he was deposed again, a different story emerged.  To obtain

access to data in the California cancer registry, Dr. Austin had to submit an application

explaining why he wanted the information and what he proposed to do with it.  Under the

registry's rules, one cannot secure the information for use in litigation.[22]  In the written

application, however, Dr. Austin did not disclose that he was an expert in this litigation and that

the California data would bear directly on the opinions he was expressing in the litigation.[23]  But

he did say under the section of the application entitled, "Previous Research," that he had a

---

[20]   *Daniel v. Wyeth* Trial Tr. (Jan. 16, 2007) (PM session) at 35:10-15 (excerpt attached as Ex.
       6).

[21]   *Nelson v. Wyeth* Trial Tr. (Jan. 17, 2007) (PM session) at 87:7-10 (excerpt attached as Ex. 7).

[22]   Deposition of Dr. Donald Austin (Jan. 11, 2007) at 286:21-287:1 ("Q:  I mean, if you told the
       California authorities that you were getting this data to use it for litigation purposes, they
       would probably tell you, well, *that's against the law, we can't give it to you*, wouldn't they?
       A:  Yes, I suppose they would.") (emphasis added) (excerpts attached as Ex. 8).

[23]   Third Austin Dep. at 106 ("Q: Is there anything in here that tells the folks in California that
       you are a witness, testifying to these opinions— A: No.  Q: —in this litigation? A: No.")
       (Ex. 2).  Dr. Austin claimed that he told the former director of the registry that he was
       interested in the topic "because of my work with Mr. Williams" and that the data would
       probably be used in the litigation.  *Id.*

"manuscript" in preparation and that the California data would be used in connection with the manuscript.[24] Further questioning, revealed that Dr. Austin was using the term "manuscript" in an unexpected way:

> Q:    Incidentally, in Exhibit No. 11, you referred to a manuscript in preparation.
>
> A:    Preparation, yes.
>
> Q:    Yes.  Where is that document?
>
> A:    Still in preparation.
>
> Q:    What stage of preparation?
>
> A:    . . . [T]he incidence report and the first report as modified by the incidence report is, and it is from that that we were preparing it.
>
> Q:    **So the manuscript in preparation that you are referring to is the report that you provided in this litigation**?
>
> A:    **Yes**.
>
>                          \*   \*   \*
>
> Q:    **. . .[T]hat's the manuscript in preparation that you told the California authorities about**?
>
> A:    **Uh-huh, that's correct**.
>
> Q:    The litigation report?
>
> A:    That's correct.
>
> Q:    And have you, in fact, submitted either of those reports or any variation of those reports to any publication?
>
> A:    As I mentioned, we haven't done any further manuscript development since that time.
>
> Q:    **So you prepared reports, submitted it for litigation, and you have not done anything towards preparing something**

---

[24]   *Id*. at 104.

> ***for publication derived from those reports as of March
> 2007****?*

    A:    ***That's right***.[25]

Were Dr. Austin's opinions sufficiently reliable under Rule 702 to be presented to a jury,

we would leave it to the members of that jury to make a judgment about his candor, for there is

no "manuscript" in preparation, only a paid-for litigation report.  For *Daubert* purposes, and is

sufficient to say that Dr. Austin's opinions have never been submitted for peer review.  This fact

is more telling (i) because the opinions themselves do not arise out of his independent research

and employ a methodology that Dr. Buckley admits has never been used before, and (ii) because

we now know that, despite his earlier representation that publication was just a matter of time, he

has "not done anything towards preparing something for publication" since delivering the reports

to Plaintiffs' counsel.

### Conclusion

The Court should bar Dr. Austin:  (1) from stating causation opinions based on ecological

data alone, because such opinions are fallacious; (2) from describing how cancer develops in the

cell, because he is not qualified to do so; (3) from offering opinions based on the assumption that

breast tissue and endometrial tissue are affected in the same way by exogenous estrogen, because

he is not qualified to address the question and because the assumption is contrary to the scientific

evidence; and (4) from opining about when an increase in the proportion of lobular cancers

should have been detected, because his opinions do not arise out of his independent research, but

were prepared solely for litigation, and have not been peer-reviewed or submitted for

publication.

---

[25]   *Id*. at 111-13 (emphases added).

Respectfully submitted,

/s/      F. Lane Heard III
John W. Vardaman, Jr.
Stephen L. Urbanczyk
F. Lane Heard III

WILLIAMS & CONNOLLY LLP
725 12th Street, NW
Washington, DC 20005-5901
(202) 434-5000

Lyn P. Pruitt, Bar No. 84121

MITCHELL, WILLIAMS, SELIG, GATES &
WOODYARD, PLLC
425 West Capitol Avenue, Suite 1800
Little Rock, AR 72201-3525
(501) 688-8800
 *lpruitt@mwsgw.com*

*Attorneys for Wyeth*

DATED:  August 15, 2007

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of August 2007 a true and correct copy of the

foregoing Memorandum in Support of Wyeth's *Daubert* Motion to Exclude Expert Testimony of

Dr. Donald Austin was electronically filed with the Clerk of Court using the CM/ECF system

and a true and correct copy was forwarded by e-mail to the parties listed below.

Joshua H. Brockman
Zoe B. Littlepage
Littlepage Booth - Houston
1012 West Alabama Street
Houston, TX 77006
Email: josh@littlepagelaw.com
      zoe@littlepagebooth.com

Jay Phillip Mayesh
Steven J. Glickstein
Alan E. Rothman
Kaye Scholer, LLP
425 Park Avenue
New York, NY 10022-3598
Email: maoedar@kayescholer.com
      arothman@kayescholer.com

Kevin A. Crass
Elizabeth Robben Murray
Friday, Eldredge & Clark, LLP
400 West Capitol Avenue, Suite 2000
Little Rock, AR 72201-3493
Email: crass@fec.net
      murray@fec.net

/s/     F. Lane Heard III
F. Lane Heard III

   WILLIAMS & CONNOLLY LLP
   725 12th Street, NW
   Washington, DC 20005-5901
   (202) 434-5000
   *lheard@wc.com*