# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

In re:

**PREMPRO PRODUCTS LIABILITY
LITIGATION**

:
:
:
:
:
:
:
:
:

**MDL Docket No. 4:03CV1507 WRW**

*Hill v. Wyeth et al.,*
**Case No. 4-05-CV-0546-WRW**

*Scroggin v. Wyeth et al.,*
**Case No. 4-04-CV-1169-WRW**


No. 2


**MEMORANDUM IN SUPPORT OF
*DAUBERT* MOTION TO EXCLUDE EXPERT TESTIMONY OF
DR. ELIZABETH NAFTALIS**

John W. Vardaman, Jr.
Stephen L. Urbanczyk
F. Lane Heard III

WILLIAMS & CONNOLLY LLP
725 12th Street, NW
Washington, DC 20005-5901
(202) 434-5000

Lyn P. Pruitt, Bar No. 84121

MITCHELL, WILLIAMS, SELIG, GATES &
WOODYARD, PLLC
425 West Capitol Avenue, Suite 1800
Little Rock, AR 72201-3525
(501) 688-8800
 *lpruitt@mwsgw.com*

*Attorneys for Wyeth*

DATED:  August 15, 2007

## TABLE OF CONTENTS

ARGUMENT ................................................................................................................ 4

I.     USING DIFFERENTIAL DIAGNOSIS TO ASSESS CAUSATION IS NOT
       A RELIABLE METHOD IN THE CONTEXT OF BREAST CANCER. ........................ 5

       A.     Dr. Naftalis's Methodology Cannot Be Tested or Validated. ............................... 5

              1.     No generally accepted test of specific causation. ...................................... 6

              2.     No scientific means to separate the effect of endogenous
                     hormones and hormone therapy on a breast cancer. ................................. 12

              3.     No physical characteristic or biomarker that distinguishes
                     breast cancers according to their cause. ................................................... 13

       B.     Dr. Naftalis's Methodology Has Never Been Peer-Reviewed or
              Published. .......................................................................................................... 16

       C.     Dr. Naftalis's Methodology Is Not Subject to a Known Error Rate. ................... 17

       D.     Dr. Naftalis's Methodology Is Not Generally Accepted in the Medical
              Community. ........................................................................................................ 18

       E.     Dr. Naftalis's Methodology Was Developed for Litigation. .............................. 21

II.    DR. NAFTALIS DOES NOT RELIABLY APPLY HER METHODOLOGY
       TO THE RELEVANT FACTS. ................................................................................. 23

       A.     Dr. Naftalis Did Not "Rule In" Short-Term Hormone Therapy. ......................... 24

       B.     Dr. Naftalis Did Not Reliably "Rule Out" Other Alternative
              Explanations. ..................................................................................................... 25

              1.     The "X" Factor(s) ................................................................................... 26

              2.     First-Degree Relative and Other Risk Factors ......................................... 30

Conclusion ................................................................................................................. 31

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

|  |  |  |
|---|---|---|
| | **:** | **MDL Docket No. 4:03CV1507 WRW** |
| **In re:** | **:** | |
| | **:** | *Hill v. Wyeth et al.,* |
| **PREMPRO PRODUCTS LIABILITY** | **:** | **Case No. 4-05-CV-0546-WRW** |
| **LITIGATION** | **:** | |
| | **:** | *Scroggin v. Wyeth et al.,* |
| | **:** | **Case No. 4-04-CV-1169-WRW** |
| | **:** | |

**No. 2**

**MEMORANDUM IN SUPPORT OF**
***DAUBERT* MOTION TO EXCLUDE EXPERT TESTIMONY OF**
**DR. ELIZABETH NAFTALIS**

Every woman with breast cancer wants to know what caused it.  If there were a doctor somewhere who knew how to answer that question, would not his picture be on the front page of *The New York Times*?  his name submitted to the Nobel Prize nominating committee?  his method published in *The New England Journal of Medicine*?  But after five years of litigation, plaintiffs have yet to produce a single doctor who routinely says, in either the clinical or research setting, "I know what caused Mrs. Smith's breast cancer."[1]

Dr. Naftalis has not stumbled upon the Holy Grail.  When she claims that she has determined the cause of Ms. Scroggin's and Ms. Hill's breast cancers by eliminating all other possible causes, she is purporting to answer a question that the leading minds in medical science have been unable to answer.  The medical community does not know what causes breast cancer.  Given the current state of medical knowledge, there exists no scientific test and no physical or objective evidence that can validate Dr. Naftalis's opinions that the alleged cause of Plaintiffs'

---

[1]   We acknowledge that in the rare cases where a woman has the BRCA gene or has been exposed to excessive radiation, doctors will often attribute causation to those factors.

breast cancers was hormone therapy rather than their own endogenous hormones, other known risk factors, or some as-yet unknown cause.[2]

It follows that, in formulating her opinions, Dr. Naftalis utilizes a methodology to determine breast cancer etiology that the experts agree:

- Has never been independently replicated or validated;

- Has not been peer-reviewed and published;

- Has never been verified within a margin of error, and is statistically likely to be wrong 80% of the time;

- Has not been generally accepted in the scientific or medical community; and

- Has been developed exclusively for the courtroom.

When she purports to use differential diagnosis to rule out all other possible causes of Plaintiffs' breast cancer except hormone therapy, Dr. Naftalis is doing something that the experts from both sides of this litigation have testified cannot be done.  These experts are doctors hailing from all corners of the country, who have taught the practice of medicine for years, who have authored published articles on breast cancer, and who have collectively treated tens of thousands of patients.

Against this backdrop, what is so telling is that Dr. Naftalis cannot point to any evidence that *she* herself has *ever* performed a differential diagnosis in her own practice so as to be able to tell a patient or a fellow doctor that hormone therapy caused a particular patient's breast cancer.

---

[2]   This brief assumes for purposes of argument that hormone therapy is capable of causing breast cancer.  That is, we assume "general causation" for purposes of showing that, even if so, Plaintiffs cannot prove "specific causation."  To succeed on their claims against Wyeth, Plaintiffs must prove both general causation (that hormone therapy causes breast cancer generally) and specific causation (that hormone therapy caused their breast cancer specifically).  *See, e.g.*, *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 881 (10th Cir. 2005).

***She is purporting to do in the courtroom what she has never done in the clinic***—indeed, what no doctor treating breast cancer patients has done.

The fact that courts have allowed plaintiffs to prove causation through differential diagnosis in the context of ***some*** diseases does not mean that "process of elimination" is a reliable method for ***all*** diseases.[3]  Differential diagnosis cannot be used to determine the cause of breast cancer, because a doctor cannot eliminate the unknown "whatever-it-is" that accounts for most cases of breast cancer.  This fact alone is sufficient to render the process-of-elimination method completely unworkable in the context of breast cancer.  But Dr. Naftalis compounds the unreliability of her opinions through the faulty application of her methodology.  She fails to "rule in" short-term hormone therapy as a potential cause of Hill's breast cancer, and either ignores or provides no scientific basis for "ruling out" other potential alternative explanations for Scroggin's and Hill's breast cancers, including (i) obesity, (ii) nulliparity, (iii) family history of breast cancer, (iv) age, (v) endogenous hormones, and (vi) breast density.

In sum, Dr. Naftalis's testimony that hormone therapy caused Plaintiffs' breast cancers is speculation.  "Personal opinion, not science, is testifying here,"[4] and is therefore inadmissible under *Daubert* and Federal Rule of Evidence 702.[5]

---

[3]  Under *Daubert*, the court must conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of *whether that reasoning or methodology properly can be applied to the facts in issue*."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993) (emphasis added).

[4]  *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ("*Daubert II*") (*quoting Turpin v. Merrell Dow Pharm., Inc.*, 959 F.2d 1349, 1360 (6th Cir. 1992)).

[5]  If the Court grants this motion, it should grant Wyeth's Motion for Summary Judgment re Specific Causation, filed separately.

**ARGUMENT**

Rule 702 provides that an expert witness may testify only if she bases her opinion upon sufficient facts or data, utilizes reliable principles and methods, and reliably applies the principles and methods to the facts of the case.  Dr. Naftalis's proposed testimony is deficient with respect to all of these conditions.

The Eighth Circuit, which "has been consistently loyal to the language of *Daubert* and Federal Rule of Evidence 702,"[6] has recognized seven *Daubert* factors to screen expert testimony for reliability.  Five of these factors relate to the reliability of the technique or methodology employed:  (i) whether the theory or technique can be (and has been) tested; (ii) whether the theory or technique has been subjected to peer review and publication; (iii) the known or potential rate of error; (iv) whether the theory has been generally accepted in the relevant scientific and medical community; and (v) whether the expertise was developed for litigation or naturally flowed from the expert's research.  Two additional factors recognize that a theoretically sound methodology can only produce a reliable result if it is faithfully applied to the facts at hand:  the proposed expert must (vi) rule out other alternative explanations; and (vii) sufficiently connect the proposed testimony with the facts of each case.[7]

---

[6]   *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 687 n.2 (8th Cir. 2001) ("[O]ur examination of the cases in the Eighth Circuit show a consistent application of *Daubert* and Rule 702").

