## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

| | | |
|---|---|---|
| In re: | § | MDL Docket No. 4:03-cv-1507 WRW |
| | § | |
| PREMPRO PRODUCTS LIABILITY | § | |
| LITIGATION | § | *Scroggin v. Wyeth*, 4:04-cv-1169 WRW |
| | § | |
| | § | *Hill v. Wyeth*, 4:05-cv-546 WRW |

## PLAINTIFFS' OPPOSITION TO
## WYETH'S MOTION TO LIMIT THE TESTIMONY OF
## DR. DONALD AUSTIN

Wyeth[1] inappropriately moves to limit the testimony of Dr. Donald Austin on the following three issues: (a) Dr. Austin's opinion that combination hormone therapy (which is estrogen plus progestin or "E+P") causes breast <u>cancer if based on ecological data alone</u>; (b) Dr. Austin's opinion that E+P promotes breast cancer by causing abnormal cells or benign lesions to progress into breast cancer; and (c) Dr. Austin's opinion that it was discoverable, since 1981, through review of cancer registry databases that hormone sensitive tumors were increasing in this country in line with the increase in E+P sales (as best shown by the lobular signal (ILC) that is apparent in those databases). Dr. Austin is among the world's most renowned epidemiologists and researchers on cancer issues. He is well qualified to offer these opinions and such opinions are based upon solid foundation and methodology. Wyeth does not even attempt to challenge Dr. Austin's credentials. Wyeth's challenges on his conclusions should be denied.

---

[1] This response refers to Wyeth because Wyeth filed the motion at issue. Pfizer filed a document purporting to join in the motion, <u>after</u> the deadline for such motions had passed, and <u>after</u> the Court had admonished the parties to refrain from post-deadline filings. Were the Court to nonetheless deem Pfizer's joinder valid, this response applies equally to Pfizer, and the actions Plaintiff claims Wyeth should have taken are actions Pfizer should have taken as well.

## I.   LEGAL STANDARD FOR ADMISSION OF EXPERT TESTIMONY

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which states that an expert may testify on scientific, technical or other specialized subjects if the testimony would assist the fact finder in understanding the evidence or determining a fact issue. "A district court is vested with broad discretion in determining whether a proffered expert is qualified to testify on a given subject under Fed.R.Evid. 702." *Baker v. McCoy*, 739 F.2d 381, 385 (8ᵗʰ Cir. 1984).   Rule 702 reflects an attempt to liberalize the rules governing the admissibility of expert testimony. *See Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 686 (8ᵗʰ Cir. 2001) (highlighting the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to "opinion testimony'). In fact the Eighth Circuit has confirmed that Fed. R. Evid. 702 "is [a rule] of admissibility rather than exclusion." *Lauzon*, 270 F.3d at 686. The standard is a flexible one.[2]   "There is no requirement 'that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness.'"[3]

The focus of the inquiry is not on the result or the conclusion reached by the expert, but on the methodology the expert employed. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). The proponent need not prove that the expert's testimony is correct, but only that the methodology used by the expert was proper.   In satisfying its gatekeeper duty, the court should examine the expert's qualifications and the methodology he used in reaching his opinions, rather than attempt to determine the accuracy of the conclusion reached.

---

[2] *Sorensen By and Through Dunbar v. Shaklee Corp.*, 31 F.3d 638, 648 (8ᵗʰ Cir. 1994).

[3] *Bonner v. ISP Tech., Inc.*, 259 F.3d 924, 929 (8ᵗʰ Cir. 2001).

## II.   SIMILAR CHALLENGES HAVE EITHER NOT BEEN MADE OR HAVE BEEN REJECTED

In just the last few months, Wyeth has filed challenges to Dr. Austin in a New Jersey state court case (*Deutsch v. Wyeth*) and various Reno state court cases, consolidated for trial (*Forrester, Scofield and Rowatt v. Wyeth*). Wyeth did not challenge Dr. Austin's ability to opine on breast cancer causation or his opinions on the strength of ecological data in either venue. In the Reno cases, where Wyeth's brief was filed just weeks ago, Wyeth also did not challenge Dr. Austin's qualifications to discuss the progression of breast cancer even though he is not a cell biologist.[4] Dr. Austin was worthy of only three pages of briefing challenges relating solely to his testimony about the lobular signal. Yet, here, Wyeth employs the "kitchen sink" strategy.

