## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

| | | |
|---|---|---|
| **In re:** | § | **MDL Docket No. 4:03-cv-1507 WRW** |
| | § | |
| **PREMPRO PRODUCTS LIABILITY** | § | **Scroggin v. Wyeth, 4:04-cv-1169 WRW** |
| **LITIGATION** | § | **Hill v. Wyeth, 4:05-cv-546 WRW** |

### PLAINTIFFS' OPPOSITION TO

### WYETH'S *DAUBERT* MOTION TO EXCLUDE
### EXPERT TESTIMONY OF DR. ELIZABETH NAFTALIS

--    ***Promotion, not initiation.***

--    ***More likely than not, not with certainty.***

These are the principles governing Plaintiffs' causation case.  Other plaintiffs in this litigation have made that clear in abundant briefing.  This Court has recognized these principles, first in its orders denying Wyeth's prior motions to exclude case-specific causation experts,[1] and then in its order *in limine* forbidding evidence relating to initiation.[2]  Everyone acknowledges these principles but Wyeth.[3]  Every quotation Wyeth has copied from an expert saying we don't know what "causes" breast cancer in an individual woman refers to the medical community's ignorance about what "initiates" cancer.  Not one of the quotations addresses "promotion," the only theory of causation Plaintiffs espouse and the causation theory expressly approved by this

---

[1]    Order, *Reeves v. Wyeth*, Case No. 05-163, Document 380 (Aug. 21, 2006) at 6 ("Plaintiff's experts need not conclude that HRT definitively caused Plaintiff's cancer; they must only establish that it was more likely than not a cause -- or that it promoted her cancer.") (emphasis added); *accord* Order, *Rush v. Wyeth*, Case No. 05-497 Document 283 (Sept. 4, 2006) at 6.

[2]    Order, *Rush*, Document 419 (Dec. 27, 2006) at 16 ¶ 14 ("I have held that if Plaintiff raises a jury issue with respect to "promotion" it is sufficient, Defendant's argument to the contrary notwithstanding.

[3]    The Pfizer Defendants ("Upjohn") filed a purported joinder of the instant motion after the deadline for *Daubert* motions and after the Court admonished the parties by letter to cease filing untimely papers.  To the extent the joinder is deemed effective, this response encompasses both Defendants' motions.

Court.  And none of the experts testified with respect to the legal standard of causation -- more likely than not.

## BACKGROUND

### I.    Dr. Naftalis's Report and Testimony

Elizabeth Naftalis is a medical doctor who earned a Bachelor of Science Degree from Tulane.  She earned her medical degree from the University of Texas Health Science Center in 1986.  She completed a surgical internship and residency at the University of Alabama in Birmingham where she served as Administrative Chief Resident.  Licensed in 1988, Dr. Naftalis specializes in surgical breast evaluation and the treatment of breast disease and cancer.  She was certified by the American Board of Surgery and has been recertified once.  She is a member of multiple organizations on surgery and breast disease.

Dr. Naftalis served as an Assistant Professor of the Department of Surgical Oncology at the University of Texas Southwestern from April, 2000 through August, 2004.  During her private practice, she examined more than 2000 patients a year for breast evaluation.  She provided surgical evaluation and treatment to approximately 100 breast cancer patients a year. Dr. Naftalis ultimately left private practice in 2004 to become a full-time parent.[4]

In reaching her causation opinions, Dr. Naftalis applied her background and experience to the medical literature on E+P and breast cancer and to Plaintiffs' medical records.  She considered the wealth of literature considering whether E+P causes cancer generally, including the epidemiological studies (such as the WHI, the Million Women's Study, Dr. Colditz's work and the recent analyses of SEER data).[5]  After analyzing the overwhelming evidence suggesting

---

[4]      Scroggin Report (Exh. 1) at 1-2; Hill Report (Exh. 2) at 1-2.

[5]      Exhs. 1 & 2 at 7-8.

2

E+P causes breast cancer, Dr. Naftalis engaged in a differential diagnosis to ascertain what likely led Donna Scroggin and Helen Hill to acquire breast cancer. After excluding other possible causes, Dr. Naftalis concluded that E+P was responsible.[6] In particular, Dr. Naftalis concluded that E+P proximately caused Plaintiffs' breast cancer, that is, but/for Ms. Scroggin's and Ms. Hill's ingestion of E+P, more likely than not, they would not have developed breast cancer.[7] And in response to repetitive, relentless deposition questioning, Dr. Naftalis remained steadfast in those convictions.[8]

## II.   The Evidence of General Causation

Wyeth does not challenge that E+P generally causes breast cancer. But in the previous bellwether trials, Wyeth attacked the plaintiffs' case-specific experts because, Wyeth erroneously claimed, they had not relied upon evidence supporting general causation.[9] A brief summary of the evidence is in order here. As partly noted above, Dr. Naftalis reviewed and relied on a variety of epidemiological and other evidence, including, among other things, the WHI and subgroup analysis, the Million Women's Study, analyses of the recent trends in breast cancer incidence and reports of Plaintiffs' general causation experts.[10]

The overwhelming consensus of medical opinion supports a causal link between E+P and

---

[6]     Naftalis Depo (July 8, 2007) (Exh. 3) at 200:5-18 (Scroggin), 201:9-202:5 (Hill). Exh. 3 at 57:5-17 (description of methodology).

