**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

| | |
|---|---|
| In re: | MDL Docket No. 4:03CV1507 WRW |
| PREMPRO PRODUCTS LIABILITY LITIGATION | *Hill v. Wyeth et al.*, Case No. 4-05-CV-0546-WRW |
| | *Scroggin v. Wyeth et al.*, Case No. 4-05-CV-1169-WRW |

**REPLY IN SUPPORT OF
*DAUBERT* MOTION TO EXCLUDE EXPERT TESTIMONY
OF DR. ELIZABETH NAFTALIS[1]**

Let us go to the heart of the matter. Dr. Naftalis is a case-specific expert. By employing differential diagnosis, she claims to know what caused Plaintiffs' breast cancers and will opine that, but for their use of hormone therapy, neither Scroggin nor Hill would have developed breast cancer.[2] But is there a reliable and accepted methodology for determining the cause of breast cancer *in an individual woman*?

That is the *Daubert* question, and it is one that the Opposition is notably reluctant to address. Not until page 14 does the reader come to a discussion and defense of Dr. Naftalis's differential diagnosis, and the startling first line of that "defense" says, "This point is largely superfluous."[3] Then follow four pages arguing that differential diagnosis is generally an

---

[1]  Pharmacia & Upjohn Company LLC joins in this Reply.

[2]  Pls' Opp' to Wyeth's *Daubert* Mot. to Exclude Expert Test. of Dr. Elizabeth Naftalis (Sept. 5, 2007) [*Scroggin* Docket No. 181; *Hill* Docket No. 161] ("Pl. Opp.") at 3 ("Dr. Naftalis engaged in a differential diagnosis to ascertain what likely led Donna Scroggin and Helen Hill to acquire breast cancer" and "Dr. Naftalis concluded that E+P proximately caused Plaintiffs' breast cancer, that is but/for [sic] Ms. Scroggin's and Mrs. Hill's ingestion of E+P, more likely than not, they would not have developed breast cancer.").

[3]  Pl. Opp. at 14.

accepted methodology, without consideration of whether differential diagnosis is an accepted methodology for determining the cause *of breast cancer* (or other conditions where the range of causes is not known). Not until page 18 does the reader reach an explanation of why Naftalis, in her clinical practice, has never written down the cause of an individual woman's breast cancer. (More on that explanation below.)[4] In the newspaper business, this would be called "burying the lead." In the law business, it is called "smoke and mirrors."

When the Opposition does finally turn to the key questions raised by Wyeth's motion, it is unable to rebut Wyeth's demonstration, based on the factors identified in the *Daubert* case law, that there is no reliable and accepted methodology for determining the cause of breast cancer in an individual woman.

**1.**
**Do Medical Textbooks, Medical Articles, Published Case Reports or**
**Continuing Medical Education Materials Describe the Use of**
**Differential Diagnosis to Determine the Cause of an Individual's Breast Cancer?**

The Opposition does not cite any such textbooks, articles, reports or materials.

**2.**
**Do Other Experts Use Differential Diagnosis to Determine**
**the Cause of an Individual's Breast Cancer?**

We submitted declarations from experts who serve or served as (1) Director of the Breast Diagnostic Center at L.A. County/University of Southern California Women's and Children's Hospital; (2) Director, Breast Health Center, University of Washington; (3) Medical Director, St.

---

[4] Despite the fact that Wyeth began its brief by assuming general causation for purposes of the motion, *see* Wyeth's Mem. in Supp. of *Daubert* Mot. to Exclude Expert Test. of Dr. Elizabeth Naftalis (Aug. 15, 2007) ("Wyeth's Mem.") [*Scroggin* Docket No. 114; *Hill* Docket No. 84] at 2 n.2, the Opposition begins with a lengthy argument about general causation. It then proceeds to an even more lengthy general exposition of why hormone therapy allegedly caused Plaintiffs' cancers. It is an exposition that has little do with Dr. Naftalis's analysis. Of the 40 footnotes that document the support for the assertions in the text, only seven have to do with Dr. Naftalis's report or testimony, and four of those merely document facts or ultimate conclusions. Pl. Opp. at 7-14 n.32-72.