[7]   *See id.* at 687 (quotations omitted).  The 2000 advisory committee's notes to Rule 702 suggest additional factors to evaluate expert reliability, including:  whether "maintenance standards and controls" exist; whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting; and whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.  *See Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 534-35 (7th Cir. 2005) (*quoting* Fed. R. Evid. 702 advisory committee's notes (2000 amends.)), *vacated on other grounds*, 448 F.3d 936 (7th Cir. 2006), *cert denied*, 127 S. Ct. 1151 (2007).

Although the *Daubert* factors "may not always be pertinent in assessing the reliability of expert testimony, they are precisely apt for analysis here," in a prescription drug case.[8]  And while the failure to meet any single factor is not necessarily fatal under *Daubert*, the failure to meet all seven of these factors, as is the case with Dr. Naftalis's proposed testimony, clearly requires that the testimony be excluded under Rule 702 as unscientific and unreliable.

**I.     USING DIFFERENTIAL DIAGNOSIS TO ASSESS CAUSATION IS NOT A RELIABLE METHOD IN THE CONTEXT OF BREAST CANCER.**

Using differential diagnosis for the purpose of pinpointing the cause of breast cancer is unreliable for five reasons.

**A.     Dr. Naftalis's Methodology Cannot Be Tested or Validated.**

"The first and most significant *Daubert* factor is whether the scientific theory has been subjected to the scientific method," that is, whether the expert utilizes "testable hypotheses" that have been "subjected to the real world crucible of experimentation, falsification/validation, and replication."[9]  In other words, a court "must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist."[10]

Dr. Naftalis's methodology defies independent validation.  In the first place, it is difficult to conceive how anyone could replicate her methodology, given that she has never written down the factors she considers relevant to the determination of specific causation, and has no set

---

[8]     *Fuesting*, 421 F.3d at 535 (citation omitted) (noting that *Daubert* concerned the admissibility of expert testimony regarding the deleterious medical effects of introducing a drug into the human body).

[9]     *See Bradley v. Brown*, 42 F.3d 434, 438 (7th Cir. 1994); *Caraker v. Sandoz Pharms. Corp.*, 188 F. Supp. 2d 1026, 1030 (S.D. Ill. 2001).

[10]    *See Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996); *id.* at 319 ("[T]he courtroom is not the place for scientific guesswork, even of the inspired sort.  Law lags science; it does not lead it.").

checklist.[11]  Second, the current state of medical science does not permit validation.  Despite

decades of study, the causes of breast cancer remain largely a mystery.  Although doctors can

test for the presence of breast cancer, they cannot test for its cause.  Medical science has

identified some of the "risk factors" for breast cancer, but, as the American Cancer Society

explains, "[e]ven when a woman with breast cancer has a risk factor, ***there is no way to prove***

***that it actually caused her cancer***."[12]

In the absence of "objective, independent validation"[13] of Dr. Naftalis's methodology, her

opinions cannot be said to constitute "good science" and must be excluded.  The absence of a

methodology that can be tested has three aspects:

### 1.     No generally accepted test of specific causation.

Dr. Naftalis testified that using differential diagnosis to determine the cause of a

particular woman's breast cancer is generally accepted among practitioners.[14]  However, a

veritable chorus of experts from both sides agree that there is ***no*** generally accepted scientific

method or formula to determine the cause of a particular woman's breast cancer.

So say the plaintiffs' experts in the litigation:[15]

---

[11]   *See* Deposition of Elizabeth Z. Naftalis, M.D. (Mar. 21, 2006) ("Naftalis *Dockter* Dep.") at 105:2-10 (attached as Ex. 1).

[12]   American Cancer Society, *Detailed Guide: Breast Cancer* at 2 (2007) (emphasis added) (attached as Ex. 2).

[13]   *See Daubert II*, 43 F.3d at 1316; *id.* at 1317-18 ("If the proffered expert testimony is not based on independent research, the party proffering it must come forward with other *objective, verifiable evidence* that the testimony is based on 'scientifically valid principles.'") (emphasis added).

[14]   *See* Deposition of Elizabeth Z. Naftalis, M.D. (May 31, 2007) ("Naftalis *Trevino* Dep.") at 160:25-161:5 (Ex. 3).

[15]   Deposition of Dr. Gail Bender (May 10, 2007) at 90:14-91:4 (excerpt attached as Ex. 4); Deposition of Dr. Virgil Craig Jordan (Jan. 9, 2006) ("Jordan Dep.") at 374:5-375:13

- Dr. Gail Bender (an oncologist practicing in Minneapolis): "Q. . . . I'm asking you to identify for me any medical organization or scientific organization, not you, something else outside of you, something bigger, some big organization that has established a protocol or test for determining the cause of breast cancer in a particular patient apart from BRCA1 and BRCA2. . . . A. I am not aware of an organization that does that. Q. You're not aware of anyone who has established a protocol? . . . A. I'm not aware of any";

- Dr. Virgil Craig Jordan (Cancer Research Chair, Vice President and Research Director at the Fox Chase Cancer Center in Philadelphia and a professor of cancer biology at the University of Pennsylvania): "Q. 'Even when a woman with breast cancer has a risk factor, there's no way to prove that it actually caused her cancer.' . . . [A.] I would share that view";

- Dr. Suzanne Klimberg (a breast surgical oncologist and a professor at the University of Arkansas for Medical Sciences) (speaking of the WHI report that 38 women on hormone therapy (per 10,000 women-years of use) versus 30 women not on hormone therapy would develop breast cancer): "Q. And so is there any way that anyone can determine which of the 38 women would have gotten breast cancer whether they used hormone therapy or not? . . . [A.] So which—could we pick out which eight? Q. Correct. A. Not to my knowledge";

- Dr. Lester Layfield (a surgical pathologist at the University of Utah in Salt Lake City): "Q. But there is no published protocol or methodology setting forth an accepted way of analyzing the cause of breast cancer in a particular specific patient, apart from BRCA1 and BRCA2? A. Not that I'm aware of";

- Dr. Paul D. Stolley (an epidemiologist and adjunct professor at the University of Maryland School of Medicine): "Q. Is there any generally-accepted method or formula by which one can determine the specific cause of an individual woman's breast

---

(excerpts attached as Ex. 5); Deposition of Dr. Suzanne Klimberg (Apr. 10 and 27, 2006) ("Klimberg Dep.") at 241:5-16 (excerpts attached as Ex. 6); Deposition of Dr. Lester Layfield (Apr. 25, 2007) ("Layfield *Zandi* Dep.") at 59:7-11 (excerpts attached as Ex. 7); Deposition of Dr. Paul D. Stolley (Mar. 15, 2007) ("Stolley Dep.") at 28:20-29:2 (excerpts attached as Ex. 8); Deposition of Dr. James A. Waldron (Apr. 17-18, 2006) ("Waldron Dep.") at 75:2-10 (excerpts attached as Ex. 9).

cancer?  A.  I don't think there's a generally-accepted
algorithm for that";

- Dr. James A. Waldron (a professor and director of anatomic
pathology at the University of Arkansas for Medical Sciences):
"Q.  For any individual woman, there is no accepted scientific
technique for determining what it is that caused her breast
cancer.  Correct?  A.  Correct."

So say the experts across the country with whom we have consulted:[16]

- Dr. Raquel D. Arias (an OB/GYN and associate professor at
the University of Southern California):  "There is no known or
generally accepted method by which one can determine the
cause of an individual woman's breast cancer, let alone that
HRT was the cause of an individual woman's breast cancer";

- Dr. Michael Edwards (a surgical oncologist specializing in
breast disease and Professor and Chairman of the Department
of Surgery at the University of Arkansas for Medical
Sciences):  "There is no reliable or regularly acknowledged
scientific method to determine the cause of any individual
woman's breast cancer";

- Dr. Barbara S. Levy (an OB/GYN and medical director of the
St. Francis Hospital Women's Health and Breast Center in
Federal Way, Washington):  "There is no known or generally-
accepted method by which one can determine the cause of an
individual woman's breast cancer";

- Dr. Frank Ling (an OB/GYN and former Chair of the
Department of Obstetrics and Gynecology at the University of
Tennessee College of Medicine in Memphis):  "There is no
tested, verified or validated technique for determining what
caused an individual woman's breast cancer and it is generally
accepted in the medical and scientific communities that there is
no way to determine if a particular risk factor which may place
a woman at an increased risk, caused an individual woman's
breast cancer";

---

[16]  *See, e.g.*, Declaration of Dr. Raquel D. Arias (July 23, 2007) ("Arias Decl.") ¶ 9 (attached as
Ex. 10); Declaration of Dr. Michael Edwards ("Edwards Decl.") (attached as Ex. 11);
Declaration of Dr. Barbara S. Levy ("Levy Decl.") ¶ 10 (attached as Ex. 12); Affidavit of Dr.
Frank Ling ("Ling Aff.") (attached as Ex. 13); Declaration of Dr. Thomas Stovall ("Stovall
Decl.") (attached as Ex. 14); Affidavit of Dr. Todd M. Tuttle ("Tuttle Aff.") ¶ 9 (attached as
Ex. 15); Affidavit of Dr. Kent C. Westbrook ("Westbrook Aff.") ¶ 3 (attached as Ex. 16).