Shortly before the *Rush* trial, Dr. Austin issued two supplemental reports. While Wyeth argued that such reports were untimely for that trial because they contained new causation opinions in addition to his prior liability-only opinions, those reports are not untimely for these upcoming cases and Wyeth does not make such an objection. Dr. Austin has been deposed on those reports and has even testified at trial as to those opinions.[5]

## III.   QUALIFICATIONS AND METHODOLOGY

Wyeth has not raised any substantive arguments regarding Dr. Austin's qualifications, but rather focused its challenge on limited aspects of Dr. Austin's opinions. Dr. Austin is a physician and epidemiologist. He is a Professor in the Department of Public Health and Preventive Medicine at the Oregon Health & Science University in Portland, Oregon. Previously, he worked for 22 years for the California Department of Health Services, where he

---

[4]      Exhibit 1 - See Wyeth's Motion to Exclude Generic Medical Testimony of Dr. Graham Colditz and Dr. Don Austin, *p. 10-12.*

[5]      See generally Dr. Austin's trial testimony in the *Daniel v. Wyeth* and *Nelson II v. Wyeth* (discussed in greater detail below) where Dr. Austin provided causation opinions based upon ecological as well as epidemiological data.

designed and operated cancer surveillance systems and used them for descriptive and analytic epidemiologic studies. Most importantly, Dr. Austin was one of the scientists who developed this country's largest cancer surveillance database, known as the SEER database (Surveillance Epidemiology and End Results). Dr. Austin has also been involved in national studies of cancers and their risk factors and has served on NIH peer review panels. He is eminently qualified to address the epidemiology issues presented in this litigation.[6]

Of particular note, Dr. Austin studied the issue of endometrial cancer and its link to the use of Premarin in the 1970s. Dr. Austin's data was presented to the FDA, along with three case control studies showing that use of unopposed estrogen drugs was a strong risk factor for endometrial cancer. These findings led the FDA to require new class labeling to warn of the risk. Afterwards, Dr. Austin published a follow-up study, which showed that the overall endometrial cancer incidence decreased once physicians were aware of the connection between unopposed estrogen and endometrial cancer.[7] Dr. Austin's study concluded that estrogen was a promoter of endometrial cancer.

Since that time, Dr. Austin has continued his interest in cancers as well as the impact of hormone therapy on cancer. As outlined in his supplemental reports, Dr. Austin has reviewed dozens of studies in support of his general causation opinions.[8] Dr. Austin's three expert reports and trial as well as deposition testimony is based on his extensive background, knowledge and research, as well as several lines of evidence, including Wyeth own documents, textbooks, peer

---

[6]    Exhibit 2 - Curriculum Vitae of Dr. Donald Austin.

[7]    Exhibit 3 - Austin & Roe, "The decreasing incidence of endometrial cancer: public health implications," 72 AM. J. PUB. HEALTH 65-68 (Jan. 1982).

[8]    Exhibit 4 - Supplemental report of Dr. Don Austin (Dated: 12/06) and Exhibit 5 - Supplemental report of Dr. Don Austin (Dated: 1/07).

reviewed published medical articles, position statements from groups such as the International Agency for Research on Cancer (IARC) as well as a significant number of epidemiological and ecological studies. Wyeth has not challenged the underlying methodology for Dr. Austin's general causation opinions, or the material he has relied upon.

## IV.     Challenged Opinion # 1: Dr. Austin's Opinion that E+P Causes Breast Cancer

Wyeth first challenges the admissibility of Dr. Austin's opinion that E+P can cause breast cancer, generally.  Critically, Wyeth <u>concedes</u> that Dr. Austin on causation is admissible, so long as it is based on epidemiological studies as well as ecological data.  Wyeth writes:

> To the extent that Dr. Austin bases his [causation] opinions on such ecological data in addition to reliable epidemiological data, Wyeth does not challenge the opinions.[9]

Dr. Austin's opinions are based on ecological data coupled with extensive epidemiological observation studies and the WHI.[10]  Thus, even under Wyeth's restrictive view, by Wyeth's own admission, Dr. Austin's opinions pass muster.

After making this concession, Wyeth cites to the Court's opinion from *Rush* v *Wyeth* where such opinion testimony was excluded because Ms. Rush (like Mrs. Reeves) had conceded in the 2006 *Daubert* hearing that, at that time, Dr. Austin was not offering any causation opinions. Indeed, Dr. Austin had not even been asked to address causation at that point – merely to opine about the lobular signal (a liability issue).

The same is **not** true of Ms. Scroggin and Ms. Hill.  These Plaintiffs do intend to offer causation opinions from Dr. Austin, have provided supplemental expert reports to support that opinion and have presented Dr. Austin again for deposition on those opinions.  These Plaintiffs

---

[9]     Wyeth's Memorandum ("Memo") at 3-4.

[10]    Exhibit 5 - Austin Supplemental Report (January 2007) at 1-6.

cannot (and should not) be held to the extent of Dr. Austin's liability opinions in February of 2006 when Dr. Austin's initial report was filed. Since then, Dr. Austin has reviewed a host of additional materials, including dozens of newly published medical articles which support his causation opinion.

When Dr. Austin wrote his initial report dated February 16, 2006, he did not have the 2003 SEER data on breast cancer incidence, which is the first year of data showing a dramatic fall in hormone-dependent breast cancer rates in post-menopausal women. This fall in cancer rates aligned directly with a similar large drop in prescriptions of Wyeth's E+P drugs. Thus his first report focused solely on whether there were signals in the SEER breast cancer database of changes in hormone-dependent tumors. He was designated only as a general liability witness.