[7]     Exh. 1 at 9; Exh. 2 at 8.

[8]     Exh. 3 at 90:17-91:16; 121:19-122:24; 205:24-207:19.

[9]     Transcript, Daubert Hearing, *Reeves v. Wyeth*, Case No. 05-163 (July 13, 2006) at 97:1-99:1.

[10]    Exhs. 2 & 3 at 1-3.

breast cancer.[11] Until recently, Dr. Graham Colditz was a full professor of medicine at Harvard Medical School. One of the world's most renowned epidemiologists, Dr. Colditz studied medicine in Australia and later obtained both his Master's and PhD degrees from Harvard. He has studied cancer as an epidemiologist for over 20 years, narrowing his research to breast cancer. He has published over 700 original papers on chronic disease and was the principal investigator of the long-running Nurse's Health Study on hormones and other products.[12] Dr. Colditz overcame Wyeth's *Daubert* challenges in the previous trials before this Court (indeed, in all trials to date) and is cited with authority frequently by Wyeth in both its summary judgment and *Daubert* motions. Wyeth did not even bother to attempt a challenge to his testimony in this case. Dr. Colditz has testified that the causal link between E+P and breast cancer has been definitively established.[13] In fact, Dr. Colditz began his latest paper on the subject by writing, simply but unequivocally: "Combination estrogen plus progestin causes breast cancer."[14]

Dr. Suzanne Klimberg is a breast surgical oncologist. She is a Professor of Surgery and Pathology and Director of the Breast Cancer Program at the University of Arkansas Medical School in Little Rock. She graduated with honors from the University of Florida Medical School and has authored over 100 peer reviewed articles on breast cancer diagnosis, prevention, research and treatment. She edits four breast cancer oncology journals and is a member of the breast

---

[11]     Testimony of Dr. James Waldron, Waldron Depo (Brockert v. Wyeth, Sept. 20, 2006) (Exh. 4) at 149:25-150:4. Dr. Waldron is a surgical pathologist at the University of Arkansas for Medical Sciences. He is board certified in pathology and has taught students in the subject for over 17 years. He has medical and PhD degrees in pathology from the Vanderbilt University. His testimony has already been approved by this Court under *Daubert* and he has been cited extensively in the defendant's *Daubert* and summary judgment briefs.

[12]     Colditz Trial Testimony, *Reeves* (Exh. 5), at 370:24-378:25.

[13]     *Id.* at 414:14-19.

[14]     Graham A. Colditz, *Decline in breast cancer incidence due to removal of promoter, combination estrogen plus progestin*, BREAST CANCER RESEARCH 2007, 9:108 at 1 (July 26, 2007) (editorial) (Exh. 6).

cancer working group committee of the Southwest Oncology Group.[15] Dr. Klimberg overcame Wyeth's *Daubert* challenges in the previous bellwether trials (the only trials in which she was a designated expert) and is cited as an expert throughout Wyeth's dispositive briefing.   Dr. Klimberg has testified that the causative relationship between E+P and breast cancer is now "unequivocal."[16]

E+P is classified as one of the three known causes of breast cancer (the other two being ionizing radiation and alcohol abuse).[17]   The world's leading organization studying cancer, the International Agency for the Research of Cancer of the World Health Organization, classifies E+P as a carcinogen.[18]   The textbook, "The Breast" concurs.[19]   The leading textbook on pharmacology notes that progestin plays a significant role in E+P's contribution to cancer.[20]  No less than 28 epidemiological studies have shown a greater than 2.0 relative risk (doubling of the risk) of breast cancer from E+P.[21]   That E+P causes breast cancer generally is now mainstream medicine.  Should Wyeth, or its experts, assert otherwise, it is Wyeth that it on the fringe and outside the realm of commonly accepted science.

---

[15]     Klimberg Trial Testimony (*Reeves*) (Exh. 7) at 1479:19-1497:20.

[16]     *Id.* at 1504:23-1505:3.

[17]     Dr. Brian MacMahon, *Forum: epidemiology and the causes of breast cancer*, 118 INT'L J OF CANCER 2006 § 2373-78 (Exh. 8).

[18]     IARC Monograph, No. 2 § 5, 3d draft, rev. 3 (May, 1995).

[19]     V. Vogel, Ch. 16, *Epidemiology of Breast Cancer* at 341-354 (Table 16-1) in THE BREAST, 3d ed. (K. Bland & E. Copeland, eds.) (2004).

[20]     D. Loose & G. Stancel, Ch. 57, *Estrogens and Progestins*, Goodman & Gilman's The Pharmacological Basis of Therapeutics, *11th ed.* at 1541-71, 1552 (McGraw-Hill 2006).

[21]     Exh. 9.