Francis Hospital Women's Health and Breast Center in Federal Way, Washington; (4) Chair, Department of Obstetrics & Gynecology, University of Tennessee College of Medicine; (5) Medical Director, Breast Cancer Center, University of Minnesota; (6) Clinical Professor, Vanderbilt University Department of Obstetrics & Gynecology (7) Founder and Director, Arkansas Cancer Research Center; and (8) Professor and Chairman, Department of Surgery, University of Arkansas Medical School.  Each of them, in his or her own words, agreed with Dr. Barbara Levy, who said: "While most of my patients inquire about the cause of their individual breast cancer, *it is impossible for me, or any clinician, to determine the cause of any individual patient's breast cancer*.  I have never written in any woman's medical records a diagnosis or conclusion regarding the cause of her breast cancer.  I am not aware of any colleagues engaging in such a practice.  As a physician who trains medical students and residents, I have never advised them to attempt to determine the cause of an individual patient's breast cancer."[5]

      The Opposition does not identify any expert in the field whose practice is different – who has used differential diagnosis to determine the cause of a patient's breast cancer, who has told a patient the cause of her breast cancer, who has recorded that determination in a patient's chart, who has observed a colleague using differential diagnosis in this way, or who has taught medical students to do so.  The Opposition certainly does not cite the testimony of any expert who has stepped forward and said, "Yes, I routinely use differential diagnosis to determine the cause of my patients' breast cancers, and I record that important information in the patients' charts."

      The only name offered by the Opposition is Dr. Klimberg, and all that the Opposition says about her is that she "confirmed that differential diagnosis – to determine etiology – is a

---

[5]  Decl. of Barbara S. Levy, M.D. (emphasis added) (attached as Ex. 12 to Wyeth's Mem.).

regular part of clinical practice."[6]  The Court knows from the prior bellwether trials, however, that there is no evidence that Dr. Klimberg has ever used differential diagnosis to determine the cause of a patient's breast cancer other than as a paid expert in the *Reeves* and *Rush* cases.[7]

### 3.
### Does Dr. Naftalis Herself Use Differential Diagnosis to Determine the Cause of an Individual's Breast Cancer?

The Opposition states that Dr. Naftalis served as an assistant professor in the Department of Surgical Oncology at the University of Texas Southwestern for four years and evaluated approximately 100 breast cancer patients per year until she left private practice in 2004.  In that time, did she teach medical students and residents how to use differential diagnosis to determine the cause of a patient's breast cancer; tell students that a particular patient's breast cancer was caused by hormone therapy; present a case to a weekly tumor board in which she concluded that hormone therapy caused a patient's breast cancer; or recall a single instance in which a colleague did any of these things?  The Opposition does not cite any such evidence, and Dr. Naftalis's testimony reflects that she has never done any of these things.[8]

Most telling of all, Dr. Naftalis has ***never*** written down in a patient's chart that hormone therapy caused the patient's breast cancer:

> Q:   . . . [D]id you ever write in the patient's chart or in a report to a treating physician or a referring physician, "Cause of breast cancer, hormone replacement therapy," or "Breast cancer, secondary to hormone replacement therapy?"

---

[6]  Pl. Opp. at 15.

[7]  When Wyeth sought to subpoena any medical charts in which she recorded a diagnosis of "hormone therapy-induced breast cancer" (or the like), and she moved to quash the subpoena, the Court barred her from offering trial testimony that she had ever made such entries without first apprising the Court and Wyeth and permitting reconsideration of the subpoena.  Order, [*Reeves* Docket No. 378].

[8]  Wyeth's Mem. at 21-22.