- Dr. Thomas Stovall (an OB/GYN and a clinical professor of obstetrics and gynecology at the University of Tennessee in Memphis and at Vanderbilt University in Nashville): "[T]here is no generally accepted test, procedure or method for determining the cause of a particular patient's breast cancer";

- Dr. Todd M. Tuttle (a surgical oncologist, Chief of Surgical Oncology and Medical Director of the Breast Center at the University of Minnesota): "There is no tested, peer reviewed or published, generally accepted method or technique to determine the cause of a particular woman's breast cancer, other than the identified genetic mutations BRCA1 and BRCA2 which are considered causes in some groups of scientists and doctors";

- Dr. Kent Westbrook (a surgical oncologist and Distinguished Professor of Surgery at the University of Arkansas for Medical Sciences): "There is no method or technique that has been tested, verified, or validated for determining the specific cause of an individual woman's breast cancer."

And so say doctors that have not been retained in this litigation.  As Dr. Stephen Edge, director of breast surgery at the Roswell Park Cancer Institute in New York,[17] put it:

A. There is no test to define the etiology of the cancer.

Q. Of this particular cancer that exists, correct?  There's no test that exists to define—to determine the etiology of breast cancer; is that correct?

A. To be clear so the jury understands, there is no test to define the cause, which is the meaning of the word etiology—

Q. Correct.

A. —there is no test to define the cause of a given breast cancer.

Q. Of any type of given breast cancer, whether it's caused by hormone replacement therapy or any other type of risk factor, correct?

---

[17] Dr. Edge was deposed as the surgical oncologist who treated a Minnesota state court plaintiff, Ms. Zandi.

\*       \*       \*

[A.]    Correct.[18]

The 2007 statement of the American Cancer Society corroborates them all:

> [H]aving a risk factor, or even several, does not mean that you will
> get the disease.  Most women who have one or more breast cancer
> risk factors never develop the disease, while many women with
> breast cancer have no apparent risk factors (other than being a
> woman and growing older).  ***Even when a woman with breast
> cancer has a risk factor, there is no way to prove that it actually
> caused her cancer.***[19]

If such a test existed outside the courtroom, it would surely be written down; if it were

used outside the courtroom, that use would surely be documented in medical records.  However,

defense experts (identified in footnote text by Δ), plaintiffs' experts (identified by π), and

treating doctors (τ) alike maintain that there are no studies or case reports that explain how to

identify the cause of a specific patient's breast cancer,[20] there are no clinical practice guidelines

---

[18]   *See* Deposition of Dr. Stephen Edge (Feb. 6, 2007) ("Edge Dep.") at 141:5-22 (Ex. 17); *see
also id.* at 126:20-127:4.  *See also* Deposition of Dr. Janet H. Sung (Feb. 20, 2007) ("Sung
Dep.") at 59:25-60:5 (excerpts attached as Ex. 18).  Dr. Sung was deposed as the radiologist
who performed a core biopsy on Zandi.

[19]   American Cancer Society, *Detailed Guide: Breast Cancer* at 2 (2007) (emphasis added) (Ex.
2).

[20]   *Rush v. Wyeth* Trial Tr. (Feb. 8, 2007) [*Rush* Docket No. 624] at 2388:2-11 (Test. of Dr.
Edwards (Δ)) ("Q.  Have you ever seen anywhere in a peer-reviewed journal anything that
suggests that a doctor, such as yourself or Dr. Klimberg, can actually determine the cause of
an individual woman's breast cancer?  A.  No, I've never heard that.  Q.  Have you ever
heard at a medical conference a presentation by an expert in the field suggesting that an
individual doctor can identify the cause of breast cancer in an individual woman?  A.  No,
I've never heard that.  And if that talk was listed, you can be assured the room would be
full."); Supplemental Report of Dr. Benjamin Anderson (Δ) (July 20, 2007) ("Anderson
Suppl. Rep.") ¶ 4 (attached as Ex. 19); Levy (Δ) Decl. ¶ 7 (Ex. 12); Ling (Δ) Aff. (Ex. 13);
Deposition of Dr. Peter Gann (π) (Jan. 24, 2006) at 59:2-3 ("[T]hat's not something that we
see in the medical literature. . . .") (excerpt attached as Ex. 20); Layfield (π) *Zandi* Dep. at
57:22-59:6 (Ex. 7); Deposition of Dr. Roland Schwarting (π) (June 29, 2007) ("Schwarting
Dep.") at 82:13-83:2 (excerpts attached as Ex. 21); Waldron (π) Dep. at 366:4-9 (admitting
that there is nothing "in the medical literature that suggests that it is possible to use this

that explain how to do so,[21] and ***they have never written or seen a report or entry in a medical chart stating the cause of an individual's breast cancer***.[22]

The bottom line is that doctors just do not determine the cause of an individual woman's breast cancer, either in the ordinary course of medical practice or in the research setting.[23]  It simply cannot be done.[24]

---

methodology [of differential diagnosis] to accurately identify the cause of breast cancer) (Ex. 9); Deposition of Dr. Howard A. Zaren (π) (July 6, 2007) ("Zaren Dep.") at 205:2-11 (excerpts attached as Ex. 22).

[21]  *See* Arias (Δ) Decl. ¶ 5 ("There are no textbooks, published articles or clinical practice guidelines that set forth a method or process by which to determine the cause of an individual woman's breast cancer.") (Ex. 10); Levy (Δ) Decl. ¶ 7 (Ex. 12); Ling (Δ) Aff. (Ex. 13); Layfield (π) *Zandi* Dep. at 58:23-59:11, 151:1-5 (Ex. 7).

[22]  *See* Tuttle (Δ) Aff. ¶ 11 ("As a result, I routinely see the medical records of other doctors treating my breast cancer patients.  I have never seen a statement identifying HT as the cause of a specific patient's breast cancer.") (Ex. 15); Anderson (Δ) Suppl. Rep. ¶ 4 (Ex. 19); Arias (Δ) Decl. ¶ 7 (Ex. 10); *Rush v. Wyeth* Trial Tr. (Feb. 8, 2007) [Docket No.624] at 2389:6-15 (Test. of Dr. Edwards (Δ)); Levy (Δ) Decl. ¶ 6 (Ex. 12); Ling (Δ) Aff. (Ex. 13); Schwarting (π) Dep. at 14:18-24 (Ex. 21).

[23]  *See* Sung (τ) Dep. at 59:17-24 (Ex. 18); Waldron (π) Dep. at 356:18-23 (Ex. 9); Layfield (π) *Zandi* Dep. at 56:9-19 ("Q. . . . As far as the practice of medicine is concerned, determination of causation of breast cancer, apart from the BRCA1, BRCA2, or perhaps radiation exposure, is just not something that's done; is that true?  A.  For a clinical purpose, that's true.  Q. Okay.  It's not done for a research purpose either, there's not a research purpose or a research program to tell particular patients, 'We have determined the cause of your particular cancer,' apart from the genetic issues?  A.  Not on a single person or patient basis, I would say that's correct.") (Ex. 7); Deposition of Dr. Lester Layfield (π) (Apr. 7, 2006) ("Layfield *Dockter* Dep.") at 74:20-75:9 (excerpts attached as Ex. 23); Stolley (π) Dep. at 40:3-7 (Ex. 8); Deposition of Dr. F. Roy MacKintosh (π) (Aug. 31, 2006) ("MacKintosh Dep.") at 68:7-10, 264:12-17, 358:10-22 (excerpts attached as Ex. 24); Tuttle (Δ) Aff. ¶ 10 (Ex. 15); Arias (Δ) Decl. ¶ 5 (Ex. 10); Anderson (Δ) Suppl. Rep. ¶ 4 (Ex. 19); Deposition of Dr. Mai Brooks (Δ) (Sept. 15, 2006) at 31:19-32:2 (excerpt attached as Ex. 25); Deposition of Dr. Michael Edwards (Δ) (May 19, 2006) ("Edwards Dep.") at 117:25-118:5 (excerpts attached as Ex. 26).

[24]  *See* Sung (τ) Dep. at 50:12-16 (Ex. 18); Deposition of Alexander Vigh (Dec. 11, 2006) at 133:7-14 (excerpt attached as Ex. 27).  Like Dr. Sung, Dr. Vigh was deposed as one of Zandi's treating physicians.

### 2. No scientific means to separate the effect of endogenous hormones and hormone therapy on a breast cancer.

In their non-litigation work, Plaintiffs' experts emphasize that the risk of breast cancer is predominately determined by **pre**menopausal events, including exposure to endogenous hormones. Every woman, before and after menopause, has endogenous hormones—both estrogen and progesterone—naturally circulating through her body. Plaintiffs' experts believe that those endogenous hormones cause or contribute to the risk of breast cancer. As one article coauthored by Plaintiffs' expert, Dr. Colditz, states on the very first page: "Endogenous hormones are a primary cause of breast cancer."[25] Assuming that to be true, for purposes of this motion, Plaintiffs' experts must be able to differentiate (and then rule out) the alleged effect of the hormones in hormone therapy from the alleged effect of a woman's natural hormone levels

---

*See also* Levy (Δ) Decl. ¶ 10 ("There is no way to determine that HRT, or any other risk factor, was the cause of an individual woman's development of breast cancer.") (Ex. 12); Deposition of Avrum Z. Bluming (Δ) (Sept. 15, 2006) at 60:11-14 ("A. I know of no one who could look at a patient with breast cancer and point to a causative agent. Q. Not even a likely causative agent? A. Not even a likely causative agent.") (excerpt attached as Ex. 28).