In late 2006, the SEER data for 2003 became available. The 2003 statistics showed that, for the first time in decades, the breast cancer rates in the country fell. And the largest decrease was seen in postmenopausal women and for hormone receptor positive cancers. The first analysis of this data was presented in a San Antonio conference in December of 2006 by some researchers from MD Anderson. Dr. Ravdin, the lead investigator for the MD Anderson team, opined that the drop in E+P sales following the WHI study was the reason for the dramatic and unprecedented fall in hormone positive breast cancers in older women.[11]   The medical community immediately started looking at this issue. Countless articles have been published in the past seven months confirming Dr. Ravdin's conclusion.[12]   The drop in E+P prescriptions

---

[11]   Exh. 6 - Ravdin, The Decrease in Breast-Cancer Incidence in 2003 in the United States, N. England J Med Vol. 356;16, (April 2007) at p. 1671.

[12]   *Id.*; Exh. 7 - Colditz, Decline in breast cancer incidence due to removal of promoter: combination estrogen plus progestin, Breast Cancer Research 2007: Vol 9, No. 108 (July 26, 2007); Exhibit 8 - Kerlikowske, Declines in Invasive Breast Cancer and Use of Postmenopausal Hormone Therapy in a Screening Mammography Population, JNCI, Vol. 99, Issue 17 (Sept. 5, 2007); Exhibit 9 - Clarke, Recent Declines in Hormone Therapy Utilization and Breast Cancer Incidence: Clinical and Population-Based Evidence, Letter to Editor in J. of Clinical Oncology, Vol. 24, No. 33 (November 20, 2006); Exhibit 10 - Robbins and Clarke, Regional Changes in Hormone Therapy Use and

correlating with the drop in breast cancer rate is a significant and important piece of the causation puzzle and, for many researchers, provided the needed proof that E+P causes breast cancer by promotion. This is because the increase in E+P sales tracking the increase in hormone receptor positive tumors is evidence of "challenge" (i.e. a link between the drug and the cancers). But, evidence that once you reduce a population's exposure to the carcinogen, the rate of cancers goes down is evidence of "de-challenge" (i.e. strong evidence of causation). The only stronger scientific evidence than de-challenge is re-challenge which is typically unethical to obtain as it requires the re-introduction of a toxin to a population to see if the incidence goes back up. Short of re-challenge, de-challenge evidence is considered by the medical community to be the "nail in the coffin" evidence, far stronger than challenge evidence (what Dr. Austin had before) and a confirmation of causation. [13]

Dr. Austin's second and third supplemental reports contain causation opinions that are based upon the body of epidemiological studies as well as the recent SEER breast cancer data as well as E+P prescription data for the same period. Indeed, Wyeth does not challenge his qualifications as an epidemiologist, but just challenges Dr. Austin's ability to form new opinions. But that is not a *Daubert* worthy challenge since it does not challenge his methodology or the reliability of his underlying data. Indeed, Wyeth's real argument appears to be that all MDL plaintiffs should be limited in a way that state court plaintiffs are not – to Dr. Austin's first opinions as expressed in February of 2006. But Wyeth does not move to exclude Dr. Austin's

---

Breast Cancer Incidence in California From 2001 to 2004, J. of Clinical Oncology, Vol. 25, No. 23 (August 10, 2007).

[13]     Exh. 11 - Trial Transcript of Dr. Don Austin, *Daniel v. Wyeth* (Date: 1/16/07 AM), p. 40-41 (discussing that the rapid increase followed by decrease of cancer tied to prescriptions going up and down is the "nail in the coffin" that "cinches it" and provides confirmatory evidence of causation).

two supplemental reports or even challenge their validity. Furthermore, if Wyeth's claim is that

Dr. Austin has somehow "changed" his opinions or "contradicted" his earlier claims (which is

false, given the completely different nature of the data involved), such claims are the subject of

cross-examination.

There are two very interesting aspects to Wyeth's challenge. First, Wyeth is very careful

in its wording of this challenge and it specifically phrases the challenge as: "the court should

exclude Dr. Austin from testifying, based on ecological data **alone** (such as data from the SEER

cancer registry) that hormone therapy causes breast cancer."[14]  The key word to that sentence is

"alone" and on that the parties can agree. Dr. Austin will not offer general causation opinions

that are based upon the SEER database **alone**. Indeed, his new causation opinions (expressed in

his supplemental reports) are based upon a whole world of epidemiological studies which

include randomized clinical trials, case control studies, cohort studies and ecological data. As

Dr. Austin fully explained in his trial testimony in the *Daniel* case:

```
17        Is ecological data along (sic), in other
18   words, something goes up, something does down, is
19   that ever enough on its own to draw a conclusion?
20   A.   Not to my knowledge, no.  I can't think of a
21   situation where it has ever been enough by itself.
```

                                    ***

```
4    Q.   So Dr. Colditz talked about the totality of
5    the evidence and putting everything together.  Is
6    that what you're talking about?
7    A.   That's what I'm talking about.
8    Q.   In terms of breast cancer, did you rely on the
9    ecological data alone to understand that E plus P
10   causes breast cancer?
11   A.   Definitely not.
12   Q.   Is it, though, an important piece -- can you
13   tell me whether or not it is an important piece of
```

---

[14] Wyeth's Memo at 2.