## ARGUMENT AND AUTHORITY

Dr. Naftalis engaged in differential diagnosis: a methodology that is universally accepted, commonly practiced and highly reliable. She first determined that Plaintiffs' tumors were hormone dependent. This means they required hormones to grow. She then determined what sources of hormones Plaintiffs had. One source was obviously E+P. Dr. Naftalis found that neither Plaintiff manufactured sufficient levels of hormones, herself, to feed a tumor since each suffered from menopausal symptoms -- a classic sign of estrogen deficiency.[22] That means E+P must have been responsible for the growth (albeit, not necessarily the initiation or ultimate origin) of their tumors. Nevertheless, Dr. Naftalis went the extra mile and excluded other potential causes of cancer, even factors that cannot be responsible for the growth of a hormone receptor-positive tumor.

Expert testimony is admissible if the expert provides scientific, technical or other specialized information that would assist the jury in understanding the evidence or determining a fact issue.[23] "A district court is vested with broad discretion in determining whether a proffered expert is qualified to testify under Rule 702.[24] The rule reflects an attempt to liberalize the rules governing the admissibility of expert testimony.[25] In fact the Eighth Circuit has confirmed that Rule 702 "is [a rule] of admissibility rather than exclusion."[26] The standard it imposes is a

---

[22]    The only natural hormone that could arguably be implicated is estrogen. The female body's natural production of progesterone nearly stops at menopause (Exh. 7 at 1617:10-12).

[23]    *See* FED. R. EVID. 702.

[24]    *Baker v. McCoy*, 739 F.2d 381, 385 (8th Cir. 1984).

[25]    *See Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (highlighting the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to "opinion testimony').

[26]    *See Lauzon*, 270 F.3d at 686.

flexible one.[27]  For instance, "[t]here is no requirement 'that a medical expert must always cite published studies on general causation in order to reliably conclude that a particular object caused a particular illness.'"[28]  The focus of the inquiry is not on the result or the conclusion reached by the expert, but on the methodology the expert employed.[29]

Most courts find epidemiological evidence showing a doubling of risk sufficient to establish causation.[30]  However, even courts that have adopted the doubling of the risk threshold have recognized that epidemiological findings that do not reach a relative risk of 2.0 may nonetheless be admissible to prove individual causation, if combined with other consistent evidence.[31]

## I.    E+P Was More Likely than Not Responsible for the Development of Plaintiffs' Estrogen and Progesterone Receptor Positive Tumors.

E+P was responsible for Plaintiffs' cancer.  Both Plaintiffs' tumors tested estrogen receptor positive and progesterone receptor positive.[32]  This means the tumors depended upon hormones for their development.[33]  Dr. Naftalis testified that both Plaintiffs' breasts were

---

[27]    *Sorensen v. Shaklee Corp.*, 31 F.3d 638, 648 (8th Cir. 1994).

[28]    *Bonner v. ISP Tech., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001).

[29]    *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993).

[30]    *See, e.g., Manko v. United States*, 636 F. Supp. 1419, 1434 , 1437 (W.D. Mo. 1986), *aff'd in part*, 830 F.2d 831 (8th Cir. 1987); *Daubert v. Merrell Dow Pharms., Inc. ("Daubert II")*, 43 F.3d 1311, 1320, (9th Cir. 1995), *cert. denied*, 516 U.S. 869 (1995); *In re Joint Eastern & Southern Dist. Asbestos Litig.*, 52 F.3d 1124, 1128 (2d Cir. 1995); *DeLuca v. Merrell Dow Pharms., Inc.*, 911 F.2d 941, 958-59 (3d Cir. 1990).

[31]    *See Daubert II*, 43 F.3d at 1321 n.16; *In re Joint Eastern & Southern Dist. Asbestos Litig.*, 52 F.3d 1124, 1128 (2d Cir. 1995); *Landrigan v. Celotex Corp.*, 605 A.2d 1079, 1087 (N.J. 1992); *Grassis v. Johns-Manville Corp.* 591 A.2d 671, 675 (N.J. Super. Ct. 1991); ANNOTATED REFRENCE MANUAL ON SCIENTIFIC EVIDENCE (SECOND) (2004) at 531.

[32]    Exhs. 1 & 2 at 8.

[33]    Klimberg Trial Testimony (*Reeves*) (Exh. 7) at 1729:18-21.

susceptible to the promotion or "proliferative effect" of E+P.[34]   She concluded that such

promotion was the likely cause of Plaintiffs' cancer.[35]  Dr. Colditz testified that this proliferation

is the means by which E+P yields breast cancer.[36]  E+P uses hormone receptors to give signals to

the nuclei of cells to divide.  Tumors testing positive for hormone receptors are tumors that have

reached the cancerous stage because of hormones.[37]  This is the prevalent view of how E+P

"causes" breast cancer.

> Q:   Now, is the concept of promotion, of abnormal cells into cancer, is that a
> recognized way that something causes cancer in women?
>
> A:    Absolutely, yes.   Promotion is clearly described in the textbooks of
> epidemiology that discuss causation.  It is clearly the mechanism that's
> well accepted for Premarin and endometrial cancer, and it is clear that the
> epidemiological field accepts this as the mechanism for E plus P causing
> cancer.[38]

Dr. Klimberg, along with medical articles and texts, agrees:

> It is well accepted in the medical and scientific communities that cancer
> development is generally a linear progression from a single mutated cell through
> the stages of hyperplasia to in situ carcinomas to invasive cancer and to metastatic
> cancer.  It is generally accepted that the mechanism by which estrogen plus
> progestin therapy promotes the tumors from benign abnormal lesions into cancers
> relates to the enhanced proliferation caused by the estrogen plus progestin
> therapy.[39]

Exogenous hormones (E+P) were the culprit rather than endogenous (naturally produced)

---

[34]   Exhs. 1 & 2 at 8; Exh. 3 at 28:2-20.