>   MR. JENNER:  Objection.
>
>   A:   *Not that I can recall*.
>
>   \*   \*   \*
>
>   Q:   . . . So the answer to my question is that *other than in the course of this litigation, after having been retained by plaintiffs' lawyers, you have never written "Cause of breast cancer, hormone replacement therapy"*?
>
>   MR. JENNER:  Objection, asked and answered.
>
>   A:   I wouldn't say never, but *not that I recall*.[9]

The Opposition concedes that there is nothing written in the records of her hundreds of breast cancer patients to indicate that she has ever used differential diagnosis as she purports to do with Scroggin and Hill and gives this explanation: "A clinician's goal is [to] treat a patient's ailment, not cast blame for the patient's predicament."[10]  But "cast blame" by determining the cause of a patient's breast cancer?  Only three pages earlier, the Opposition said that "[d]ifferential diagnosis is essential to the treatment of illnesses."[11]  Performing a differential diagnosis, by Plaintiffs' admission, is not an academic exercise; when it is done, it has a clinical purpose. And, for that reason, one can fairly assume that, when it is done, that fact is written down.

---

[9]  Deposition of Dr. Elizabeth Naftalis (Jul. 9, 2007) ("Naftalis *Mill* Dep.") at 26:18-28:5 (emphasis added) (attached as Ex. 38 to Wyeth's Mem.).

[10]  Pl. Opp. at 18.

[11]  Pl. Opp. at 15-16 (emphasis added).  The examples given by the Opposition, however, reveal that doctors are not performing a differential diagnosis in deciding on a course of treatment, but are merely acting on what is known about the patient's medical history.  If the breast cancer patient has a history of alcohol abuse, the doctor will advise abstinence because alcohol is a risk factor.  A determination of cause has nothing to do with it.  (Note that the Opposition says, "a tumor caused by radiation would be properly treated with breast conservation," when Dr. Naftalis says just the opposite in the portion of her deposition cited by the Opposition.  *See* Pl. Opp. at 16 n.85.)

That Dr. Naftalis has *never* written down that she has performed a differential diagnosis to determine the cause of a patient's breast cancer is persuasive evidence that she has never done it outside the courtroom. Hers, then, is a methodology custom-made for litigation, not an accepted and reliable scientific methodology.

### 4.
### Has Dr. Naftalis's Methodology Been Peer-Reviewed?

Not having done a differential diagnosis to determine the cause of a patient's breast cancer in her clinical practice, it goes without saying that she has not ventured to submit for peer-review and publication a description of the methodology by which she purports to determine the cause of an individual's breast cancer.

To this point, the Opposition says: "Wyeth notes that Dr. Naftalis's <u>particular</u> differential diagnosis was not reviewed and evaluated by others."[12] But that is not what Wyeth noted. Our point was not that her particular opinions about Scroggin and Hill had not been subjected to peer review (a silly point), but that her "methodology *to determine the specific causation of breast cancer*" in any patient had not been subjected to peer review.[13] Nor is there any indication in the medical literature that anyone has submitted that methodology for peer review. That point stands unrebutted as yet another *Daubert* factor warranting the exclusion of her opinions.

### 5.
### Is Dr. Naftalis's Methodology Subject to a Known Error Rate?

In other words, is her method any more reliable than guessing? We noted in the opening brief that Dr. Naftalis had acknowledged that she does not know how often she would be wrong,

---

[12] Pl. Opp. at 17-18 (emphasis in original).

[13] Wyeth's Mem. at 16 (emphasis added). The Opposition cites this page of Wyeth's brief, which speaks only of Dr. Naftalis's general methodology, not its purported application to Scroggin and Hill. Pl. Opp. at 18 n.91.

using her methodology – a concession that the Opposition does not contest, and one that makes sense in light of the fact that it has never been subjected to peer review and no one else has been identified who does it.

But the Opposition makes a further important concession. Our opening brief also pointed out that, in the WHI study, 38 women per 10,000 in the user group developed breast cancer versus 30 women per 10,000 in the placebo group. Both Dr. Austin (Plaintiffs' expert) and Dr. Westbrook (Wyeth's expert) have testified that a doctor who tried to identify the 8 women whose cancer was seemingly caused by hormone therapy would be wrong four times out of five.[14] This is "obviously true," the Opposition agrees[15] – but, it adds, only if one tries to pick the 8 out of a line-up without performing a differential diagnosis.