[25] A. Heather Eliassen et al., *Adult Weight Change and Risk of Postmenopausal Breast Cancer*, 296(2) JAMA 193, 193 (2006) (attached as Ex. 29). Other articles make the same point that premenopausal events primarily determine a woman's risk of breast cancer. *See* Graham A. Colditz & A. Lindsay Frazier, *Models of Breast Cancer Show That Risk Is Set By Events of Early Life: Prevention Efforts Must Shift Focus*, 4 Cancer Epidem., Biomarkers & Prevention 567 (1995) (attached as Ex. 30); Graham A. Colditz, *Hormones and Breast Cancer: Evidence and Implications for Consideration of Risks and Benefits of Hormone Replacement Therapy*, 3 J. Women's Health 347, 348 (1999) ("The rate of breast cancer in postmenopausal women is largely determined by the timing and number of births.") (attached as Ex. 31); Graham A. Colditz, *A Biomathematical Model of Breast Cancer Incidence: The Contribution of Reproductive Factors to Variation in Breast Cancer Incidence*, Accompl. in Cancer Res. 116, 118 (1996) ("The overall magnitude of the risk of breast cancer diagnosis by age 70 is primarily a function of age at first birth and subsequent parity.") (attached as Ex. 32); Susan E. Hankinson et al., *Reproductive Factors and Family History of Breast Cancer in Relation to Plasma Estrogen and Prolactin Levels in Postmenopausal Women in the Nurses' Health Study (United States)*, 6 Cancer Causes & Control 217, 218 (1995) ("Endogenous hormones are considered to play a central role in the development of breast cancer in women . . . .") (attached as Ex. 33).

before menopause, or even by the lower levels that are present after menopause.  Even assuming

that exposure to hormones causes breast cancer, there is no test or procedure to separate the

effect of endogenous hormones from the alleged effect of exogenous hormones.  Dr. Naftalis

admitted this point:

> Q.     Is there any test that you know of that allows you to
>        distinguish the effect of endogenous hormones on a breast
>        cancer as compared to exogenous hormones?
>
> A.     ***There is no test that I am familiar with.***[26]

Plaintiffs' other experts, Drs. Goldfarb and Waldron, also concede the point, further stating that

there is no way to tell to what extent a breast tumor's growth is affected by exposure to

hormones, whether endogenous or exogenous.[27]

> **3.     No physical characteristic or biomarker that distinguishes breast
>          cancers according to their cause.**

Unlike some diseases that have distinctive physical characteristics, there is no known

physical characteristic that distinguishes a breast cancer purportedly caused by hormone therapy.

There is nothing unique or identifiable about the pathological features of a breast tumor which

points to hormone therapy use—no biomarkers, no blood tests, nothing that can be seen on any

slide—in short, no biological "mark of Zorro."[28]  Or as Plaintiffs' expert, Dr. Colditz, has

---

[26]   Naftalis *Dockter* Dep. at 210:10-16 (emphasis added) (Ex. 1); *see also* Naftalis *Trevino* Dep. at 30:11-18 (Ex. 3).

[27]   *See* Waldron (π) Dep. at 330:8-13 (Ex. 9); Deposition of Dr. Paul M. Goldfarb (π) (June 12, 2006) at 197:14-17 ("Just so I'm clear, we can't test a tumor to say this is associated with exogenous hormones versus endogenous hormones; that test doesn't exist?  A.  Not that I'm aware of.") (excerpts attached as Ex. 34).

[28]   *See* Deposition of Dr. Paul Goldfarb (π) (Aug. 17, 2006) at 123:2-10 (excerpt attached as Ex. 35); Layfield (π) *Dockter* Dep. at 83:14-17 ("The findings are not sufficiently specific for any given breast cancer to state backwards, oh, this woman had to be on hormone replacement therapy.") (Ex. 23); *id.* at 85:8-13 ("There are women who have never been on hormone replacement therapy that develop carcinomas of the same histologic appearance as

testified, even though a woman may have multiple risk factors, scientists do not yet "have the

individual markers of exposure at the tumor level to tell individual women which of their factors

caused their cancer."[29]

Dr. Naftalis attaches great weight to the fact that Plaintiffs were diagnosed with ER/PR

positive tumors, claiming that it provides support for her specific-causation opinion.  But as Dr.

Naftalis concedes, the mere presence of the receptors does not answer whether it was

endogenous hormones (over a lifetime) or exogenous hormones (during a few years' use of

hormone therapy) that acted on the receptors:

> Q.    The question was:  Is there anything about the presence of
> those receptors that tells you whether it was influenced by
> natural hormones or hormones from a pill like Prempro?
>
> A.    In her particular case, I believe it was from the exogenous
> hormones, but ***looking at the receptor themselves, I don't
> think you could necessarily tell that***.[30]

---

those that are on hormone replacement therapy. . . . ."); MacKintosh (π) Dep. at 80:2-6,
276:13-20 (Ex. 24); *id.* at 319:11-15 ("Q.  And as we discussed earlier, there's no test or
unique signature finding that you could directly relate to HRT? . . . THE WITNESS:  Not
that I'm aware of."); Deposition of Dr. Lowell W. Rogers (π) (Sept. 7, 2006) at 19:21-24
("Again, you can't look at a patient's slides and—and determine—you can't tell whether or
not they've been on hormones, whether or not hormones affect the tumor in any way.")
(excerpt attached as Ex. 36); Schwarting (π) Dep. at 85:15-18 (Ex. 21); Waldron (π) Dep. at
365:13-19 (Ex. 9); Arias (Δ) Decl. ¶ 8 ("There are no biomarkers, other pathologic, or
clinical features that are unique to breast cancer patients who have taken HRT.") (Ex. 10);
Ling (Δ) Aff. ("There are no clinical or histologic markers to determine if a woman's use of
hormone replacement therapy caused or contributed or affected a woman's breast tumor.")
(Ex. 13).

[29]   Deposition of Dr. Graham Colditz (π) (May 2, 2006) at 182:2-5 (excerpts attached as Ex. 37).
Dr. Colditz observed that, although there is currently "enormous research ongoing to better
characterize tumors with molecular markers," including some experimental assays, the use of
such assays is "not yet standard clinical practice" or approved as the standard of care in the
guidelines of the American Society of Clinical Oncology.  *Id.* at 219:10-222:22.

[30]   Deposition of Elizabeth Z. Naftalis, M.D. (July 9, 2007) ("Naftalis *Mill* Dep.") at 116:22-
117:8 (excerpts attached as Ex. 38) (emphasis added).  Plaintiffs' expert, Dr. Waldron, agrees

This is because, as Dr. Naftalis agrees, the "vast majority" of postmenopausal women diagnosed with breast cancer are diagnosed with ER/PR positive tumors and have ***not*** taken hormone therapy.[31]   Indeed, a study that Dr. Naftalis herself considered in generating her expert report shows that hormone therapy is not more strongly associated with ER/PR positive tumors.[32]   The WHI findings are to the same effect; in terms of the proportion of ER/PR positive tumors that developed, there was no difference between hormone therapy users and the placebo group and no statistically significant increase in the absolute number of such tumors.[33]   As Dr. Tuttle explains:

> The occurrence of an ER/PR positive tumor is not a scientifically accepted sign that the cancer was caused, or influenced in any manner, by HT. . . .  ***Any claim that ER/PR positive status identifies the cause of a tumor or what influenced it during its development is a misrepresentation of what is known, and what remains unknown, about breast cancer.***  There is no scientific consensus, or series of reliable studies, that the percentage of ER/PR positivity in a particular cancer tells us what caused the cancer, or influenced its development in the past.[34]

---

that the fact that a tumor is ER/PR positive is not some objective indication that the tumor was caused by hormone therapy.  *See* Waldron (π) Dep. 76:6-11, 363:24-364:5 (Ex. 9).

[31]   Naftalis *Mill* Dep. at 99:17-24 (Ex. 38); *see also* Naftalis *Trevino* Dep. at 165:4-14 (Ex. 3). Moreover, the percentage of breast cancers that are receptor-positive increases as women get older.  Naftalis *Mill* Dep. at 100:1-8 (Ex. 38).

[32]   *See* Jonas Manjer et al., *Increased Incidence of Small and Well-Differentiated Breast Tumours in Post-Menopausal Women Following Hormone-Replacement Therapy*, 92 Int'l J. Cancer 919, 920 (2001) ("The proportion of ER+ tumours in cases who did not use HRT was 79.8% and in HRT users 78.8%.  The corresponding proportions for PgR+ tumours were 41.4% and 33.3%.") (attached as Ex. 39).

[33]   *See* Deposition of Dr. Paul M. Goldfarb (π) (June 12, 2006) at 231:22-232:16 (Ex. 34); Rowan T. Chlebowski et al., *Influence of Estrogen Plus Progestin on Breast Caner and Mammography in Healthy Postmenopausal Women:  The Women's Health Initiative Randomized Trial*, 289 JAMA 3243, 3250 (2003) (Table 4) (attached as Ex. 40).