14   data in understanding that, as we just looked at,
15   that once you have the other information from the
16   studies and the biologic plausibility, in other
17   words how it works, once you have the other data, is
18   it important to see that type of tracking of breast
19   cancer rate with prescriptions?
20   A.   It is important because it tests the validity
21   of the other kinds of data and it is especially
22   important to know the decrease.  And the reason that
23   that's important is because it tells one that this
24   is not a long-term effect, it's a short-term effect,
25   like a promoter effect.[15]

The second important facet of Wyeth's argument is that Wyeth did not challenge Dr.

Colditz's identical opinions.  Indeed, Dr. Colditz also opines that E+P causes breast cancer by

promotion and that the ecological data is an important piece of evidence supporting that

conclusion.

14       So that if we're dealing
15   with a promotion causation, then with the
16   increase in prescriptions in use, you
17   would expect the risk of cancer to go up?
18       A.   It parallels in close order,
19   not with a 40-year lag, the change in
20   prescriptions and the change in cancer.

***

23       But then once the use goes
24   down, what do you expect the risk to do?
1       A.   That there's a rapid
2   decline.
3       Q.   So, the risks go down?
4       A.   Yeah.
5       We can see this both at the
6   individual level in studies that have
7   data on use by individual women, and we
8   can see these big effects in population
9   level data where we have the number of
10   prescriptions in the population and tumor

[15]     Trial testimony of Dr. Don Austin in *Daniel v. Wyeth* (1-16-07)(PM session), p. 66-67 (attached as Exh. 12).

11  registries to record the new cases of
12  cancer diagnosed in the population.[16]

Wyeth accepts that Dr. Colditz's methodology and qualifications to offer such an opinion pass

the *Daubert* standard.   Wyeth challenges Dr. Austin saying the same thing, solely because Dr.

Austin is no longer a liability-only witness but now has causation opinions as well.

Dr. Austin's general causation opinion is based upon a wealth of information.[17]   New

articles are published regularly.   Since the last time this Court ruled on *Daubert* motions, there

have been a number of significant articles published which further support this general causation

opinion.  Multiple published medical articles now confirm that E+P is not only a risk factor for

the development of breast cancer, but E+P **causes** breast cancer.   The published science alone

rebuts Defendants' argument on this issue.   Among these are the following:

> **2007**: Dr. Colditz:
> "*Combination estrogen plus progestin **causes** breast cancer*".[18]
>
> **2007:** Dr. Kerlikowske:
> *There is clearly a "**causal link**" between E+P and breast cancer.*[19]
>
> **2006:** Dr. Brian MacMahon:
> *There are "three known **causes** of breast cancer:" ionizing radiation (such as from exposure to a nuclear bomb), alcohol and hormone therapy.*[20]
>
> **2005**: Dr. Colditz:

---

[16]   Deposition of Dr. Graham Colditz (12/18/06), p. 56-57 (attached as Exh. 13).

[17]   Exh. 5, Austin Supp. Rpt. (Jan. 2, 2007) at 1-6.

[18]   *See* Exh. 7, Colditz, *Decline in breast cancer incidence due to removal of promoter: combination estrogen plus progestin*, Breast Cancer Research 2007: Vol 9, No. 108 (July 26, 2007) (emphasis added).

[19]   Exh. 14, Interview of Dr. Kerlikowske re: new published article:  Kerlikowske, *Declines in Invasive Breast Cancer and Use of Postmenopausal Hormone Therapy in a Screening Mammography Population*, JNCI, Vol. 99, Issue 17 (Sept. 5, 2007) (emphasis added).

[20]   Exh. 15 - MacMahon, *Epidemiology and the causes of breast cancer*, Int. J. Cancer, Vol. 118  at 2373-2378 (2006) (emphasis added).

*"One can conclude that use of postmenopausal hormones **causes** breast cancer." "The overall association between use of postmenopausal hormones and risk of breast cancer is unequivocal."* [21]

**2005:** International Agency for Research on Cancer (IARC):
*There is sufficient evidence in humans for the **carcinogenicity** of combined estrogen-progestogen menopausal therapy in the breast".* [22]

**1998**: Dr. Colditz;
*"Based on this review, it is evident that post-menopausal hormones **cause** breast cancer. Long-term use substantially increases the risk of this cancer."* [23]

Three recent ecological studies – two from the United States and one from Germany – have concluded that the rise and fall in hormone-receptor positive breast cancers, which have corresponded to a matching rise and fall in E+P prescriptions, is most likely due to the change in use of E+P. Just as Dr. Austin did during the endometrial cancer epidemic, these researchers compared data from breast cancer registries and prescription data for hormone therapy and found a sharp reduction in breast cancers following the drop in prescriptions.[24] The study investigators agree that a cause-and-effect relationship provides a likely explanation for the rise and fall in breast cancer rates. Moreover, many scientists consider the evidence "compelling" and "astounding."[25] Scientists other than Dr. Austin have also observed that this trend for breast

---

[21]     Exh. 16 - Colditz, *Estrogen, Estrogen plus Progestin Therapy, and Risk of Breast Cancer*, Clinical Cancer Research, Vol. 11, 909s-917s (Jan. 15, 2005) at 2, 5 (emphasis added).