[35]   Exh. 1 at 9; Exh. 2 at 8; Exh. 3 at 90:17-91:16; 121:19-122:24; 205:24-207:19.

[36]   Colditz Depo (Dec. 18, 2006) (Exh. 10) at 47:22-48:11.

[37]   Exh. 5 at 394:9-23; 395:15-23.

[38]   Exh. 10 at 49:22-50:14.

[39]    Klimberg Decl. (*Reeves*) (Exh. 11) at 2.  *See* ROBERT A. WEINBERG, *Multi-Step Tumorigenesis* in THE
BIOLOGY OF CANCER 440 (Garland Science, Taylor and Francis Group, LLC, Ch. 11 2007); DAVID E. MALARKEY &
ROBERT R. MARONPOT, *Carcinogenesis*, in ENCYCLOPEDIA OF TOXICOLOGY 445-466 (Philip Wexler, et al, eds. El
Sevier 2nd ed. 2005); Abrahan Benshushan & Amnon Brzezinski, *Hormonal Manipulations and Breast Cancer*, 57,
No. 5 Obstetrical and Gynecological Survey 314-323 (May 2002).

estrogen. We know that because both Plaintiffs were estrogen-deficient and therefore did not generate enough estrogen to feed a tumor. Though not always the case, menopause generally signals a significant decline in a woman's production of estrogen.[40] Wyeth's own expert, Dr. Ronald Young, actually testified that women stop producing estrogen at menopause.[41] The substantial decline in estrogen production is referred to (both by clinicians and Wyeth's marketing documents) as "estrogen deficiency." Women who suffer from the symptoms of menopause are estrogen-deficient. In particular, women suffering from hot flashes, night sweats or vaginal atrophy/dryness are estrogen deficient.[42]

Both Plaintiffs suffered from menopausal symptoms. Ms. Scroggin and her prescribing doctor both acknowledged that Ms. Scroggin suffered from hot flashes.[43] These symptoms were relieved by hormone therapy[44] and returned when Ms. Scroggin was removed from the drug.[45] Ms. Scroggin also suffered from vaginal atrophy,[46] which her doctor acknowledged was caused by low levels of estrogen.[47] Ms. Hill likewise suffered from menopausal symptoms,[48] including hot flashes[49] and vaginal dryness.[50] Hormone therapy made these symptoms go away.[51]

---

[40]   Pl. Tr. Exh. 651, 2001 Premarin Marketing Plan (Exh. 12) (filed under seal because stamped "Confidential").

[41]   Young Depo (*Brockert v. Wyeth*) (Exh. 13) at 221:20-222:9. Dr. Young is the Chief of the Division of Gynecology at the Baylor College of Medicine.

[42]   Klimberg Trial Testimony (*Reeves*) (Exh. 7) at 1615:13-15.

[43]   Scroggin Depo (Exh. 14) at 62:7-18, 203:7-10; Kuperman Depo (Exh. 15 at 13:25-14:2, 15:14-23.

[44]   Exh. 15 at 19:1-9.

[45]   Exh. 14 at 134:12-22.

[46]   Exh. 15 at 40:2-7.

[47]   Exh. 15 at 40:8-22.

[48]   Hill Depo (Exh. 16) at 136:9-137:8).

[49]   Rowe (prescriber) Depo (Exh. 17) at 41:11-14.

Estrogen-deficient women do not manufacture enough estrogen to avert the symptoms of menopause, let alone to feed a tumor. Low estrogen-producing women are at the lowest risk of acquiring breast cancer.[52] As. Dr. Colditz has testified, estrogen-deficient women who refrain from taking E+P will likely remain cancer-free.[53] Indeed, women suffering from breast cancer are administered estrogen blocking drugs like Tamoxifen precisely to reduce their estrogen levels to prevent a recurrence of cancer, as multiple studies suggest these drugs do.[54]

Wyeth argues there is no way to separate the effects of exogenous and endogenous estrogen.[55] In particular, Wyeth notes there is no medical test that can differentiate the types of estrogen.[56] It is true that one cannot tell with a microscope whether estrogen in the blood came from the human or the horse. But if a woman was estrogen-deficient, we know E+P is responsible for her cancer, rather than natural estrogen, because the woman was not producing natural estrogen in any tangible amount. In addition, the Chatterton article confirms that post-menopausal women who use E+P have 18 times the level of estradiol in their breast tissue than menopausal women with no exposure to hormone therapy.[57] E+P swamps the breast tissue of estrogen deficient women with hormones.

---

[50]    Exh. 16 at 139:9-140:3.

[51]    Exh. 16 at 229:8-11.