Yet only a few pages earlier, the Opposition explained why differential diagnosis could *not* serve to pick out the 8. Plaintiffs' theory is that, "if a woman was estrogen-deficient, we know E+P is responsible for her cancer, . . . because the woman was not producing natural estrogen in any tangible amount."[16] That is, the key fact for Plaintiffs' theory is that a woman is "estrogen-deficient." But, according to the Opposition, "WHI was a study of *asymptomatic* women."[17] They were "[w]omen who never had menopausal symptoms and had not taken hormone therapy" and therefore "were generally women who had sufficiently high levels of

---

[14] Wyeth's Mem. at 17.

[15] Pl. Opp. at 18.

[16] *Id*. at 10.

[17] *Id*. at 11 (emphasis added).

endogenous estrogen such that they did not need a prescription supplement."[18] But, if *none* of the study participants was "estrogen-deficient" and *all* had "sufficiently high levels of endogenous estrogen," then how does Dr. Naftalis's method of differential diagnosis work to identify the 8 participants whose cancers are attributable to their use of hormone therapy? How can she rule out, for any of the 38 participants who used hormone therapy and developed breast cancer, that their "sufficiently high levels of endogenous hormones" did not cause their breast cancer?

      She cannot. Her methodology is guesswork.

### 6.
### Did Dr. Naftalis Rule Out the "X" Factor?

      On this dispositive point, the Opposition talks nonsense. The Court knows from the bellwether trials that the experts on both sides agree that *the vast majority of women who develop breast cancer do not have any risk factors other than being older women*. (The experts also agree to the twin corollaries that (i) most women who develop breast cancer did not take hormone therapy and (ii) most who use hormone therapy do not develop breast cancer.) It necessarily follows that some as yet unknown "X" factor(s) causes breast cancer in most women.

      This conclusion has nothing to do with "initiation" versus "promotion," and the Opposition is demonstrably wrong when it tries to dismiss the problem posed by the "X" factor by simply asserting that the "'X' factor, or unknown cause, concerns only 'initiation.'"[19] By

---

[18] *Id*. at 11. This is not an accurate description of the study population, but, for purposes of this motion, we will not respond to this (and other) flaws in the description and interpretation of WHI.

[19] *Id*. at 11. Without any consideration of what the many experts actually say, the Opposition tosses off the assertion that "[a]ll of those physicians [who state that we cannot know what causes breast cancer] are referring to cause as 'initiation' . . . Just a cursory review of the language reveals this." *Id*. at 12. But what even a cursory review actually reveals is that the

Plaintiffs' own logic, the causal concept of "promotion" must also confront the problem that not all the causes of breast cancer are known:

- Plaintiffs contend that "estrogen-deficient women [i.e., women with menopausal symptoms] who refrain from taking E+P will likely remain cancer-free."[20]

- But Plaintiffs agree that the vast majority of women who develop breast cancer have no risk factors other than age and gender, meaning that they did not use hormone therapy.

- This vast majority of so-called risk-free menopausal women necessarily includes women with menopausal symptoms, because most menopausal women experience symptoms.[21]

- And because most postmenopausal breast cancers are hormone receptor-positive (in Plaintiff's lingo, "hormone-dependent"),[22]

---

fourteen experts we quote do not refer to "initiation" or "promotion," but to causation in the broadest sense.

Consider, for example, the quoted testimony of plaintiffs' expert, Dr. Jordan (who obviously classifies hormone therapy as a risk factor for breast cancer):

> Q: Even when a woman with breast cancer has a risk factor, there's no way to prove that it actually caused her cancer
> . . .
>
> A: I would share that view.

Wyeth's Mem. at 7.

[20] Pl. Opp. at 10.

[21] Deposition of Dr. Elizabeth Naftalis (March 21, 2006) ("Naftalis Dep.") at 123:21-124:2 (attached here as Ex. 1). ("Q: Well, you've already said that most of the patients who are postmenopausal and get breast cancer get ER/PR positive breast cancers whether they took hormone therapy or not. A: Right.")