[34]   Tuttle (Δ) Aff. ¶¶ 6-8 (emphasis added) (Ex. 15); *see also* Anderson (Δ) Suppl. Rep. ¶ 3 ("Even when a cancer is ER and/or PR positive in a woman taking HRT currently or in the past, this does not prove that the HRT contributed to or caused that particular woman's breast cancer.") (Ex. 19).

In summary, there is no protocol, procedure, principle, or methodology that is generally accepted in the scientific community for determining what caused a particular woman's breast cancer, nor is there any objective clinical data or diagnostic test that can identify hormone therapy as "the" cause (or even "a" cause) of a woman's breast cancer.  What this means is that Dr. Naftalis's methodology has been insulated from the "dispassionate crucible" of the scientific method.[35]  Her opinion that hormone therapy caused Plaintiffs' breast cancer cannot be and has not been validated by any independent methodology, and is not based on any objective test results or hard data—she is guessing.

**B.      Dr. Naftalis's Methodology Has Never Been Peer-Reviewed or Published.**

It should come as no surprise that a methodology that cannot be tested and has never been written down has also never been peer-reviewed or published.  The experts from both sides agree that there is nothing in the medical literature regarding this or any other methodology to determine the specific causation of breast cancer.[36]  Dr. Naftalis admits as much:

> Q.      And your theories of causation, have they been tested, to your knowledge, in any studies?
>
> *          *          *
>
> A.      My professional opinion regarding causation.
>
> Q.      Right.
>
> A.      Has it—is it—
>
> Q.      Has it been subjected to peer review, to your knowledge?

---

[35]  *See Fuesting*, 421 F.3d at 536 ("Such insulation of [her] theory from the dispassionate crucible deeply, if not fatally, compromises [her] testimony's reliability.").

[36]  *See* text accompanying *supra* note 20.

A.    The way I've written it up, no.[37]

## C.    Dr. Naftalis's Methodology Is Not Subject to a Known Error Rate.

Dr. Naftalis acknowledges that she does not know the error rate for her specific-causation "methodology."[38]  There can be no error rate if there is no test, and no way for anyone else to replicate her approach.  This means that there is no guarantee of accuracy when Dr. Naftalis applies her methodology to a particular woman.  Without any means of "scoring" her accuracy, Dr. Naftalis's opinion that hormone therapy caused Scroggin's and Hill's breast cancers is no more than a guess.

WHI found that 38 women per 10,000 developed breast cancer among hormone therapy users versus 30 women per 10,000 in the placebo group.  Plaintiffs' expert, Dr. Austin, testified that a doctor who tried to pick the 8 women whose cancer was associated with hormone therapy would be wrong most of the time.[39]  Dr. Westbrook explained just how wrong—*i.e.*, four times out of five.[40]  Because an opinion with such a high potential rate of error cannot be reliable, this factor, too, weighs heavily against the admission of Dr. Naftalis's testimony.

---

[37]   *See* Deposition of Elizabeth Z. Naftalis, M.D. (July 10, 2007) ("Naftalis *Hill/Scroggin* Dep.") at 194:23-195:16 (excerpts attached as Ex. 41).  By "written it up," she can only mean "written up" in her expert report.

[38]   Naftalis *Dockter* Dep. at 116:8-14 (Ex. 1).

[39]   Deposition of Dr. Donald Austin (π) (Mar. 13, 2007) at 219:12-223:22 (excerpts attached as Ex. 42).  Dr. Austin testified that knowing the estrogen receptor status and the histology of the tumor would not change this fact—one would still be wrong most of the time.  *See id.* at 223:1-11.

[40]   Westbrook (Δ) Aff. ¶ 8 (Ex. 16).  As a matter of statistics, a doctor who claimed that any one of the 38 women developed her breast cancer because of hormone therapy use would be wrong 30 out of 38 times, or approximately 80% of the time.

### D.   Dr. Naftalis's Methodology Is Not Generally Accepted in the Medical Community.

Rule 702's reference to "reliable principles and methods" means that the court must look behind the expert's credentials to determine whether the method and manner by which she has moved from the data to her opinions is established and accepted in the scientific community.  An expert's own "say so" that she is doing what persons in her field routinely do is not enough.[41]

Let us be clear.  There is no dispute that, as regularly used by doctors in clinical practice, the technique of differential diagnosis is an accepted method of identifying a patient's **condition**—whether, for example, an abnormality in the breast can be "diagnosed" as a cyst, benign tumor, breast cancer, another type of malignant tumor, an inflammatory lesion, etc.  But that is not what Dr. Naftalis purports to do here.  Rather, she is purporting to use differential diagnosis as a method of ***assessing causation***—in other words, once the disease has been identified, going further to identify the cause, or etiology, of an individual woman's disease by systematically ruling out all other possible causes.  This litigation methodology may go by the same name, but it is an entirely different animal whose provenance is primarily in the courtroom, not in the real world of medical practice.  It operates in medical practice only when the causes of a disease are known.

A wide spectrum of experts from the most distinguished medical institutions in the country have consistently maintained that the use of differential diagnosis to determine the cause

---

[41]   *See Daubert II*, 43 F.3d at 1316 ("[T]he expert's bald assurance of validity is not enough."); *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 157 (1999) ("Of course, Carlson himself claimed that his method was accurate, but . . . 'nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.'"); *see also Nilson v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 678, 681 (2006) (noting that "[r]egardless of how genuinely a theory is believed by an expert, the passion with which it is believed is no substitute for scientific support").

of a patient's **breast cancer** is not generally accepted in medical or scientific practice, because the cause(s) of most breast cancers is unknown.[42]  Dr. Layfield, one of plaintiffs' experts in this litigation, has testified that he has never heard of the use of differential diagnosis as a method of assessing causation in medical practice,[43] as corroborated by sources who have not been retained by either side in this case.[44]

And there is good reason for this.  As explained by Wyeth's expert, Dr. Rodney F. Pommier, a surgical oncologist and director of breast cancer research at the Oregon Health and

---

[42]  Edwards (Δ) Dep. at 157:15-21 (Ex. 26); *id.* at 158:10-14 ("[Differential diagnosis] says nothing about what caused the pathological entity in the first place.  And until this deposition, I had never heard anybody talk about differential diagnosis in the context of causation."); Deposition of Dr. Robert Langer (Δ) (May 10, 2006) at 194:7-11 ("A differential diagnosis as we use it clinically is quite a bit different from assessing causation.") (excerpt attached as Ex. 43); Anderson (Δ) Suppl. Rep. ¶ 5 (Ex. 19); Arias (Δ) Decl. ¶ 5 (Ex. 10); Stovall (Δ) Decl. ("[It] is not scientifically valid or generally accepted in the medical community that the cause of breast cancer in an individual woman can be identified by the process of eliminating other known risk factors.") (Ex. 14); Levy (Δ) Decl. ¶ 10 (Ex. 12); Tuttle (Δ) Aff. ¶ 12 (Ex. 15); Ling (Δ) Aff. (Ex. 13); Deposition of Dr. Kent C. Westbrook (Δ) (June 8, 2006) at 160:7-161:2 (excerpt attached as Ex. 44).

[43]  *See* Layfield (π) *Zandi* Dep. at 81:12-21 ("Q.  And you use differential diagnosis to determine the diagnosis . . . of a condition or disease? A.  Right.  Q.  You don't use differential diagnosis to determine causation of the disease; is that right?  A.  As—as I think I'm understanding your term 'differential diagnosis,' that would be correct.  Q.  Okay.  And you're not aware that differential diagnosis is a methodology that's used to determine the cause of breast cancer, correct?  A.  As I personally use the term 'differential diagnosis,' that would be correct.  *They're totally different undertakings.*") (emphasis added) (Ex. 7).

[44]  *See* Edge (τ) Dep. at 140:8-19 (Ex. 17); *cf. Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1208 (8th Cir. 2000) (distinguishing the medical definition of "differential"—a determination of "which of two or more *conditions* is the one from which a patient is suffering"—from "the type of *causal* diagnosis which the legal community calls 'differential'"); *Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814, 846 & n.37 (W.D. Tex. 2005) (noting that differential diagnosis in the causation context "is not the typical methodology employed by doctors to diagnose a patient," and that "differential diagnosis is a term more appropriately used to describe the traditional role of doctors in determining a diagnosis for a patient's symptoms, rather than determining a cause of a plaintiff's cancer").