[22]     Exh. 17 - International Agency for Research on Cancer (IARC) Monograph (2005), PX 866 at 6 (emphasis added).

[23]     Exh. 18- Colditz; *Relationship between Estrogen Levels, Use of Hormone Replacement Therapy and Breast Cancer*, Journal of the National Cancer Institute, Vol. 90, No. 11 (June 3, 1998) at 6.

[24]     Exh. 6 – Ravdin at p. 1671; Exh. 9 - Clarke; Exh. 19 - Trial Ex. M4754, Katalinic & Rawal, Decline in breast cancer incidence after decrease in utilization of hormone replacement therapy, BREAST CANCER RES. TREAT. (2007).

[25]     *Id. See also* Exh. 20 - PX 8407, Gina Kolata, Reversing Trend, Big Drop Is Seen in Breast Cancer, N.Y. TIMES, Dec. 15, 2006 at A1.

cancers is strikingly similar to the rapid decline in endometrial cancers in the 1970s after Premarin prescriptions fell.[26]

A leading medical textbook on cancer epidemiology -- Cancer Epidemiology and Prevention -- credits Dr. Austin's 1982 paper as a classic study linking the rise and fall of estrogen hormone therapy prescriptions to the rise and fall in endometrial cancer.[27] The textbook chapter concludes:

> Our knowledge of identified risk factors for endometrial cancer indicates that an impact can be made in the primary prevention of this disease by minimizing the use of unopposed estrogens. **It is highly likely that the sharp decline in the use of this hormone therapy regimen has been responsible for the sharp decline in the occurrence of endometrial cancer in the United States since the mid-1970s.**[28]

The scientific community as a whole places tremendous value on the role of ecological studies, such as those done by Dr. Austin, in assessing causality to understand how to prevent cancer and other serious diseases.[29]

Dr. Austin has demonstrated that the data and information he used were soundly and reliably generated and are of a type reasonably relied on by comparable experts in his field.

Wyeth accuses Dr. Austin of contradicting his earlier opinions on the role of ecological data.[30] Wyeth cleverly distorts Dr. Austin's testimony that ecological studies do not, on their own, establish causation to suggest that ecological studies provide no evidence of causation.

---

[26]     Exh. 21 – PX 8406, Gina Kolata, *Breast Cancer News Brings a Range of Reactions*, N.Y. TIMES, Dec. 18, 2006.

[27]     Exh. 22 – PX M4728, LINDA S. COOK ET AL., *Ch. 53, Endometrial Cancer in* CANCER EPIDEMIOLOGY AND PREVENTION 1027 (David Schottenfeld & Joseph F. Fraumeni, Jr., eds., Oxford Univ. Press 3d ed. 2003).

[28]     *Id.* at 1037.

[29]     *Id.*

[30]     Memo at 3.

What Dr. Austin told Wyeth was that such studies <u>by themselves</u> do not establish causality, but taken together with other epidemiological data, can support an inference of causation.  Dr. Austin's testimony on this point is clear:

> Q:    When you say, Dr. Austin, that the ecological data can't prove causation, do you mean to say that it is not any evidence in support of a causation conclusion?
>
> A:    No, I don't mean that.
>
> Q:    Could you explain why and how you said that, then.
>
> A:    Yes.  What one really has to do is take all of the body of scientific data that are available and examine a specific hypothesis using all of the data.  And if there was a hypothesis that came from individual data, that people, women, for example, who took estrogen had a higher risk of endometrial cancer, one would expect that in a population with higher use, they would have had a higher risk.  And so, you can examine a hypothesis like that.  And if you find that it is consistent with that prediction, then it supports the hypothesis.  If you find that it's inconsistent with the hypothesis, it's a serious – it's a serious flaw in the hypothesis.
>
> * * *
>
> Q:    The question is, is the ecological data that you looked at with respect to endometrial cancer and estrogen therapy, and with respect to breast cancer and combination hormone therapy, does that support in some way a conclusion that these drugs can promote or cancer on a short-term basis in some women?
>
> MS. COCHRAN:  Object to the form, "short-term basis" being undefined.
>
> A:    The answer is yes.  It is consistent with that hypothesis.  And the fact, particularly with the endometrial cancer, that the rate went down so quickly, would say this is not initiation, it is promotion.
>
> Q:    And in short, what did you understand "short-term" to mean when you gave me the answer?  Are we talking months or years?
>
> A:    Yeah, months.
>
> Q:    Is that also true for the breast cancer phenomenon?
>
> A:    Well, with the almost-yearly coincidence of the fall in the rates and in the use of estrogen, I would say that's true there too.[31]

---

[31]    Exh. 23 - Deposition of Dr. Don Austin (1-11-07), p. 310-313.