[52]    Colditz Trial Testimony (*Reeves*) (Exh. 5) at 418:7-15; Klimberg Trial Testimony (*Reeves*) (Exh. 7) at 1614:16-1617:6.

[53]    Exh. 5 at 415:15-22.

[54]    Klimberg Decl. (Exh. 11) at 2-3; Klimberg Trial Testimony (Exh. 7) at 1510:15-25.

[55]    Memo at 12.

[56]    Memo at 13.

[57]    Chatterton, *Comparison of Hormone Levels in Nipple Aspirate Fluid of Pre- and Postmenopausal Women: Effect of Oral Contraceptives and Hormone Replacement*, J.Clin.Endocrinology & Metabolism 90(3):1686-1691 (2005)

Wyeth notes that the placebo group in WHI had a high incidence of cancer.[58] But that is because the women in the placebo group had sufficient endogenous estrogen to feed a tumor. WHI was a study of asymptomatic women. The majority of study participants had never ingested E+P previously.[59] Women who never had menopausal symptoms and had not taken hormone therapy were generally women who had sufficiently high levels of endogenous estrogen such that they did not need a prescription supplement; otherwise, they would likely have used E+P. The WHI investigators understood this distinction, noting that in "never users" (women who likely had higher than normal endogenous estrogen levels), the cumulative incidence of breast cancer over time between the drug and placebo groups did not cross for five years, whereas among prior users (women who took the drug before because they were estrogen-deficient), the incidence lines crossed after three years.[60]

The fact that hormones are essential for the development of hormone receptor positive tumors makes Wyeth's "X" factor analysis meaningless.[61] The "X" factor, or unknown cause, concerns only "initiation." We do not know every way that abnormal cells or nonmalignant lesions form in a woman's body. Regardless of what causes them, if such abnormal cells are hormone dependent, they will remain dormant or die without hormones. While there may be an "X" factor of initiation, there is no "X" factor of promotion.

The same analysis applies to Wyeth's claim that most women have no risk factors other than being female and old. Even if womanhood and age actually initiated abnormal cells (for

---

[58]     Memo at 15.

[59]     Pl. Tr. Exh. 785 (Exh. 18) at 1.

[60]     Garnet L. Anderson, *Prior hormone therapy and breast cancer risk in The Women's Health Initiative randomized trial of estrogen plus progestin*, MATURITAS 2006 (Exh. 19) at 8.

[61]     Memo at 26-27.

which there is no evidence), hormones are still needed to convert the cells into hormone-positive tumors. Dr. Naftalis testified that age does not cause breast cancer. It simply makes a woman's cells more suspectible to the disease.[62]  As Dr. Klimberg testified, the promotion effect of E+P is still required to convert the abnormal cells of an older woman into cancer.

> Q:     For many women, all they really have as risk factors is age and they have female breasts. Is that a true statement?
>
> A:     That's true.
>
> Q:     Okay. But even with that, do you need the promotion in order to get the cancer?
>
> A:     Yes.[63]

This analysis of promotion is independent of the pages of quotations Wyeth offers from doctors saying we cannot know what causes breast cancer. All of those physicians are referring to cause as "initiation" – whatever created the abnormality that E+P promotes into cancer. Just a cursory review of the language used reveals this. Wyeth's brief and the quotations provided speak of radiation, genetics, germ-lines and the environment as being potential causes of breast cancer.[64] Each of these is an initiator of an abnormality or lesion. Not once, in any excerpt, did a single doctor use the term "promote" or any synonym of that term. Yet, the promotion effect clearly establishes proximate cause because Plaintiffs' experts have testified that, but/for this effect, Plaintiffs would not have developed breast cancer. And the Court has accepted this notion of causation, both in denying Wyeth's previous motions on the same issue and in precluding the parties from discussing initiation at trial.[65]

---

[62]     Exh. 3 at 88:3-20.

[63]     Exh. 7 at 1511:25-1512:7.

[64]     Memo at 1 n. 1, 11 & n. 23, 27.

[65]     See text at notes 1, 2, *supra*. Furthermore, none of the doctors were asked their opinions based on the

Contrary to Wyeth's claim otherwise, there are at least three biomarkers establishing causation in this case.[66] These are objective indicia of causation, and are independent of differential diagnosis. Initially, as shown above, Plaintiffs' tumors were estrogen receptor positive and progesterone receptor positive, meaning the tumors required hormones to grow. Since Plaintiffs did not produce enough estrogen to feed a tumor, E+P is the only explanation for the cancer's development.

Second, E+P maintained the density of Plaintiffs' breasts, thereby establishing an objective drug effect to E+P. E+P had a cell proliferation effect in both women that is responsible for cancer. The cancer-causing proliferative effect of E+P is visible in women on the drug whose breasts remain dense even after menopause (when density normally decreases). Both Ms. Scroggin and Ms. Hill maintained breast density after they began taking E+P.[67] This phenomenon is known as a drug "dechallenge," which most physicians consider to be powerful evidence of a drug's effects.[68] Dr. Naftalis testified that it contributed to her causation opinion.[69]

Finally, the histological subtype of cancer in one of Ms. Scroggin's breasts was tubular.[70] Tubular carcinoma is practically always hormone-dependent and is particularly associated with E+P.[71] Epidemiological studies establish a high relative risk for development of tubular breast

---

preponderance of the evidence standard -- that which is more likely than not. But this is largely academic, since the questions they were asked were not probative in the first place.