[22] William D. Dupont et al., *Menopausal Estrogen Replacement Therapy and Breast Cancer*, 151 Arch Intern. Med. 67 (1991); Graham A. Colditz et al., *Hormone replacement therapy and risk of breast cancer: Results from epidemiologic studies*, 168 Am J Obstet. & Gynecol. 1473 (1993); Collaborative Group on Hormonal Factors in Breast Cancer, *Breast Cancer and hormone replacement therapy: collaborative reanalysis of data from 51 epidemiological studies of 52705 women with breast cancer and 108411 women without breast cancer*, 350 Lancet 1047 (1997); Trudy L. Bush et al., *Hormone Replacement Therapy and Breast Cancer: A Qualitative Review*, 98 Obstet. Gynecol. 498 (2001). The percentage increases

> most of the so-called risk-free women who develop breast cancer have hormone receptor-positive cancer, whether they experienced menopausal symptoms or not.

For the symptomatic woman ("estrogen-deficient," according to Plaintiffs) who did not take hormone therapy, but nevertheless developed hormone receptor-positive cancer, what caused (i.e., promoted) her breast cancer? That is, whatever it is that initiated the tumor, what then "promoted" its growth to detectable size in an "estrogen-deficient" woman (i.e., *no* endogenous hormones) who did not take hormone therapy (i.e., *no* exogenous hormones)? The Opposition does not say. That is because, in the words of the American Cancer Society, "we do not yet know what causes most breast cancer." In sum, the "X" factor applies to any discussion of the causes of breast cancer, whether framed in terms of "initiation" or "promotion."[23]

Dr. Naftalis herself admitted that science does not know all the factors that cause – i.e., promote – "the growth of breast tumors." Asked whether she would agree that "there are a number of growth factors other than estrogen receptors and progesterone receptors that influence the growth of breast tumors," she answered, "there are some other factors, *and some factors that we – we're not sure about*." She did not attempt to rule out these other factors, which are the

---

with age. Christopher Li et al., *Hormone receptor status, tumor characteristics, and prognosis: a prospective cohort of breast cancer patients,* Breast Cancer Research 1, Table I (2007) (attached here as Ex. 2).

[23] In this context, the difference between "initiation" and "promotion" is negligible. "Initiation" asks what causes a non-cancerous cell to start down the road to becoming cancerous. "Promotion," as Plaintiffs define it, asks what causes a pre-existing lesion or abnormal cell to move further down the road toward cancer, but assumes that it will otherwise lie dormant. In both cases, the question what *causes* breast cancer in an individual women concerns the factor(s) that put the cancer "in motion" such that it will inevitably be subject to detection.

subject of ongoing experimentation, because it is "still a little bit unclear as to what to do with this information"[24] – as, one might say, it is always hard to deal with unknown causes.

The Opposition ignores this admission, as it ignores the legal authority that differential diagnosis is *inherently* faulty when the range of causes is not known. In *Doe 2 v. Ortho-Clinical Diagnostics, Inc.*, the court held that the existence of a strong likelihood of unknown genetic causes of autism "serves to **negate Dr. Geier's use of the differential diagnosis technique as being proper** in this instance."[25] The near consensus that breast cancer, too, has unknown causes should negate Dr. Naftalis's use of differential diagnosis – particularly when there is no evidence that other doctors use the technique to determine the cause of an individual patient's breast cancer, or that Dr. Naftalis herself has done so except in connection with this litigation.

### 7.
### Does Dr. Naftalis Perform a Bona Fide Differential Diagnosis?

For the reasons already given, one cannot perform a bona fide differential diagnosis to determine the cause of an individual's breast cancer. That is why there is no evidence that doctors do it – apart from retained experts, like Drs. Naftalis and Klimberg, who cannot supply any evidence that they have done it in their clinical practice, but claim to have done it for Plaintiffs in this litigation. Any attempt to do so will necessarily be a charade.