Science University, any attempt to arrive at the cause of an individual patient's breast cancer

through the process of elimination "actually sounds very, very dangerous to me."  That is:

> If—if I were rounding with my chief resident and my medical student and we came across a patient who has yellow jaundice and I could ask them to each generate a differential diagnosis as to what's making the patient jaundiced, *the process is very, very dependent on having a complete list of the causes, and we don't have that with breast cancer*.  And so if you look at the—at the complete list of jaundice, my medical student, you know, with very little experience may only be able to generate a couple of causes on the differential diagnosis, saying, Well, it could either be a Tylenol overdose or gallstones.  And then ask the patient, Did you take Tylenol?  And the patient says, No.  And it's gallstones.
>
> My chief resident could be much more expertise [sic] saying, it could be hepatitis, it could be hydra tetrachloride overdose, it could be pancreatic cancer, and run tests for each one of those and says, The patient has pancreatic cancer.  *And so there's a tremendous difference between having a partial list of eliminating some things and saying it must be this because it's the only thing remaining on your list and having a complete list.*[45]

Other than her own say-so, Dr. Naftalis can offer no proof that it is generally accepted in

the scientific or medical community for a scientist or doctor to determine what caused a

particular woman's breast cancer through differential diagnosis.  She cannot point to a single

documented instance *outside the courtroom* of a doctor using any methodology—let alone

differential diagnosis—to identify hormone therapy as the cause of a woman's breast cancer—

*not* in any medical records, *nor* in any published case report in the entire medical literature,[46] *nor*

in any medical textbooks.[47]  The declarations submitted by Drs. Anderson, Arias, Edwards,

---

[45]  *See Frye* Hr'g Tr., *Coleman et al. v. Wyeth* (Aug. 7, 2006) at 119:19-120:22 (emphases added) (excerpts attached as Ex. 45).  *See also* Westbrook (Δ) Aff. ¶ 9 ("We know that there are unknown risk factors, so, by definition, those could not be ruled out.") (Ex. 16).

[46]  *See* Naftalis *Mill* Dep. at 16:2-11 (Ex. 38).

[47]  *See* Naftalis *Trevino* Dep. at 64:25-66:9 (Ex. 3).  It is futile for Dr. Naftalis to pin her hopes on the DeGowin & DeGowin medical textbook.  *See* Naftalis *Mill* Dep. at 30:22-32:8 (Ex.

Levy, Ling, Stovall, Tuttle, and Westbrook constitute overwhelming proof that her method is ***not***

generally accepted.  "When a scientist claims to rely on a method practiced by most scientists,

yet presents conclusions that are shared by no other scientist, the district court should be wary

that the method has not been faithfully applied."[48]

### E.    Dr. Naftalis's Methodology Was Developed for Litigation.

Dr. Naftalis claims that she determines the cause of specific patients' breast cancer in her

medical practice on a routine basis.  Yet in five years' worth of weekly tumor boards, she cannot

recall a single instance in which she or any of her colleagues discussed a case where hormone

therapy was determined to be the cause of a patient's breast cancer.[49]  Nor can she recall a single

instance in which she or any other colleague presented a breast cancer case at an association

meeting and pinpointed hormone therapy as the cause.[50]  She cannot think of ***any*** professional

setting where she announced that to her peers.[51]

---

38).  That textbook only discusses how to identify the disease condition that is causing the
plaintiff's symptoms, not the etiology of her disease.  *See, e.g.*, DeGowin & DeGowin's
Bedside Diagnostic Examination at 4 (5th ed. 1987) ("The examiner maintains an *imaginary
slate* upon which the names of the diseases are inscribed that are considered as hypothesis for
the diagnosis. . . The attributes found in the patient are matched with those of the hypothetic
disease on the imaginary slate.  The best match is selected as *the diagnosis* of the patient.")
(excerpts attached as Ex. 46); *id.* at 10 ("*Diagnostic Examination.*  This procedure is much
less routinized, more searching, has symptoms as clues, and starts with the problem of
*finding a disease that is causing discomfort or dysfunction.*").  When a patient's symptom is
a breast mass, the "imaginary slate" includes the following diseases:  cyst, fibroadenoma,
chronic breast abscess, fat necrosis of the breast, tuberculosis of the breast, galactocele,
carcinoma, acute mastitis, acute abscess of the breast, inflammatory breast carcinoma, and
juvenile mastitis.  *See id.* at 262-65.

[48]   *See Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

[49]   *See* Naftalis *Mill* Dep. at 11:24-15:5 (Ex. 38)

[50]   *See id.* at 15:10-16:1.

[51]   *See id.* at 16:12-18 ("Q. . . . Okay.  Is there any professional situation in which you have
announced to your peers, 'Here's a case caused by HRT?' . . . A.  There is not a professional

The same goes for her teaching.  Dr. Naftalis cannot recall ever telling her students, fellows, or residents that a patient's breast cancer was caused by hormone therapy.[52]  Nor can she recall ever teaching her students that hormone therapy was a "cause" of breast cancer.[53]

Importantly, there is no evidence that Dr. Naftalis actually performs differential diagnosis in the manner she claims.  Despite having treated thousands of breast cancer patients in her clinical practice, she testified that she has "probably" never recorded her opinion of what caused a patient's breast cancer[54]—***not once***:

> Q.    . . . Did you ever—in all—you must have treated thousands of breast cancer patients in the course of your clinical practice, right?
>
> A.    That's correct.
>
> Q.    In any one of those, did you ever write in the patient's chart or in a report to a treating physician or a referring physician, "Cause of breast cancer, hormone replacement therapy," or, "Breast cancer, secondary to hormone replacement therapy?"
>
> MR. JENNER:  Objection.
>
> A.    ***Not that I can recall***.
>
> Q.    . . . Okay.  So would it be fair for me, then, to conclude that the only time you have ever written a medical report of any kind in which you have concluded, "Cause of breast cancer, hormone replacement therapy," is in the course of this litigation?

---

setting that I could think of where I announced that.").  Dr. Naftalis subsequently claimed that she had had such discussions with colleagues outside of the lecture setting.  *See id.* at 22:4-24:9.  However, this testimony remains uncorroborated; Plaintiffs must come forward with affidavits or other evidence sufficient to meet their burden.

[52]    *See id.* at 16:19-17:11.

[53]    *See id.* at 17:23-18:7.

[54]    *See* Naftalis *Trevino* Dep. at 62:16-18, 64:3-12 (Ex. 3).

MR. JENNER:  Objection.

A.      That would—*that would probably be correct if you're
        talking about writing*.  Not that it didn't occur to me when
        I was seeing patients that hormone therapy was a cause of a
        patient's breast cancer.

Q.      . . . So the answer to my question is that *other than in the
        course of this litigation, after having been retained by
        plaintiffs' lawyers, you have never written "Cause of
        breast cancer, hormone replacement therapy"*?

MR. JENNER:  Objection, asked and answered.

A.      I wouldn't say never, but *not that I recall*.[55]

        The fact that this litigation is the only instance in which Dr. Naftalis can recall having

reached and recorded the conclusion that hormone therapy caused a particular woman's breast

cancer suggests that her opinions are the result of a methodology that has been custom-made for

this litigation, and should weigh heavily against a finding of reliability.[56]

## II.     DR. NAFTALIS DOES NOT RELIABLY APPLY HER METHODOLOGY TO THE RELEVANT FACTS.

        Even if differential diagnosis were a theoretically sound methodology for determining

specific causation in a breast cancer case, Dr. Naftalis did not perform a scientifically sound

---

[55]    *See* Naftalis *Mill* Dep. at 26:18-28:5 (emphasis added) (Ex. 38).

[56]    *See Nelson v. Am. Home Prods. Corp.*, 92 F. Supp. 2d 954, 967 (W.D. Mo. 2000) (noting "at
        the outset that in determining the reliability of a proffered expert's opinion, courts have
        discounted the reliability of experts who formed their opinions only within the context of
        litigation"); *Metabolife Int'l, Inc. v. Wornick*, 72 F. Supp. 2d 1160, 1168-69 (S.D. Cal. 1999)
        (holding expert evidence unreliable and inadmissible after noting that all experts except one
        formed their opinions after having been hired as expert witnesses), *aff'd in part, rev'd in
        part*, 264 F.3d 832 (9th Cir. 2001); *Braun v. Lorillard Inc.*, 84 F.3d 230, 235 (7th Cir. 1996)
        (noting that *Daubert* discourages "the hiring of reputable scientists . . . to testify for a fee to
        propositions that they have not arrived at through the methods . . . they use when they are
        doing their regular professional work rather than being paid to give an opinion helpful to one
        side in a lawsuit"); *Daubert II*, 43 F.3d at 1317 ("That an expert testifies based on research
        he has conducted independent of the litigation provides important, objective proof that the
        research comports with the dictates of good science.").

differential diagnosis with respect to either Plaintiff.  In the first place, Dr. Naftalis failed to "rule in" short-term hormone therapy as a potential cause of Hill's breast cancer.  That is, she simply assumes that short-term use of hormone therapy (less than five years) can cause breast cancer. Second, rather than systematically ruling out Plaintiffs' known risk factors, she either eliminates them based on unsupported assumptions (as with obesity, nulliparity, and family history of breast cancer), or she ignores them (as with the "X" factor(s), age, endogenous hormones, and breast density).  "An expert opinion that fails to consider the relevant facts of the case is fundamentally unsupported" and so "can offer no assistance to the jury" and "must be excluded."[57]

### A.    Dr. Naftalis Did Not "Rule In" Short-Term Hormone Therapy.

Before Dr. Naftalis can perform a differential diagnosis, she must first "rule in" the potential causes.[58]  That is, one does not reach specific causation until general causation is established.  Plaintiffs cannot do so for short-term hormone therapy use (less than five years). For that reason, Dr. Naftalis fails to provide a valid scientific basis for "ruling in" short-term hormone therapy as a potential cause of Hill's breast cancer.