Dr. Christina Clarke, a colleague of Dr. Austin and the author of one of the most recently published analyses of SEER breast cancer trends, explained that there is no other study design other than an ecologic study that can help answer the question as to why breast cancer rates have declined so rapidly:

> So said another way, there is no better data resource that we can use to answer this question. And that we are going to have to keep watching what we have got to continue to learn more.[32]

Dr. Clarke further explained how ecological data fits into the bigger picture of causation in this case:

Q:    If somebody were to come into a court and say, well, by gosh, we saw this falloff in the use of HRT. We saw a falloff in the rate of breast cancer ... after that. That is proof that HRT causes breast cancer. That would be sheer speculation, wouldn't it?

A:    I would say that observation is interesting, and you need to incorporate it with the entire body of ecologic, observational and experimental data that informs the question of does hormone therapy cause breast cancer. I don't think it's irrelevant, I don't think it's directly – I think it's not directly answering that question. It's a package, it's an interesting piece of information to put into an entire spectrum of evidence.[33]

Like his colleagues, Dr. Austin has relied on the available epidemiological data to support his general causation opinions. There is nothing inconsistent or unscientific about his opinion and his underlying methodology. As an epidemiologist and a leading expert on public health, Dr. Austin is both qualified and entitled to present his data and testimony to the jury.

---

[32]    Exh. 24 - Deposition of Dr. Christina Clarke (3-15-07), p. 215.

[33]    *Id.* at p. 250-251.

## V.     Challenged Opinion # 2:  Dr. Austin's Testimony on the Mechanism of E+P's Promotion Effect on the Progression of Cancer

Wyeth claims that only a cell biologist can give opinions as to biologic mechanism or how E+P promotes cancer. However, Wyeth ignores the fact that Dr. Austin has a Masters Degree in microbiology, with a focus on tumor growth.[34] Indeed, the trial judge in the recent *Simon* trial in Philadelphia overruled Wyeth's objection to Dr. Austin's testimony, and held that he was qualified to testify as a cell biologist.[35] Just this summer, Wyeth raised this exact challenge to Dr. Austin's qualifications to discuss the impact of E+P on the progression of cancer in a New Jersey state court case (*Deutsch v. Wyeth*). Wyeth insisted that the court conduct an actual intensive hearing with Dr. Austin to flesh out his methodology. Plaintiffs thus arranged for a video-conference hearing at which both Wyeth, and the Court, had the opportunity to question Dr. Austin about this opinion. At the conclusion of this hearing, Judge Bryan Garruto denied Wyeth's challenge and wrote a thoughtful and detailed opinion about Dr. Austin and his methodology.[36] As to Dr. Austin's opinions on biological mechanisms of how E+P promotes cancerous cells, Judge Garruto found that "Dr. Austin is qualified to offer his opinions" and his opinions are based upon "generally accepted knowledge in the scientific literature."[37]

Further, Wyeth's argument overlooks the fundamental principle that all epidemiologists follow when assessing causation. That is, epidemiological data on an association should be consistent with plausible biological findings in order to support an inference of causation. By necessity, Dr. Austin must comment on the consensus of scientific literature on the biology of

---

[34]     *See* Exh. 25- Transcript of hearing on Dr. Austin methodology in *Deutsch v. Wyeth* (6-14-07).

[35]     Exh. 26 - Trial Transcript of *Simon v. Wyeth*, (4-17-07), p. 24-26.

[36]     Exh. 27 - Judge Bryan Garruto's order and memorandum re: Wyeth's challenges to Dr. Austin in *Deutsch v. Wyeth* (6-19-07).

[37]     *Id.*

15

estrogen and progestins and their role in promoting tumor growth. As a cancer cell biologist, he is certainly qualified to do so.[38] As a standard practice, epidemiologists use the Bradford Hill criteria to assess cause-and-effect relationships between an association and a disease.[39] Accordingly, Dr. Austin used these same seven criteria to assess whether E+P is causally related to hormone-dependent breast cancer.[40] One of the criteria is, "does the biologic plausibility of the association support a causal interpretation?" Dr. Austin thus addressed biologic plausibility in his report to explain that hormone therapy causes breast cancer by acting as a promoter.[41] In support of this opinion he cites a number of sources, including the International Agency for Research on Cancer (IARC)'s consensus paper.

Recall that the jump in endometrial cancer rates caused by skyrocketing estrogen use began within months, not years. And the decline in endometrial cancer rates when estrogen use plummeted occurred in months, not years. Similarly, the rise in breast cancer rates coincided almost in lockstep with sales of E+P. The dramatic declines in use of E+P after WHI caused an enormous decline in breast cancer rates (the largest in America's history) -- principally in hormone-dependent cancer among menopausal women -- within months. According to Wyeth, cancer takes many years -- perhaps decades -- to develop from initial abnormality to malignancy. Thus, the short-term effect hormone therapy had on endometrial and breast cancer rates depicts a promotion, rather than an initiation effect.