[66]    Memo at 13.

[67]    Exh. 1 at 8 (Scroggin); Exh. 3 at 6:21-7:2.

[68]    *See* Ernest Sterns & Benny Zee, *Mammographic Density Changes in Perimenopausal Women: Is Effect of Hormone Replacement Therapy Predictable?*, 59 BREAST CANCER RES. AND TREATMENT 125 (2000).

[69]    Exh. 1 at 8; Exh. 3 at 6:21-7:2.

[70]    Exh. 1 at 8.

[71]    Waldron Depo (*Brockert*) (Exh. 4 at 81:23-83:6).

cancer by E+P users.  In fact, the relative risk of tubular cancer revealed in the 28 studies cited earlier ranges from 4.81 to 6.5.[72]  Thus, independent of any other methodology, the presence of objectively established biomarkers supports causation.

## II.     Differential Diagnosis Is Well-Established, Universally Accepted, Peer-Reviewed, Highly Reliable and Regularly Employed.

This point is largely superfluous.  Given objective biomarkers of causation, and the fact that the issue is promotion, not initiation, there was no need for Dr. Naftalis to rule out the factors Wyeth cites.  Indeed, Dr. Naftalis had only to rule out factors that created endogenous estrogen levels (obesity and alcohol use).  She did so when she found that Plaintiffs were estrogen-deficient before they begin E+P, meaning their natural estrogen levels were insufficient to feed a tumor.  But Dr. Naftalis went further than she needed to, considering and ruling out other factors through differential diagnosis.

Contrary to Wyeth's claim that such analysis is used only to diagnose a condition,[73] courts have consistently found differential diagnosis to be an appropriate technique for determining the etiology or cause of an injury.  As the Eighth Circuit has held, a reliable differential diagnosis is one that identifies the cause of a plaintiff's medical condition by eliminating other likely causes until the most probably cause is isolated.[74]  The Eighth Circuit considers a medical opinion on causation, based on a proper differential diagnosis, to be sufficiently reliable to satisfy the *Daubert* criterion.[75]

Also contrary to Wyeth's claims otherwise, courts have concluded that differential

---

[72]     Exh. 9.

[73]     Memo at 18.

[74]     *See Mattis v. Carlon Elec. Prods.*, 295 F.3d 845, 861 (8th Cir. 2002) (physician's testimony held reliable because she ruled out other likely causes and relied on published studies linking the toxin to plaintiff's injury).

[75]     *See Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1208 (8th Cir. 2000).

diagnosis <u>to determine causation</u> enjoys widespread support in the medical community, is commonly used, is not designed purely for litigation, is reliable and is peer-review approved.[76] Indeed, differential diagnosis -- <u>to ascertain cause</u> -- "has widespread acceptance in the medical community, has been subject to peer review, and does not frequently lead to incorrect results."[77] Moreover, "the overwhelming majority of the courts of appeals that have addressed the issue have held that a medical opinion on causation based upon a reliable differential diagnosis is sufficiently valid to satisfy the first prong of the Rule 702 inquiry."[78]

Dr. Klimberg confirmed that differential diagnosis -- to determine etiology -- is a regular part of clinical practice. Differential diagnosis enabled investigators to determine that the uterine cancer crisis was caused by estrogen and that lung cancer is often caused by smoking.[79] Differential diagnosis is essential to the treatment of illnesses, for treatment often involves addressing the cause. For instance, if Dr. Klimberg determined that the cause of breast cancer was genetic, she would counsel the patient to have a mastectomy, even though such treatment might not be necessary for others. Similarly, if she determined that alcohol was the likely cause of a tumor, she would vigorously counsel the patient on the importance of alcohol abstinence and

---

[76]    Memo at 16-22.

[77]    *Westbury v. Gislaved Gummi AB*, 178 F.3d 257, 262-63 (4th Cir. 1999) (*citing Brown v. Southeastern Penn. Transp. Auth.*, 35 F.3d 717, 758 (3d Cir. 1994), *cert. denied*, 513 U.S. 1190 (1995); *see also Glaser v. Thompson Med. Co.*, 32 F.3d 969, 978 (6th Cir. 1994) (recognizing that differential diagnosis is "a standard diagnostic tool used by medical professionals to diagnose the most likely cause or causes of illness, injury and disease"); *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 154-55 (3d Cir. 1999) (noting "that differential diagnosis consists of a testable hypothesis, has been peer reviewed, contains standards for controlling its operation, is generally accepted, and is used outside of the judicial context") (internal quotation marks omitted); *Praytor v. Ford Motor Co.*, 97 S.W.3d 237, 245 (Tex. App.--Houston [14th Dist.] 2002, no pet.) ("Differential diagnosis, or differential etiology, is a standard scientific technique for identifying the cause of the medical problem by eliminating the likely causes until the most probable one is isolated.").

[78]    *Westbury*, 178 F.3d at 263 (multiple citations omitted).