Dr. Naftalis's purported differential diagnoses of Scroggin and Hill are not bona fide for three reasons. First, Dr. Naftalis did not "rule in" short-term hormone therapy use as a potential cause of Hill's cancer. About "ruling in" potential causes, the Opposition says, "whatever that

---

[24] Dep. of Dr. Elizabeth Naftalis (May 31, 2007) ("Naftalis *Trevino* Dep.") at 80:4-81:5 (emphasis added) (attached as Ex. 3 to Wyeth's Mem.).

[25] 440 F. Supp.2d at 476 (emphasis added).

- 11 -

means."[26]  What it means, as the Eighth Circuit said in *Glastetter v. Novartis Pharm. Corp.*, cited in Wyeth's opening brief,[27] is that the process of ruling out the potential causes under consideration does not begin until the expert has first established that there is reliable scientific evidence that the alternatives are capable of causing the condition.  Far from ruling in short-term use, Dr. Naftalis has acknowledged that "[t]he epidemiologic studies tend to show that it's *five years* of use or greater when you see a cancer on a mammogram or when a cancer is diagnosed."[28]  The Opposition now baldly asserts – not citing her reports, deposition or trial testimony, or any other source – that "Dr. Naftalis considered the very studies" that Plaintiffs rely on and that she, "herself, concluded that a duration of use shorter than Ms. Hill's can cause cancer."[29]  There is no evidence that she did any such thing.

Second, now that we have the previously undisclosed genetic counseling records for Scroggin from UAMS, it is even clearer that Dr. Naftalis did not rule out family history as an explanation for her cancer.  Dr. Naftalis only considered the fact that Scroggin's mother had breast cancer, not that, on the maternal side, a great-aunt and two cousins also had breast cancer and one (like Scroggin herself) had bilateral breast cancer.  That Scroggin's family history of cancer involves (i) three successive generations (ii) on the maternal side, (iii) with early onset,

---

[26] Pl. Opp. at 19.

[27] Wyeth's Mem. at 24 n.58.  *See also Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) ("[E]xpert opinions employing differential diagnosis must be based on scientifically valid decisions as to which potential causes should be 'ruled in' and 'ruled out.'").

[28] Deposition of Dr. Elizabeth Naftalis (Mar. 21, 2006) ("Naftalis *Dockter* Dep.") at 315:23-316:2 (emphasis added) (attached as Ex. 1 to Wyeth's Mem.).

[29] Pl. Opp. at 19.

(iv) bilateral breast cancer and also (v) ovarian cancer is strong evidence of genetic causation. Dr. Naftalis did not consider it, much less rule it out.[30]

Third, the Opposition indirectly makes clear that Dr. Naftalis cannot rule out the effect of endogenous hormones. It repeatedly claims that only hormone therapy can have promoted the growth of Plaintiffs' tumors, because both Plaintiffs had menopausal symptoms, meaning that they were "estrogen-deficient" and did not produce sufficient endogenous estrogen to promote tumor growth. To begin with, however, the Opposition misuses the term "estrogen deficiency." It first acknowledges that Wyeth and clinicians use the term to refer to the ***decline*** in estrogen that accompanies menopause, not any particular level of estrogen.[31] But the Opposition then proceeds to use the term only to denote women who have menopausal symptoms, despite the fact that all menopausal women experience a sharp decline in estrogen production. No reliable, scientific evidence supports the claim that only women with symptoms are "estrogen-deficient," and the Opposition does not cite any such evidence.[32]

---

[30] Dr. Naftalis testified that a family history including only a first-degree relative "would be contributory toward her underlying risk." Naftalis *Dockter* Dep. at 221:17-22 (Ex. 1). The Opposition's claim that the negative BRCA test rules out family history is inconsistent with both that testimony and the interpretation of the BRCA test given by UAMS. Yet again, Plaintiffs' lawyers are testifying when it is their burden to come forward with evidence that Dr. Naftalis performed a bona fide differential diagnosis.