---

[57]  *See Neb. Plastics, Inc. v. Holland Colors Ams., Inc.*, 408 F.3d 410, 416 (8th Cir. 2005); *see also Nelson*, 92 F. Supp. 2d at 970.  "Even a theory that might meet certain *Daubert* factors, such as peer review and publication, testing, known or potential error rate, and general acceptance, should not be admitted if it does not apply to the specific facts of the case." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000) (noting that "[n]ot all relevant circumstances were incorporated into the expert's method of analysis related to antitrust liability," because the expert's analysis "ignored inconvenient evidence").

[58]  *See Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001) (per curiam) (agreeing with district court's exclusion of differential diagnosis because "[t]he data and methods of plaintiffs' experts are not scientifically valid bases" for "ruling in" a specific medication as a potential cause of intra cerebral hemorrhage); *see also Cano*, 362 F. Supp. 2d at 846 ("A differential 'diagnosis' in the causation context involves first 'ruling in' the potential causes for a patient's condition to a list of possible causes and second involves a 'ruling out' process in which one attempts to narrow down the possible causes to the most likely cause or causes.").

Hill was prescribed hormone therapy from December 1995 until September 1998, when she was diagnosed with breast cancer.  Thus, she used hormone therapy for no more than three years and nine months.  Dr. Naftalis admits that "[t]he epidemiologic studies tend to show that it's **five years** of use or greater when you see a cancer on a mammogram or when a cancer is diagnosed."[59]  The WHI study found no increased risk of breast cancer with less than five years' use of hormone therapy.  (A full elaboration of the argument why Plaintiffs cannot establish a reliable scientific basis for general causation involving short-term use is set forth in Wyeth's *Daubert* Motion to Exclude Testimony that Short-Term Hormone Therapy Use Can Cause Breast Cancer.)

## B. Dr. Naftalis Did Not Reliably "Rule Out" Other Alternative Explanations.

In *Turner v. Iowa Fire Equipment Co.*, 229 F.3d 1202 (8th Cir. 2000), the Eighth Circuit held that while "a causation opinion based upon a proper differential diagnosis (one that systematically rules out other possible causes) satisfies *Daubert*," the district court did not abuse its discretion in excluding the doctor's testimony because he "***did not systematically rule out all other possible causes***."[60]

*Turner* requires the exclusion of Dr. Naftalis's proposed testimony.  In the first place, she cannot rule out the significant probability that unknown "X" factor(s) caused Plaintiffs' breast

---

[59]   Naftalis *Dockter* Dep. at 315:23-316:2 (emphasis added) (Ex. 1).

[60]   *Turner*, 229 F.3d at 1208 (emphasis added) (affirming summary judgment based on the trial court's exclusion under *Daubert* of the deficient differential diagnosis by the plaintiff's doctor).

cancers.  Second, Dr. Naftalis failed to rule out a number of identified risk factors with respect to both Plaintiffs, rendering her opinions faulty and unreliable.[61]

### 1.    The "X" Factor(s)

There are some diseases for which medical science has advanced to the point of identifying the universe of possible causes.  For those diseases, differential diagnosis may be a sufficiently reliable method of determining specific causation.  Breast cancer is not one of them.  As is generally accepted, and as Dr. Naftalis and other plaintiffs' experts agree, despite the identification of a number of risk factors for breast cancer, scientists and doctors are far from knowing what causes it.[62]  Wyeth's expert, Dr. Pommier, explained:

> ***There's no complete list of causes for breast cancer****. . . .*  There might be some diseases like tuberculosis where that's the diagnosis and you can say, Yes, it's the tubercle bacillus that causes that, an infection.  ***But in cases where we don't know what causes the disease, the differential diagnosis does nothing to tell us the cause.***[63]

How do we know that the list of the causes of breast cancer is incomplete?  All the experts agree that a woman is at an increased risk of breast cancer simply because she is female and at the age of menopause (with increasing risk as she grows older).[64]  Beyond age and gender,

---

[61]   *Cf. Redfoot v. B.F. Ascher & Co.*, No. C 05-2045 PJH, 2007 U.S. Dist. LEXIS 40002, at *37 (N.D. Cal. June 1, 2007) (noting that the expert's differential diagnosis "is incomplete, because he did not rule out the unspecified cause of dysgenesis").

[62]   *See* Naftalis *Hill/Scroggin* Dep. at 68:12-69:1 (Ex. 41).  *See, e.g.*, Jordan (π) Dep. at 373:7-10 ("It is clear to me in my professional opinion that if we knew what caused breast cancer, we wouldn't be here today.") (Ex. 5); MacKintosh (π) Dep. at 385:3-12 (Ex. 24); Waldron (π) Dep. at 71:1-5 (Ex. 9).

[63]   *See Frye* Hr'g Tr., *Coleman et al. v. Wyeth* (Aug. 7, 2006) at 120:18-121:10 (Ex. 45) (emphases added).

[64]   *See* Deposition of Dr. Mariann Harrington (plaintiff Linda Reeves's treating doctor) (May 5, 2006) at 31:21-32:1 (excerpt attached as Ex. 47); Deposition of Dr. Karen Kozlowski (plaintiff Helene Rush's treating doctor) (Jan. 6, 2006) at 34:8-35:1 (excerpt attached as Ex.

*most* post-menopausal women (50-70%) who develop breast cancer have no known risk

factors.[65]  That is to say, for most women, science does not know what causes their breast

cancers.  Age and gender—and the unknown cause(s) which they represent—are risk factors that

*cannot be eliminated* as part of a differential diagnosis.  That unknown is the "X" factor (or

factors).[66]  In the words of plaintiffs' expert, Dr. Layfield:

> We are always hopeful that we can find something that explains a
> sizeable proportion of causation for breast cancer.  As I pointed
> out, to date we've been unsuccessful.  ***And indeed breast cancer,
> in my professional opinion, is a very heterogeneous disease that
> has a variety of causes***.  Some of which will be germ line
> mutations, some of which will be environmental, and some of
> which I can't speculate upon at all.[67]

That view is mainstream science, as evidenced by the American Cancer Society's statement that,

"[a]lthough we know some of the risk factors linked to breast cancer, we do not yet know what

causes *most* breast cancer."[68]

---

48); Westbrook (Δ) Aff. ¶¶ 4-5 (Ex. 16); Deposition of Dr. Klim McPherson (π) (Mar. 9, 2006) ("McPherson Dep.") at 325:20-326:20 (excerpt attached as Ex. 49).

[65]  *See* Edge (τ) Dep. at 124:1-5 (estimating that, leaving out age as a risk factor, anywhere from 50 to 70% of women who are diagnosed with breast cancer have no identifiable risk factors) (Ex. 17); *Rush v. Wyeth* Trial Tr. (Feb. 7, 2007) [*Rush* Docket No. 593] at 2153:7-9 (Test. of Dr. Klimberg (π) acknowledging that "75 percent of women who get breast cancer have no risk factors"); Zaren (π) Dep. at 98:12-99:24 (Ex. 22) (testifying that other than age and gender, "[p]robably only 40 percent of the women who come to see me have any risk factors.").

[66]  Breast cancer is a complex, multifactorial process, many aspects of which are not yet clearly understood.  *See* Deposition of Dr. Nigel J. Bundred (π) (Jan. 17, 2006) at 126:10, 127:21 (excerpts attached as Ex. 50); Arias (Δ) Decl. ¶ 4 (Ex. 10); Anderson (Δ) Suppl. Rep. ¶ 5 (Ex. 19); Levy (Δ) Decl. ¶ 5 (Ex. 12).

[67]  Layfield (π) *Dockter* Dep. at 130:24-131:7 (Ex. 23) (emphasis added).

[68]  American Cancer Society, *Overview:  Breast Cancer, Can Breast Cancer Be Prevented?* (Rev. 2006) (emphasis added) (attached as Ex. 51); *see also* Levy (Δ) Decl. ¶ 9 ("For as many risk factors that are recognized, there are likely scores of other risk factors not yet known.  Science discovers new ones every day.") (Ex. 12); *Nelson v. Wyeth* Trial Tr. (Sept.

Dr. Naftalis herself believes that there may be other, unknown causes of breast cancer, including "something else in the environment that we haven't identified yet,"[69] and including an unknown familial gene that may cause 10 to 15% of hereditary breast cancers.[70]  The potential role of unknown factors has been confirmed by other plaintiffs' experts.[71]  And herein lies the rub:  ***Dr. Naftalis cannot reliably rule out what is unknown***.  She cannot, in other words, eliminate these "X" factors as part of her differential diagnosis.[72]  In fact, she conceded as much with respect to a number of unknown growth factors that influence the growth of breast tumors:

> Q.    Would you agree that there are a number of growth  factors
>        other than estrogen receptors and progesterone receptors
>        that influence the growth of breast tumors?
>
> A.    There—***there are some other factors, and some factors
>        that we—we're not even sure about***.
>
>                  *        *        *
>
> Q.    Did you do anything to attempt to determine are there other
>        growth factors that could be affecting the growth of her
>        tumor?
>
> A.    That—that's not something that is commonly done or
>        typically done with breast tumors.
>
> Q.    Can it be done?