---

[38]     Wyeth claims that the field of cell biology is constantly growing, hence Dr. Austin's degree should be afforded little weight. But Wyeth does not cite any established "cell biology" principle that has been handed down in the intervening years that is inconsistent with Dr. Austin's conclusions.

[39]     Austin B. Hill, *The Environment and Disease: Association or Causation?*, 58 PROCEEDINGS. ROYAL SOC'Y MED. 295-300 (1965).

[40]     Exh. 5 - January 2007 Expert Report by Dr. Austin, p.2

[41]     *Id.* at p. 10-11.

Dr. Austin has expertise in cell biology. He is qualified to explain to the jury how hormones promote tumor growth in cell subtypes. Indeed, Dr. Colditz, another epidemiologist, offers the exact opinion (without any objections or challenges from Wyeth).

## VI.    Challenged Opinion # 3:  Dr. Austin's Testimony on the Lobular Cancer Signal

Wyeth has made this exact challenge to a number of courts – without success. Indeed, this Court denied such a challenge in both the *Reeves* and *Rush* cases.[42] Similar challenges were rejected by the Pennsylvania consolidated judge, the New Jersey consolidated judge and the Reno, Nevada state court judge in hormone therapy cases.[43]

In light of the lack of success with this particular challenge, Wyeth puts a new gloss on its argument. Now, Wyeth argues that because Dr. Austin has not published his opinions on this issue, his opinions must be denied. Not only is this argument invalid, but it flies in the face of Wyeth's own actions. Indeed, Dr. Lewis Chodosh has taken his dog and pony show of why (in his lone opinion) E+P does not cause breast cancer to every hormone therapy trial to date (including *Reeves* and *Rush*). But Chodosh has yet to reduce a single one of those opinions to writing, perhaps because they are so against the weight of the medical science that no journal would publish them.[44] Further, Chodosh admits that he has never even written a letter to the editor of any journal to refute the dozens of published articles that say the exact opposite or to let the medical community know his opinion.[45]

---

[42]     Exhibit 28 - Order denying challenges to Dr. Austin in *Rush v. Wyeth* (9/13/06).

[43]     Exhibit 29 - Order denying Wyeth's challenges to Dr. Austin in Pennsylvania state court (Aug. 30, 2006); Nevada state court in *McCreary v. Wyeth* (9/27/06).

[44]     Exhibit 30 - Trial testimony of Dr. Lewis Chodosh from *Daniel v. Wyeth* (1-19-07 PM), p. 60-63.

[45]     Id.

Wyeth argues because Dr. Austin testified that he might publish his study, but has not done so, exclusion is warranted.  While this might be fascinating cross-examination, it does not rise to a *Daubert* challenge.  Such a challenge is limited to Dr. Austin's methodology and reliability: both of which have been routinely approved by courts.  Indeed, following an intensive methodology hearing in the New Jersey case this summer, Judge Bryan Garruto explained that Dr. Austin's signal study was based upon "what is standard practice in the field of epidemiology" and "the fact that Dr. Austin does this retrospectively does not make it unreliable."  He further asserted that "Dr. Austin sufficiently explained to the Court" why he used lobular cancers instead of ductal cancers for his study since "the SEER database did not include specific data about hormone-receptive status of cells until 1990.  Regardless such argument goes to the weight of Dr. Austin's testimony, not its admissibility."[46]  Indeed, in the Eighth Circuit, "there is no requirement 'that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness.'"[47]  Yet, Wyeth asks that Dr. Austin be forced to cite his own published work before he can testify.

Dr. Austin is an esteemed epidemiologist whose previous ecological research on cancer trends helped lead to the consensus in the scientific community that Premarin increases the risk of endometrial cancer.  Based upon his review of the breast cancer data in the SEER publicly available cancer registry, Dr. Austin opines that, by the early 1980s, Wyeth could easily have detected a signal suggesting that E+P may be causing a disproportionate number of hormone-

---

[46]    Exh. 27 – Order denying Wyeth's Motion to Exclude Dr. Austin in *Deutsch v. Wyeth* (Date: 6/19/07) at p. 2-3.

[47]    *Bonner v. ISP Tech., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001).

dependent breast cancers.[48]   In light of that clear signal, Wyeth should have followed up with

further studies.   Dr. Austin expresses reasonable, clear and concise opinions on this issue: (a)

Had defendants monitored the publicly available SEER breast cancer registry data, they would

have detected a signal in the 1980s that E+P use was associated with a disproportionate increase

in hormone-dependent breast cancers, and (b) this signal should have motivated defendants to

conduct further studies to confirm and quantify this effect.

Defendants claim that, because Dr. Austin's study focused on lobular cancers, it does not

have relevance to the trial Plaintiffs.   This argument ignores several important facts, including

that:

- Dr. Austin's studies concerned "hormone-fed," i.e., hormone receptor positive cancers, and these Plaintiffs were diagnosed with hormone positive breast cancers -- virtually all lobular cancers are hormone-dependent;

- Dr. Austin is a highly qualified epidemiologist whose work has been accepted by and acted upon by those at the highest levels of prescription drug regulation, and whose methods in conducting such studies cannot be legitimately challenged; and

- Dr. Austin's training, experience and study all qualify him to render opinions in this case based on that background, and based on the published literature of others.