[79]    Exh. 11 at 1.

treatment for alcohol use.[80]

Dr. Naftalis likewise testified that there are multiple instances in which the physician would need to learn the probable cause of an injury in order to effectively treat it.[81]  For instance, a breast tumor caused by genetics might require more aggressive surgery.[82]  A tumor caused by alcohol might necessitate unique treatment because, for instance, corresponding liver problems might make surgery inappropriate.[83]   A tumor caused by hormone therapy would be appropriately treated by cessation of that drug and administration of Tamoxifen.[84]  And a tumor caused by radiation would be properly treated with breast conservation.[85]  In each instance, the physician would be required to ascertain the likely cause through differential diagnosis before determining the appropriate treatment regimen.

Dr. Waldron also agreed that differential diagnosis to ascertain cause is a regular part of clinical practice.[86]

Not only have courts rejected the notion that differential diagnosis is purely a litigation construct, Dr. Naftalis rebutted this claim as well.  She testified that the technique she employed was the same process used in treatment and prevention to determine causation.[87]  Dr. Naftalis

---

[80]    *Id.* at 1-2.

[81]    Exh. 3 at 57:18-59:22; 84:17-86:21.

[82]    *Id.* at 57:18-58:16.

[83]    *Id.* at 58:7-59:7.

[84]    *Id.* at 59:8-16.

[85]    *Id.* at 59:17-22.

[86]    Exh. 20.

[87]    Exh. 3 at 74:16-75:23.

learned the process in medical school.[88]

Perhaps the most telling evidence of the propriety of differential diagnosis was provided by the testimony of Dr. David Page, one of Wyeth's causation experts.  Dr. Page noted that there are no biomarkers or physical tests that can pinpoint smoking as the cause of any individual's lung cancer.  But we can determine whether smoking is the cause through differential diagnosis. While Dr. Page obviously does not use the term, "differential diagnosis," he implicates it with his testimony.

> Q:    Well, do you, do you agree that we know that cigarette smoking causes some lung cancers?
>
> A:    Yes.
>
> Q:    Can you say, in an individual case that the cigarette smoking caused lung cancer?
>
> A:    To a high degree of likelihood, yes.
>
> Q:    What's that based on?  What's the likelihood based on?
>
> A:    The likelihood is based on past experience and the reproducibility of that experience.
>
> Q:    Is there any signature in the biochemical sense, in a lung cancer, that allows you to say it was the cigarette smoke that did it as opposed to some other source?
>
> A:    I don't believe so.[89]

Certainly, the combination of examining the epidemiological data and employing differential diagnosis is sufficient to generate a reliable and admissible causation analysis.[90]

Wyeth notes that Dr. Naftalis's particular differential diagnosis was not reviewed and

---

[88]    Id. at 79:3-81:8.

[89]    Page Depo (Apr. 29, 2006) (Exh. 21) at 8:9-9:1.

[90]    See Grassis v. Johns-Manville Corp., 591 A.2d 671, 675 (N.J. Super. 1991).

evaluated by others.[91]  But that will always be the case.  While differential diagnosis as a general

practice is universally approved, the particular method of differential diagnosis will always

depend upon the circumstances of the individual case and therefore cannot claim consensual

support.  That does not diminish its reliability or make it inadmissible.

> Thus, although differential diagnosis is a generally accepted technique, no
> particular combination of techniques chosen by a doctor to assess an individual
> patient is likely to have been generally accepted. But unlike a methodology used
> in conducting a scientific study, lack of general acceptance is not a sign of
> unreliability, it is merely a result of the fact that the medical community will
> rarely have considered the reliability of a particular process of differential
> diagnosis used in an individual case. Nor is it likely that the particular
> combination will have been published and subject to peer review, because a
> particular version of differential diagnosis will rarely be of general interest to the
> medical community. However, to the extent that a doctor utilizes standard
> diagnostic techniques in gathering this information, the more likely we are to find
> that the doctor's methodology is reliable. For these reasons, we must be flexible in
> conducting our *Daubert* inquiry.[92]

Wyeth notes that several experts have testified that, in a line-up of 38 breast cancer

victims of WHI, one could not determine which eight obtained cancer due to E+P.[93]  That claim

is obviously true.  One would have to examine the patients' medical records for objective

biomarkers or conduct a differential diagnosis of each victim to make the determination.

Wyeth further notes that Dr. Naftalis could not recall writing in any patient's chart that

she concluded the patient's breast cancer was caused by hormone therapy.[94]  A clinician's goal is

treat a patient's ailment, not cast blame for the patient's predicament.  Thus, when a doctor

determines that E+P probably causes a patient's cancer, she instructs the patient to stop taking

---

[91]     Memo at 16-17.

[92]     *Brown v. Southeastern Penn. Transp. Auth.*, 35 F.3d 717, 758 (3d Cir. 1994), *cert. denied,* 513 U.S. 1190
(1995).

[93]     Memo at 17.

[94]     Memo at 22.

the drug and to begin ingesting estrogen-blockers. The doctor would not necessarily tell the patient she thought E+P was probably to blame, or note that on a record.