[31] Pl. Opp. at 9 ("The substantial decline in estrogen production is referred to (both by clinicians and Wyeth's marketing documents) as 'estrogen-deficiency.'").

[32] The Opposition does not cite evidence for any of the following five iterations of the assertion that only women with symptoms are "estrogen-deficient:" (1) "neither Plaintiff manufactured sufficient levels of hormones, herself, to feed a tumor since each suffered from menopausal symptoms – a classic sign of estrogen deficiency," *id*. at 6; (2) "Plaintiffs were estrogen-deficient and therefore did not generate enough estrogen to feed a tumor," *id*. at 9; (3) "[e]strogen-deficient women do not manufacture enough estrogen to avert the symptoms of menopause, let alone feed a tumor," *id*. at 10; (4) "[s]ince Plaintiffs did not produce enough estrogen to feed a tumor, E+P is the only explanation for the cancer's development," *id*. at 13; and (5) Dr. Naftalis ruled out any effect of endogenous hormones "when she found that Plaintiffs were estrogen-deficient before they began E+P, meaning their natural estrogen

But the Opposition also misuses "estrogen-deficiency" in a more fundamental way. It claims both (i) that women with menopausal symptoms have lower levels of endogenous hormones and (ii) that those levels are so low that they can have no effect on the growth of breast tumors. The Opposition does not cite any scientific evidence for either proposition. As the burden is on Plaintiffs to show that Dr. Nafatalis's methodology is reliable, this failure to provide any scientific support for her threshold assumption is fatal. In fact, the evidence is to the contrary. Regarding whether menopausal women with symptoms have lower levels of estrogen than menopausal women without symptoms, the 2001 article, "Physiology of Hot Flashes," reported that "[a]lthough hot flashes clearly accompany the estrogen withdrawal at menopause, estrogen alone is not responsible *since levels do not differ between symptomatic and asymptomatic women*"[33] – a point that is made over and over in the medical literature.[34] Obese

---

levels were insufficient to feed a tumor," *id.* at 14. In a brief with 107 footnotes, it is notable that the Opposition *never* footnotes this proposition with scientific evidence. It is purely testimony by counsel.

[33] Robert Freedman, *Physiology of Hot Flashes*, Am. J. Human Bio. 13:453 (2001).

[34] *See* J.E. Manson, *Hot Flashes, Hormones & Your Health*, 0019-20 (2007) ("In perimenopausal the level of estrogen in a woman's blood is not a reliable predictor of whether or not she will have hot flashes."); Deborah Grady, *Management of Menopausal Symptoms*, 355 NEJM 2338,2339 (2006) ("Endogenous estrogen levels do not differ substantially between postmenopausal women who have hot flushes and those who do not have them."); Robert Freedman, *Pathophysiology and Treatment of Menopausal Hot Flashes*, 23 Sem. in Reprod. Med.117 (2005) ("[E]strogen levels do not differ between symptomatic and asymptomatic women."); John Randolph et al., *Change in Estradiol and Follicle-Stimulating Hormone across the Early Menopausal Transition: Effects of Ethnicity and Age*, 89 J. Clin. Endocrinol. Metab. 1555 (2004) ("The responsiveness of many of these physiologic changes to estrogen therapy suggests that estrogen deficiency may contribute to the pathogenesis. However, vaginal symptoms have been associated with lower serum levels of androgens but not of estrogens"); Lisa Gallicchio et al., *Body mass, estrogen levels, and hot flashes in midlife women*, 193 Am. J. Obstet. & Gynecol 1353 (2005) ("In studies of postmenopausal women, researchers have shown that women with a high BMI have higher estrogen levels than women with a low BMI . . . . [E]strogen levels have been observed to be negatively associated with the risk of hot flashes."); Position statement: Treatment of menopause-associated vasomotor symptoms: position statement of the North American

women, like Scroggin and Hill, are known to have more frequent and severe hot flashes although they have ***higher*** levels of estrogen.[35]  And regarding the second proposition – that menopausal women with symptoms do not produce enough endogenous estrogen to promote tumor growth – the Opposition acknowledges that just the opposite is true when it notes that "women suffering from breast cancer are administered estrogen blocking drugs like Tamoxifen" regardless of whether they have experienced menopausal symptoms in the past.[36]  That is, doctors routinely administer Tamoxifen precisely because it is believed that menopausal women are still producing sufficient endogenous estrogen to have an effect on the growth of a pre-existing cancer.  Thus, Dr. Naftalis rules out the endogenous hormones only by *ipse dixit*, not based on reliable scientific evidence.