---

21, 2006) at 37:17-22 (Test. of Dr. Lewis Chodosh (Δ)) (testifying that when it comes to the causes of breast cancer, "the reality is:  What we don't know dwarfs what we know.") (excerpt attached as Ex. 52).

[69]   *See* Naftalis *Dockter* Dep. at 119:18-120:23 (Ex. 1).

[70]   *See id.*

[71]   *See* MacKintosh (π) Dep. at 432:2-14 (agreeing that "it is possible that there are unknown factors" that contributed to plaintiffs' development of breast cancer) (Ex. 24).

[72]   Most women who take hormone therapy do not develop breast cancer.  For the minority who do develop breast cancer, medical science has no way of telling whether hormone therapy or other risk factors that may be present played any role or whether an unknown "X" factor must be deemed the cause.

A.    It is done in experimental labs, and the information is still a
      little bit unclear as to what to do with that information.[73]

In two recent opinions, federal courts have affirmed the common-sense principle that

differential diagnosis cannot be used to prove the cause of an individual's disease where an

expert cannot eliminate an unknown cause of the disease (in those cases, autism).  In both cases,

the plaintiff's expert, Dr. Geier, purported to conduct a differential diagnosis to prove that the

cause of the plaintiff's autism was thimerosal:  for example, "he relied upon the medical records

and testimony of Minor Child Doe's treating physicians, as well as some specific genetic testing

that he performed, in order to rule out other possible causes of Minor Child Doe's autism."[74]

The District Court for the Middle District of North Carolina granted the defendant's *Daubert*

motion to exclude Dr. Geier's testimony, explaining:

> More troubling . . . is that Dr. Geier's differential diagnosis failed
> to acknowledge the one conclusion that is generally accepted in the
> medical community with respect to the causation of autism, which
> is, that its cause is genetic, but that the exact genetic sequence of
> autism is unknown. . . .  Although Dr. Geier apparently has
> considered a number of specific genetic disorders in performing
> his differential diagnosis, the Court finds that ***his failure to take
> into account the existence of such a strong likelihood of a
> currently unknown genetic cause of autism serves to negate Dr.
> Geier's use of the differential diagnosis technique as being
> proper*** in this instance.[75]

---

[73]   Naftalis *Trevino* Dep. at 80:4-81:5 (emphasis added) (Ex. 3).

[74]   *Doe 2 v. Ortho-Clinical Diagnostics, Inc.*, 440 F. Supp. 2d 465, 476 (M.D.N.C. 2006).

[75]   *Id.* at 477-78 (emphasis added) (citations omitted).

Likewise, the District Court for the Northern District of California held that "Dr. Geier's differential diagnosis is faulty because he failed to consider one specific alternative explanation—*that the cause of autism is not known today*."[76]

Just so here. In that 50-70% of menopausal women who developed breast cancer have no known risk factors other than their age and gender, Dr. Naftalis failed to consider the "high probability" that an unknown cause "cannot be ruled out as the specific cause"[77] of Plaintiffs' breast cancer. Because "there is simply too great an analytical gap between the data and the opinion proffered,"[78] Dr. Naftalis's proposed testimony must be excluded.

### 2.     First-Degree Relative and Other Risk Factors

Even if the universe of risk factors for breast cancer were known and it were possible to perform a differential diagnosis that ruled out all the explanations but one, Dr. Naftalis's approach would not survive scrutiny under *Daubert*. Her approach to ruling out alternative explanations is inconsistent and unsupported by hard science. Her treatment of the heightened risk associated with having a first-degree relative (e.g., mother, sister) with breast cancer is typical of her "breezy" dismissal of alternative explanations.

---

[76]   *See Redfoot*, 2007 U.S. Dist. LEXIS 40002, at *37 (emphasis added). Similarly, in *Cano*, 362 F. Supp. 2d at 846, the court held that the expert's differential diagnosis methodology was faulty. Among other things, the court noted: "In fact, given that Dr. Dollinger does not appear to consider the fact that some cancers are due to unknown origins, *it is possible that none of the possible causes he lists was an actual cause*." *Id.* (emphasis added) (footnote omitted).

[77]   *See Doe*, 440 F. Supp. 2d at 478 (concluding that Dr. Geier did not properly perform differential diagnosis due to his "failure to consider within his analysis the high probability that an unknown genetic cause cannot be ruled out as the specific cause of Minor Child Doe's autism").

[78]   *See G.E. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Dr. Naftalis testified in the past that "[i]f there were a family history of breast cancer, ***especially a first degree relative***, that would be contributory toward her underlying risk."[79] Scroggin's mother, a first-degree relative, had breast cancer.  But Dr. Naftalis purports to rule out the possibility that Scroggin is genetically predisposed to developing breast cancer based on the fact that she is not a ***known*** gene carrier.[80]  This reasoning is not sound for two reasons.  First, the same can be said for most women who develop breast cancer and have first-degree relatives with breast cancer.  Second, because science has not yet discovered all the causes of breast cancer—and Dr. Naftalis herself believes that 10-15% of hereditary breast cancers may be explained by as-yet ***unknown*** genes[81]—the fact that Scroggin is not a known gene carrier is an insufficient basis for ruling out the possibility that hers is a case of hereditary breast cancer.

This result-driven approach is also true of Dr. Naftalis's treatment of obesity, nulliparity, age, endogenous hormones, and breast density.  She rules them out with little more rigor than a shopper saying, "I don't like that dress."  By failing to rule out alternative explanations, Dr. Naftalis did not connect her theory of specific causation with the facts of each case.

### Conclusion

There is a reason why the Court has not been shown a patient's medical chart with the notation, written by the gynecologist or breast surgeon or oncologist:  "Breast cancer secondary to hormone therapy" or "Hormone therapy-induced breast cancer."  In the real world of medicine, where doctors must earn the respect of their colleagues and owe a duty of candor to

---

[79]   *See* Naftalis *Dockter* Dep. at 221:17-22 (Ex. 1) (emphasis added).

[80]   *See* Naftalis *Hill/Scroggin* Dep. at 69:18-21 (Ex. 41).

[81]   *See* text accompanying *supra* notes 69-70.

patients, they do not claim to know what causes a particular patient's breast cancer and do not tell patients: "Your breast cancer was caused by taking hormone therapy."

No matter how strongly Dr. Naftalis believes in her own ability to assess the cause of a particular patient's breast cancer through differential diagnosis, the facts are that (i) no one knows what causes breast cancer; (ii) outside of the courtroom, differential diagnosis is not used to assess causation of an individual's breast cancer; (iii) there is no way of testing or validating Dr. Naftalis's methodology; and (iv) Dr. Naftalis fails to account for alternative possible causes of Hill and Scroggin's breast cancers.

As one federal court put it:

> What the scientific community will in the course of time prove or disprove remains to be seen, but asking a lay jury to do what science has yet to do, and may never do, would be clearly inappropriate. It may well be, as defendants' experts suggest, that science has overtaken plaintiffs' theory of causation; or, perhaps, the ongoing studies will provide critical evidence to establish a connection. But the trial court is no place for pure theory, hypothesis, or even sincerely held opinion. And, for the moment at least, that is all plaintiffs are in a position to offer. Accordingly, the defendant is entitled to judgment in its favor.[82]

Respectfully submitted,

/s/     F. Lane Heard III
John W. Vardaman, Jr.
Stephen L. Urbanczyk
F. Lane Heard III

WILLIAMS & CONNOLLY LLP
725 12th Street, NW
Washington, DC 20005-5901
(202) 434-5000

---

[82] *Colon v. Abbott Labs.*, 397 F. Supp. 2d 405, 418 (E.D.N.Y. 2005) (granting summary judgment for defendant where plaintiff alleged that infant formula caused Type I diabetes).

Lyn P. Pruitt, Bar No. 84121

MITCHELL, WILLIAMS, SELIG, GATES &
WOODYARD, PLLC
425 West Capitol Avenue, Suite 1800
Little Rock, AR 72201-3525
(501) 688-8800
*lpruitt@mwsgw.com*

*Attorneys for Wyeth*

DATED:  August 15, 2007

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of August 2007 a true and correct copy of the

foregoing Memorandum in Support of Wyeth's *Daubert* Motion to Exclude Expert Testimony of

Dr. Elizabeth Naftalis was electronically filed with the Clerk of Court using the CM/ECF system

and a true and correct copy was forwarded by e-mail and first-class mail, postage prepaid, to the

parties listed below.

Joshua H. Brockman
Zoe B. Littlepage
Littlepage Booth - Houston
1012 West Alabama Street
Houston, TX 77006
Email: josh@littlepagelaw.com
      zoe@littlepagebooth.com

Jay Phillip Mayesh
Steven J. Glickstein
Alan E. Rothman
Kaye Scholer, LLP
425 Park Avenue
New York, NY 10022-3598
Email: maoedar@kayescholer.com
      arothman@kayescholer.com

Kevin A. Crass
Elizabeth Robben Murray
Friday, Eldredge & Clark, LLP
400 West Capitol Avenue, Suite 2000
Little Rock, AR 72201-3493
Email: crass@fec.net
      murray@fec.net

 

/s/     F. Lane Heard III
F. Lane Heard III

WILLIAMS & CONNOLLY LLP
725 12th Street, NW
Washington, DC 20005-5901
(202) 434-5000
*lheard@wc.com*