Plaintiffs retained Dr. Austin in this litigation to answer this question, among others:   If

the available national cancer data had been monitored for changes in breast cancer incidence,

could an increase in hormone receptor positive cancers have been detected, and if so, when? [49]

For his analysis, Dr. Austin used the National Cancer Institute's SEER database, because it was

---

[48]     Exh. 3, Dr. Austin's expert report (2-14-06) at p. 25

[49]     Exh. 31, Dr. Austin's expert report at i.

one of the earliest and most comprehensive publicly available sources of cancer information. Furthermore, Wyeth was already familiar with the SEER database as it had used that cancer registry to generate statistics for background rates of cancer.[50] Dr. Austin selected lobular cancer as the histological subtype to monitor, because SEER did not collect actual data on hormone receptor status until 1990, yet almost all lobular cancers are hormone receptor positive.[51] Thus, lobular cancer was the most logical cell type to examine because it is hormonally the most sensitive.[52]

Worthy of emphasis is the fact that data from the SEER registry collected since 1990, when this agency began recording hormone receptor positive tumors, has consistently documented an increased incidence of *all* hormone receptor positive tumors in postmenopausal women, not just lobular cancers, and a dramatic decline after 2002 (when the WHI study was published) in hormone receptor positive cancers. Therefore, the relevance of Dr. Austin's focus on this most hormone sensitive type of tumor available for analysis, i.e. lobular carcinoma, is obvious. The opinions Dr. Austin will express in this case about how the increase and decrease of breast cancer incidence parallels the increase and decrease of E+P sales have been now confirmed by multiple published articles.[53]

The statistical models used by Dr. Austin to measure the degree, if any, of any increase in proportion of lobular cancers from 1980 are the same standard and widely accepted methodologies used by epidemiologists and statisticians to conduct similar ecological studies –

---

[50]     Exh. 32, PX 137 (1990 Internal Wyeth memo showing Wyeth's use and knowledge of SEER database) (W-MCL003-03011).

[51]     Exh. 31, Dr. Austin's expert report at 6.

[52]     Exh. 31, Dr. Austin's expert report at 2.

[53]     Exhs. 6 and 10.

both now and in the 1980s. Dr. Jody Lapidus, a biostatistician and professor at OHSU, validated the study design and verified the statistical formula used to ensure that the methods used in the study were sound and appropriate. Using the methods described in his report, Dr. Austin's analysis found that lobular cancers (a surrogate marker for hormone receptor positive cancers) compared to all breast cancers was steadily increasing in SEER, but only among women age 50 and older. This effect was significantly detectable since 1981. For most of the following 20 years, the effect continued to increase, often significantly, over baseline.[54] Furthermore, from 1990 (the first year that SEER recorded estrogen receptor positive cancers) through 1997, the proportion of *all* estrogen receptor positive tumors – both lobular and ductal – was elevated over other tumor types. [55] By the early 1980s, Wyeth should have been aware of this signal. This data should have caused Wyeth to conduct further studies to quantify and better understand this risk.

The strength of Dr. Austin's analysis is undoubtedly why this Court has rejected Wyeth's challenge to the admissibility of his testimony.[56]

///

///

///

---

[54]   Exhibit 31 - Dr. Austin's expert report at vii.

[55]   Exhibit 31 - Dr. Austin's expert report at 15

[56]   Exhibit 33 - Order, *Reeves v. Wyeth*, Case No. 05-163, Document 380 (8-21-06)at 7-9.

## VI.    CONCLUSION

For each of the foregoing reasons, Wyeth's Motion to Limit and/or Exclude the

Testimony of Dr. Austin should be denied

Dated this 4th day of September, 2007.

### LITTLEPAGE BOOTH

   /s/ Zoe B. Littlepage
Zoe B. Littlepage – Federal Bar No. 12896
1012 W. Alabama
Houston, Texas 77006
(713) 529-8000 – Telephone
(713) 529-8044 – Facsimile

### ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on this the 4th day of September, 2007, a true and correct copy of the

foregoing document was electronically filed with the Clerk of the Court using the CM/ECF

system, and a true and correct copy was forwarded by e-mail to the parties below:

Ms. Lyn Pruitt
Mitchell, Williams, Selig, Gates & Woodyard
425 West Captiol, Suite 1800
Little Rock, AR  72201

John W. Vardaman
F. Lane Heard, III
725 12th St. N.W.
Washington, DC  20005

Jay Mayesh
Alan E. Rothman
Steven J. Glickstein
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022

Elizabeth Robben Murray
Kevin A. Crass
Friday, Eldredge & Clark, LLP - Little Rock
Regions Center
400 West Capitol Avenue
Suite 2000
Little Rock, AR 72201-3493

/s/   Zoe B. Littlepage