Wyeth complains that Dr. Naftalis failed to "rule in" (whatever that means) short-term hormone therapy use as a cause of Ms. Hill's breast cancer.[95] Dr. Naftalis considered the very studies that Plaintiffs have shown establish a link between short use of E+P and breast cancer. Dr. Naftalis, herself, concluded that a duration of use shorter than Ms. Hill's can cause cancer. The arguments proving this were made in Plaintiffs' response to Wyeth's *Daubert* brief on short-term use and will not be repeated here.[96]

Dr. Naftalis considered and rejected other potential alternate causes of breast cancer for each Plaintiff.[97] She did not even need to go that far, because the only alternate factors that might actually cause the promotion effect necessary to the development of a malignancy were obesity and alcohol. These are the only factors that can stimulate the body's production of estrogen. Yet, neither factor did so in either Plaintiff, given that both were estrogen-deficient.[98] And neither woman was a drinker.[99]

Wyeth objects to Dr. Naftalis's exclusion of genetics as a possible cause of Ms. Scroggin's breast cancer.[100] As Dr. Naftalis noted, Ms. Scroggin submitted to genetic testing and tested negative for the breast cancer gene.[101] Wyeth argues that is not enough because Dr.

---

[95]     Memo at 24.

[96]     See Plaintiff's Response in Opposition to Wyeth's Motion to Exclude Testimony that Short-Term Hormone Therapy Use Can Cause Breast Cancer in *Hill v. Wyeth*, Case. No. 05-546, generally & at 14-15.

[97]     Exh. 3 at 66:4-67:6; 69:71:2.

[98]     Exhs. 1, 2 at 8; Exh. 3 at 172:14-19; 189:23-191:22.

[99]     Exhs. 1, 2 at 8.

[100]    Memo at 31-32.

[101]    Exh. 1 at 8.

Naftalis acknowledged that another gene might also be responsible for some genetically induced breast cancer. [102] Initially, as Wyeth, itself, acknowledges, Dr. Naftalis testified that, at most, this gene might account for 10 to 15 percent of genetically caused cancers only. That means Ms. Scroggin's negative BRCA test results reduce the possibility of a genetically caused breast cancer by 85 or 90 percent. The law deals in probabilities, not possibilities. Preponderance of the evidence means more likely than not; it does not mean beyond all reasonable doubt. More significantly, genetically-induced tumors are typically hormone receptor negative, not positive.[103] Even more significantly, tumors "initiated" by a gene still require hormones to develop, if they are hormone dependent tumors. Genetics would only account for initiation of such tumors – not promotion into clinically relevant cancers.

Wyeth concludes its memorandum with a conclusory allegation that Dr. Naftalis failed to rule out other risk factors.[104] Wyeth presents no argument in support. Furthermore, in this circuit, an expert's failure to rule out *every* possible cause does not warrant exclusion of her testimony.[105] The existence of causes not ruled out goes to the weight, not the admissibility, of the testimony.[106] Finally, Dr. Naftalis excluded all causes that might involve promotion of a hormone receptor tumor. The bottom line is that, regardless of what "initiates" a tumor, if it is

---

[102]   Memo at 28.

[103]   *See* Wen-Yi Huang, et al, *Hormone-related Factors and Risk of Breast Cancer in Relation to Estrogen Receptor and Progesterone Receptor Status*, 151 Am. Jnl. of Epid. 703, 703, 708 table 4 (2000) (Exh. 22).

[104]   Memo at 31.

[105]   *See Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 693 (8th Cir. 2001).

[106]   *Id.* at 694; *accord Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C. Cir. 1996); *see also Coastal Townships, U.S.A., Inc. v. Anderson*, 87 S.W.3d 591, 605 n. 25 (Tex. App.--Houston [1st Dist.] 2002, pet. denied) (expert's purported failure to rule out all causes is not fatal but is fodder for cross-examination).

hormone receptor positive, as here, it requires hormones to grow.[107]

Dated this 5th day of September, 2007.

**LITTLEPAGE BOOTH**

    /s/ Zoe B. Littlepage
Zoe B. Littlepage – Federal Bar No. 12896
1012 W. Alabama
Houston, Texas 77006
(713) 529-8000 – Telephone
(713) 529-8044 – Facsimile

**ATTORNEYS FOR PLAINTIFFS**

---

[107]    E.g., Klimberg Trial Testimony (*Reeves*) (Exh. 7) at 1729:18-21.

## CERTIFICATE OF SERVICE

I hereby certify that on this the 5th day of September, 2007, a true and correct copy of the

foregoing document was electronically filed with the Clerk of the Court using the CM/ECF

system, and a true and correct copy was forwarded by e-mail to the parties below:

Ms. Lyn Pruitt
Mitchell, Williams, Selig, Gates & Woodyard
425 West Capitol, Suite 1800
Little Rock, AR  72201

John W. Vardaman
F. Lane Heard, III
725 12th St. N.W.
Washington, DC  20005

Jay Mayesh
Alan E. Rothman
Steven J. Glickstein
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022

Elizabeth Robben Murray
Kevin A. Crass
Friday, Eldredge & Clark, LLP - Little Rock
Regions Center
400 West Capitol Avenue
Suite 2000
Little Rock, AR 72201-3493

/s/   Zoe B. Littlepage