## Conclusion

If Dr. Naftalis truly knew how to determine the cause of a patient's breast cancer, the scientific community would bestow prizes on her.  Instead, it is Plaintiffs' counsel who merit a prize for creative writing.

---

Menopause Society (2004) (". . . endogenous estrogen concentrations alone are not predictive of hot flash frequency or severity."); J.D. Hutton et al., *Relation between Plasma Oestrone and Oestradiol and climacteric symptoms*, Lancet 678 (1978) ("We have not found the cause of flushes.  Flushes are obviously not related to particular concentrations, mean levels, or pattern of fluctuation of plasma-oestrone or oestradiol."); SC Stone et al., *Postmenopausal symptomatology, maturation index and plasma estrogen levels*, 45 OB/GYN 625 (1975) ("No statistical difference in plasma levels of estrogen was found between the group of patients with symptoms and the patients without symptoms."); Raquel Arias, M.D., *Reeves* Tr. Transcript at 2766:25-2767:2 (Sept. 7, 2006) [*Reeves* Docket No. 438] ("There's no data to support that differences in blood levels of estrogen at menopause or thereafter is related to anything in my reading of the literature.").

[35] *See* Janos Garai, *Hepatic dysfunction in development of menopausal hot flushes?* 58 Medical Hypotheses 535 (2002) ("Obese menopausal women tend to suffer more frequently and more severely from hot flushes, *though they have higher residual estrogen levels* due to the conversion of adrenal androgens in fat tissue.") (emphasis added).

[36] Pl. Opp. at 10.

        Respectfully submitted,

        /s/    F. Lane Heard III
        John W. Vardaman, Jr.
        Stephen L. Urbanczyk
        F. Lane Heard III

        WILLIAMS & CONNOLLY LLP
        725 12th Street, NW
        Washington, DC 20005-5901
        (202) 434-5000

        Lyn P. Pruitt, Bar No. 84121

        MITCHELL, WILLIAMS, SELIG, GATES & WOODYARD, PLLC
        425 West Capitol Avenue, Suite 1800
        Little Rock, AR 72201-3525
        (501) 688-8800
        *lpruitt@mwsgw.com*

        *Attorneys for Wyeth*

DATED:  September 12, 2007

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of September 2007 a true and correct copy of the foregoing Reply in Support of *Daubert* Motion to Exclude Expert Testimony of Dr. Elizabeth Naftalis was electronically filed with the Clerk of Court using the CM/ECF system, and a true and correct copy sent by e-mail to the parties listed below.

Joshua H. Brockman
Zoe B. Littlepage
Littlepage Booth - Houston
1012 West Alabama Street
Houston, TX 77006
Email: josh@littlepagelaw.com
       zoe@littlepagebooth.com

Kevin A. Crass
Elizabeth Robben Murray
Friday, Eldredge & Clark, LLP
400 West Capitol Avenue, Suite 2000
Little Rock, AR 72201-3493
Email: crass@fec.net
       murray@fec.net

Jay Phillip Mayesh
Steven J. Glickstein
Alan E. Rothman
Kaye Scholer, LLP
425 Park Avenue
New York, NY 10022-3598
Email: maoedar@kayescholer.com
       arothman@kayescholer.com

/s/     F. Lane Heard III
F. Lane Heard III

WILLIAMS & CONNOLLY LLP
725 12th Street, NW
Washington, DC 20005-5901
(202) 434-5000
*lheard@wc.com*