1

                    IN THE UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF ARKANSAS
                            WESTERN DIVISION

    IN RE:  PREMPRO PRODUCTS LIABILITY    MDL No. 1507
                                          No. 4:03CV01507

                    * * * * * * * * * *
    DONNA SCROGGIN,
                    Plaintiff,         Individual Case
         v.                            No. 4:04CV01169 WRW

    WYETH and its divisions; PHARMACIA
    & UPJOHN COMPANY LLC; WYETH
    PHARMACEUTICALS, INC.; and ESI LEDERLE,

                    Defendants.


         Friday, May 9, 2008 - Little Rock, Arkansas - 9:18 a.m.

                    TRANSCRIPT OF MOTIONS HEARING
              BEFORE THE HONORABLE WILLIAM R. WILSON, JR.,
                     UNITED STATES DISTRICT JUDGE

    APPEARANCES:

    On Behalf of the Plaintiffs:

         MR. ERIK BRETT WALKER
           Hissey, Kientz & Herron, P.L.L.C.
           16800 Imperial Valley Drive
           Suite 130
           Houston, Texas   77070

         MR. JAMES A. MORRIS, JR.
         MR. STEVE M. FARIES
           Brent Coon & Associates
           11614 Bee Caves Road, Suite 220
           Austin, Texas   78738

         MR. RALPH M. CLOAR, JR.
           Law Office of Ralph M. Cloar, Jr.
           1501 North University Avenue
           Suite 640
           Little Rock, Arkansas   72207-5235


                                              [CONTINUED]

```
 1   APPEARANCES CONTINUED:

 2
     On Behalf of the Plaintiffs (Continuing):
 3
         MS. ZOE B. LITTLEPAGE
 4          Littlepage Brockman, P.C.
            1012 West Alabama Street
 5          Houston, Texas  77006

 6   On Behalf of the Wyeth Defendants:

 7       MR. F. LANE HEARD, III
         MR. STEPHEN L. URBANCZYK
 8       MR. DANIEL N. MARX
         MR. PAUL MOGIN
 9          Williams & Connolly
            725 Twelfth Street, N.W.
10          Washington, D.C.  20005-5901

11       MS. LYN PEEPLES PRUITT
            Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.
12          425 West Capitol Avenue, Suite 1800
            Little Rock, Arkansas  72201-3525
13
     On Behalf of the Upjohn Defendants:
14
         MS. ELIZABETH ROBBEN MURRAY
15          Friday, Eldredge & Clark
            Regions Center
16          400 West Capitol Avenue, Suite 2000
            Little Rock, Arkansas  72201-3493
17
         MR. CHARLES P. GOODELL, JR.
18          Goodell, DeVries, Leech & Dann, LLP
            Commerce Place
19          One South Street
            Suite 2000
20          Baltimore, Maryland  21202

21       MR. STEVEN J. GLICKSTEIN
         MR. ANDREW K. SOLOW
22          Kaye Scholer LLP
            425 Park Avenue
23          New York, New York  10022-3598

24

25       Proceedings reported by machine stenography; transcript
```

3

1                    P R O C E E D I N G S

2          THE COURT:  Good morning.  Be seated, please.

3      I apologize for being tardy.  In view of the fact that I've

4  been guilty of being tardy, I'll cut your time in half when you

5  go to the marshal's lockup when you're late.

6      We're here for arguments in Scroggin against Wyeth, et al,

7  4:04CV01169 on defendants' motion to strike or remittitur of

8  punitive damages award.

9      As I understand it, the defendants claim that the -- let's

10  all turn our cell phones off.  I don't know how to turn mine

11  off, so I'll just hang up on somebody.  I didn't turn off the

12  ringer.

13      Defendants claim that the only cause of action in this case

14  is failure to warn, and any punitive damages award must be

15  related to plaintiff's failure to warn claim.  Williams against

16  ConAgra Poultry Company, 378 F.3d 790.  That's 378 F.3d 790,

17  Eighth Circuit, 2004.  That case would seem to support this

18  proposition.

19      After weeping and wailing and gnashing of teeth, I've

20  expanded the oral argument time from 45 minutes to an hour.

21      How do the defendants want to divide that hour up?

22          MR. HEARD:  Your Honor, we're going to divide that 40

23  minutes for the initial argument, 20/20, between Mr. Goodell and

24  myself, and we'll take 20 for the rebuttal and split that 10 and

25  10.

4

1          THE COURT:  Alrighty.  Are the plaintiffs going to

2   have one or more lawyers arguing?

3          MR. WALKER:  Just me, Your Honor.

4          THE COURT:  Okay.  Well, are we ready to commence?

5     Mr. Heard.

6          MR. HEARD:  Your Honor, thank you for your guidelines

7   yesterday and your two questions.  I want to address both

8   questions, the question about the evidence, whether endometrial

9   cancer episode put Wyeth on duty of a notice to test, and I want

10  to address the second question about Dr. Parisian's testimony.

11  But I think it would be helpful to step back, before answering

12  both of those questions, and step back and consider one

13  principle of law and one element of the big picture that is

14  established by the evidence.

15     The Arkansas Supreme Court has been clear that when the

16  question is whether a defendant has acted with wantonness or

17  malice, that that question is answered almost always by whether

18  the defendant had unique knowledge, whether the defendant had

19  some secret information, whether the defendant was in the

20  possession of some fact that nobody else knew that charged it

21  with a duty to act for the care of others.  So that in the Airco

22  case, involving an artificial breathing machine, the defendant

23  knew before it ever put the product on the market that its field

24  testing had shown it to be defective.  In the D'Arbonne case,

25  the defendant knew that it had backed off the brakes and

1  rendered them inoperable before the truck went on the highway.

2  The defendant in the Routh case knew when it reported the

3  vehicle stolen that the vehicle was, in fact, sitting on the car

4  owner's lot with the keys still in it.  That's true of the

5  hypothetical in plaintiff's brief that they open with.  The

6  defendant rancher knew that he had a cow in the herd with mad

7  cow disease, but he didn't tell the authorities, under the

8  hypothetical.  And it is true in the hypotheticals that they

9  quote from the Silkwood case in Oklahoma where the court

10  hypothesized about an airplane manufacturer that knew there was

11  a defect in the plane that could cause it to crash, but didn't

12  tell the FAA.

13      And what we know here from the evidence in the case is that

14  Wyeth never had any unique knowledge.  It never had any secret

15  information in its files.  The plaintiff's experts concede that

16  Wyeth fully disclosed everything it ever knew.  And the only

17  proprietary information it had, that information that was in its

18  investigational new drug information was information it turned

19  over to the NIH to enable it to do the Women's Health Initiative

20  study.

21      When we step back and look at the facts, Your Honor, what

22  we see is that hormone therapy was one of the most widely

23  prescribed drugs in the United States, and breast cancer was one

24  of the most widely studied diseases.  And these two facts

25  converged in the 1970s and '80s and '90s to mean that this

1    possible link between hormone therapy and breast cancer was one

2    of the most active fields of scientific research, cutting-edge

3    research, research which engaged scientists from government,

4    from academia, from industry, because not only was this an

5    important issue that engaged people's interests and would have

6    wide consequences, it would have made somebody's reputation.

7    It's not crazy to say this would have earned somebody the Nobel

8    Prize if they could have come up with a definitive answer.  And

9    this active, cutting-edge research was being conducted in

10   Oakland.  There was a debate about whether hormone therapy

11   caused breast cancer, and it was a two-sided debate, to be sure,

12   and it was played out in the public peer-reviewed literature and

13   in conferences like the San Antonio conference that Your Honor

14   heard about that happens every year, that draws hundreds of

15   scientists.  And this open debate, this active research resulted

16   in extensive literature about hormone therapy and breast cancer.

17   You've heard ad nauseam the FDA's claim that Premarin was the

18   most widely studied drug in the United States, and the study of

19   Prempro and E plus P only added to that already extensive

20   literature.

21        So this big picture means that all of the so-called signals

22   that Wyeth received about breast cancer were public signals that

23   were delivered in the public peer-reviewed literature, that were

24   signals that everyone heard, all of the researchers in

25   government, academia, and industry, that there was nothing

1    uniquely known by Wyeth and that it alone had in its possession

2    to act upon.

3        So that when we go back to this question of whether Wyeth

4    acted wantonly or maliciously or willfully, and the plaintiffs

5    say, well, Wyeth missed the signal, then we have to say, well,

6    so did everyone else.  So did Hoover and Ross and Pike and

7    Cummings.  So did Dr. Austin, whose endometrial cancer work

8    supposedly created the signal.  So did Dr. Colditz miss the

9    signal if Wyeth missed the signal.  And Dr. Colditz was the

10   principal investigator for the Nurses' Health Study, the

11   largest, perhaps the largest ongoing observational study of

12   women's health in the United States.  But he, too, didn't do

13   that supposedly quick, easy, definitive study that the

14   plaintiffs say could have been done.  All of the scientists at

15   the 40 centers that participated in the Women's Health

16   Initiative study missed the same signal that Wyeth missed.  And

17   we're not saying here, Your Honor, to be clear, well, we got

18   caught running the red sign, so did everyone else, that excuses

19   us.  Not talking about excusing the negligence that the jury

20   found we committed by not doing the study.  But we are talking

21   about the state of mind, because if the signal was public and

22   everyone missed it, then how could Wyeth alone be wanton and

23   malicious?

24       Plaintiffs concede at page 34 in their brief that Wyeth

25   conducted studies, Wyeth supported studies.  The evidence was

1    that there were at least 57 studies about estrogen plus

2    progestin.  Wyeth conducted or supported 19 of those.  But what

3    Wyeth did not do was a study that no other researcher in

4    government, academia, or industry did, or recommended that be

5    done, or submitted a research proposal to be done.  And what

6    that tells us, Your Honor, what I submit it means is that

7    science proceeds step by step.  It was proceeding step by step

8    in the '70s and '80s.  There was a two-sided debate in this area

9    of breast cancer, just as there was about cardiovascular

10   benefit.  And Wyeth was not malicious or wanton in walking in

11   step with all the other researchers in the field.

12        And, Your Honor, that leads us up to and begins to answer

13   your first question:  What is the evidence in the record that

14   the endometrial cancer episode put Wyeth on notice, and really

15   more than notice for purposes of malice, of the danger of breast

16   cancer?  Well, this story, this big picture shows us that if

17   there was a signal of that kind, nobody got it.  We know,

18   secondly, that Dr. Austin, whose work supposedly created the

19   signal, never said contemporaneously, never said at the time

20   that there was a signal that estrogen plus progestin created a

21   heightened risk of breast cancer.  There is no evidence in the

22   record for the claim that plaintiffs make -- I know Your Honor

23   has noted this or you wouldn't have asked the question yesterday

24   -- when the brief says twice, plaintiff's brief, "Wyeth knew

25   that the addition of a progestin could increase the incidence of

1    breast cancer," it's repeated on the next page of their brief,

2    as well, there's no footnote, there's no citation to the record

3    because there is no evidence in the record for that illogical

4    claim.  Because what the endometrial cancer episode showed was

5    that the addition of progestin had a protective effect on the

6    endometrium.  If anyone thought you could extrapolate from that,

7    it would be that the addition of progestin had a protective

8    effect on the breast.  And the evidence, the evidence in the

9    record is precisely that.  I will hand up to Your Honor when

10    we're through the testimony from Dr. Graham Colditz given at

11    this trial in which Dr. Colditz testified that the working

12    hypothesis, his working hypothesis as late as 1993 was that the

13    addition of progestin had a protective effect on the breast.

14    And Dr. Parisian was asked about that in her trial testimony,

15    and I will hand that up to Your Honor, in which she somewhat

16    grudgingly, but grudgingly admitted, too, that that was the

17    working hypothesis as late as 1989.

18       And lastly on this point, Your Honor, about the endometrial

19    cancer episode --

20       THE COURT:  Wait a minute.  She grudgingly conceded

21    what was the working hypothesis?

22       MR. HEARD:  The working hypothesis was that the

23    addition of progestin had a protective effect on the breast, and

24    it was not until the study in 1989, she says, that things began

25    to turn, yet Dr. Colditz said he was still working on the

1   protective hypothesis until 1993.  And that's the evidence in

2   the record.

3       But apart from that evidence, Your Honor, is the fact that

4   in this stage of the case, when the question is malice and

5   wantonness, something more is required than simply that Wyeth

6   was put on duty of a notice to test.  That's what led up to a

7   finding of negligence in Phase I.  In Phase II what's required

8   is evidence that Wyeth believed or Wyeth knew that doing one

9   more test would naturally and probably result in finding a much

10  higher risk of breast cancer, that they knew that this

11  additional testing would lead to that kind of consequential

12  finding, and there's simply no evidence that would support that.

13      Now, Your Honor, that brings us to Dr. Parisian, your

14  second question.  Was it permissible to allow in her testimony,

15  and does that testimony really add anything to the testimony of

16  Phase I, which was the same old stuff that Your Honor heard in

17  the Rush case and found insufficient to support punitive

18  damages?

19      Now, whether or not Your Honor should have permitted

20  Dr. Parisian's testimony at the outset, I would submit at this

21  stage is not so much the question as whether now that we can

22  look back and examine that testimony, whether Your Honor should

23  strike it or consider it.  And I would put these three questions

24  on the table.  First of all, did her testimony hew to the

25  Court's pretrial and trial rulings that limited what she could

1    say as an expert?  And I submit the answer is no, and I

2    challenge plaintiff's counsel in his hour here at the podium to

3    cite to Your Honor, question and answer, line and page, of

4    Dr. Parisian's testimony in which, as to each of the 14

5    documents that made up her testimony in Phase II, she was ever

6    asked the question, "What FDA regulation does this violate?", or

7    ever gave the answer "This violates an FDA regulation, and

8    here's what it is."  Cite the question and answer.  Because it's

9    not there.  And because it's not there, we never even get to the

10   second question we would want to follow up with, is what those

11   regulations have to do with testing in a failure to test.

12   Because Your Honor will remember that when she first took the

13   stand, there was some window dressing.  "I'm going to talk about

14   the following three regulations."  And when we went back to look

15   at those three regulations she cited, one of them was about

16   veterinary products, and one was about the wholesale importation

17   of drugs, and only the third one marginally had a significance

18   for prescription drugs.  The first question, did she hew to Your

19   Honor's ruling?  Let's see the line and page numbers of the

20   answers.  Secondly, did she offer truly expert testimony?  Was

21   she providing the jury something they couldn't have gotten for

22   themselves by simply reading the documents?

23       Your Honor, we have the 14 documents.  I think we've

24   submitted them before.  We can submit them again today.  A

25   simple examination shows that the gloss she added wasn't a gloss

1    to be provided by an expert.  It was argument.  Take the first

2    document in this binder, a letter from the FDA to Wyeth.  This

3    is what they wanted the jury to hear.  "This has incensed the

4    FDA at all levels."  Did it require testimony from Dr. Parisian

5    to tell the jury that the FDA was mad at Wyeth when it said it's

6    incensed?  Did it take expert testimony to interpret a document

7    that was a list of grants that Wyeth made to various

8    organizations?  Or did it take expert testimony to tell the jury

9    what it meant, that marketing plan laid out, "We want to change

10   women's perceptions about the benefits and risks of this drug"?

11   This was precisely the kind of testimony that the MDL judges in

12   Rezulin and Baycol came face to face with, and they flagged it

13   as impermissible testimony.  And the only defense that you find

14   in the plaintiff's brief is a defense for summary witnesses.

15   And the brief says, well, it's fair game for a witness in this

16   case to summarize for the jury a half-century of Premarin and

17   Prempro documents.

18             THE COURT:  Hold on just a minute.

19        Okay.  Go ahead.

20             MR. HEARD:  But Dr. Parisian wasn't summarizing a

21   half-century of Wyeth's documents.  She was specifically

22   addressing 14 documents, 12 of which came from the narrow period

23   of 1988 to 2000.  And that brings us to the third question --

24             THE COURT:  Let me ask you this.  When you're talking

25   about testing, the only issue submitted to the jury, and the

1    only issue upon which they found against the defendants was

2    failure to warn.  Is that correct?

3         MR. HEARD:  That's correct, Your Honor.  And I know

4    the plaintiffs would say a theory of failure to test leading to

5    a failure to warn.  But, ultimately, a failure to warn.  And

6    Your Honor's quite right by asking that question.  The conduct

7    about which Dr. Parisian testified was not about testing and not

8    about warning.

9         What are the 14 documents about which she used to string

10   together her testimony?  The conduct that harmed plaintiff was

11   not Seasons magazine, which she never saw and which the document

12   was about a draft of the magazine, not one that anybody ever

13   saw.  The conduct that harmed Ms. Scroggin was not about that

14   list of disbursements to various organizations.  The conduct

15   that harmed Ms. Scroggin was not the PR marketing plans, because

16   marketing wasn't in this case.  Ms. Scroggin didn't rely on any

17   advertisements or marketing.  The conduct that harmed

18   Ms. Scroggin wasn't these speeches to sales representatives and

19   what sales representatives said, because the testimony from

20   Dr. Kuperman was that he did not rely on anything the sales

21   representatives said.  And the conduct was not about the

22   endometrial cancer documents that she testified about because

23   those two documents were not about testing or warning; they were

24   about a "Dear Doctor" letter that the FDA found insufficient.

25        That constitutional principle for a Phase II is, you can

1   talk about injury to nonparties if it's similar conduct to what

2   harmed the plaintiff, but you can never, never talk about

3   dissimilar conduct.   Punitive damages, and every aspect of it,

4   has to relate to the conduct that harmed the plaintiff, just as

5   the Williams v. ConAgra case said, and one has to be careful

6   that that nexus is pretty tight.

7        So that we would say that her testimony did not relate to

8   the conduct in issue, it is, therefore, constitutionally

9   irrelevant.   But even if it weren't dissimilar conduct, it

10  doesn't establish malice or intent.   Even if it were similar

11  conduct, it doesn't establish malice, for two reasons.   As I

12  said before, it is not enough just to say that Wyeth failed to

13  test, because that's negligence.   Malice required showing that

14  Wyeth believed or strongly suspected that doing another study --

15  here there were all these studies that had been done on estrogen

16  versus progestin; 20, 30, 40, 50 studies, the record says.   Did

17  Wyeth believe that doing one more study was naturally and

18  probably going to show a definitive, significantly higher risk

19  of breast cancer?   No evidence of that.

20       And, Your Honor, what these 14 documents show, when one

21  goes through them, again and again, is that, rightly or wrongly,

22  Wyeth believed that the benefits of this drug greatly outweighed

23  the risks; believed that the risk of breast cancer was small;

24  consistently say the problem is not that somebody is saying the

25  risk of breast cancer is great, but that every time somebody

1  talks about the risk of breast cancer, people lose a balanced

2  perspective about the fact that the benefits and the risks weigh

3  in favor of the product.  Remember, Your Honor, that all of this

4  action takes place at the threshold of the '90s.  And what was

5  happening at the threshold of the '90s?  The WHI study was about

6  to get underway; a study that was premised on the fact that the

7  risk of breast cancer was small and that the potential enormous

8  benefits, beyond relieving vasomotor symptoms and beyond

9  osteoporosis prevention, there were additional benefits that

10  were even greater.  It wasn't just Wyeth's view.  It was the

11  view of the National Institutes of Health, the 40 centers, and

12  the hundreds of researchers who were about to commence on that

13  massive scientific project.  And that fact weighs heavily in

14  favor of finding that there was no malice here.

15     As Judge Friendly said in the Roginsky case, a case we've

16  cited and in the second phase I may quote when there's some more

17  time, this is precisely one of those cases where maybe, in

18  retrospect, they should have done more to test, but their

19  mind-set is at the opposite end of the continuum from malice and

20  wantonness.

21     THE COURT:  Your time is up.  I'd give you another

22  five minutes if you're wound up so tight you're going to swell

23  up and burst.  And I'll do this for everybody.  It's an

24  important issue.

25     MR. HEARD:  Your Honor, I'm fine.  And I'll come back

1    in rebuttal and use that time.

2            THE COURT:  Okay.

3            MR. GOODELL:  Good morning, Your Honor.

4            MR. HEARD:  While they're setting up, Your Honor, let

5    me hand up these two bits of testimony --

6            THE COURT:  Give it to Ms. Johnson or Mr. Morgan,

7    please.  My letter yesterday didn't mean you couldn't use

8    PowerPoint.

9            MR. GOODELL:  I have a couple of PowerPoints, Your

10   Honor, but we're trying to be mindful of your admonition, so

11   we're not going to overburden this.

12           THE COURT:  I'm big on posterboards anyway.

13           MR. GOODELL:  May I begin?  Thank you, Your Honor.

14   I'm Charlie Goodell on behalf of Upjohn.  It is a pleasure to be

15   here again.

16       Let me start off by saying that we absolutely adopt and

17   believe that the argument that Wyeth has made is correct on

18   this -- can you hear me okay?

19           THE COURT:  Great.

20           MR. GOODELL:  And believe that the arguments, with the

21   exception of the comments about specific documents related to

22   them, are the exact arguments that relate to us.  So I won't

23   repeat those arguments.

24       But what we have here, particularly as it relates to

25   Upjohn, is an absence of evidence.  We have an absence of

1   evidence of any conscious intent on the part of Upjohn to do

2   anything to injure anyone.  We have an absence of evidence of a

3   knowing reckless conduct which could amount to malice.  And to

4   the point that Mr. Heard made, there is equally an absence of

5   evidence of some unique information about the risk of breast

6   cancer that was available to Upjohn in this process.

7       We know the standard.  I won't repeat it to Your Honor.  It

8   is not negligence, it is not gross negligence.  We believe the

9   right standard is, essentially, the absence of all care.  Under

10  that standard, punitive damages can not be sustained.

11  Plaintiffs argue a different standard, which we disagree with,

12  but even under that standard, punitive damages can not be

13  sustained against Upjohn.

14      Your Honor, if I could harken back to when I made the

15  argument originally, you commented that you were dubious about

16  this, but you believed that the Eighth Circuit said at least the

17  jury ought to resolve the issue.  And we believe now is the time

18  for you to act to set the record straight.

19      We have cited a case called Morris v. Union Pacific

20  Railroad, which we think is very relevant.  It is a 2004 U.S.

21  Court of Appeals for the Eighth Circuit decision.  And it's a

22  railroad crossing accident in which they say that punitive

23  damages were not appropriate because the train crew was actively

24  making choices, exhibiting some level of care.  Now, the jury

25  has determined that --

1          THE COURT:  Which case is that?

2          MR. GOODELL:  This is Morris v. Union Pacific, 373 --

3          THE COURT:  What district did that come from?

4          MS. MURRAY:  Western District.

5          MR. GOODELL:  Western District.  Thank you, Betsy.

6     Western District.

7          THE COURT:  Western District of Arkansas?

8          MR. GOODELL:  Of Arkansas, I believe.  Right?

9          MS. MURRAY:  Yes.

10          MR. GOODELL:  Yes, Western District of Arkansas.

11          THE COURT:  I can't remember the name of my kids, so

12     the name of a case doesn't --

13          MR. GOODELL:  That's okay.  I didn't do a good job

14     answering your question.

15          THE COURT:  Oh, you did.

16          MR. GOODELL:  It's 373 F.3d 896.

17          THE COURT:  I appreciate you giving me a few of the

18     facts.  That helps me remember.

19          MR. GOODELL:  That's okay.  I would like to go to our

20     slide 1.  If you can go to the ELMO -- to the board.  And, Your

21     Honor, I want to spend a minute with you on this, because the

22     plaintiffs have made some very critical concessions in this

23     case.

24          This is in their brief.  We've got the reference.  This is

25     the brief responding to Upjohn's argument.  "Ms. Scroggin does

1    not claim that the breast cancer risk had been accepted when she

2    ingested E plus P.  She acknowledges that the general medical

3    consensus at the time did not include acceptance of a breast

4    cancer risk.  She recognizes that the FDA did not require any

5    stronger warning than what Upjohn provided.  She acknowledges

6    that the FDA and other organizations did not embrace the breast

7    cancer risk before WHI.  She's in agreement with most of what

8    Upjohn says."  These are huge admissions as they relate to

9    Upjohn, Your Honor.  And, by the way, those same admissions

10   would apply equally to Wyeth.  The fact of the matter is that --

11   and there was significant evidence in this case.  The FDA

12   provided very specific guidelines in 1989 and 1992 about what

13   they wanted in our label about Provera, and we adhered to those

14   guidelines.  Your Honor disputes with us -- and this is not a

15   dispute that's relevant to this -- about whether guidelines are

16   minimum.  It doesn't matter for our purpose.  For purposes of

17   punitive damages, guidelines which reflect the best thinking of

18   the FDA and, by concession, the state of the medical science

19   reflects not only in our compliance our state of mind, but the

20   state of mind of the entire medical community, which negates any

21   punitive damages here, and we've cited you case law which goes

22   to the conformance with government standards.

23       Plaintiffs want to take that off the table.  In other

24   words, what they want to do is say, well, that's all irrelevant

25   because we're only talking about this little narrow issue of

1   testing.  But it is not irrelevant.  We're looking at the state

2   of mind of these companies and, in my case, Upjohn, in

3   particular, and this is highly relevant to our state of mind and

4   compliance and conformance.

5        Would you put up the next concession, please?

6        "From the perspective of punitive damages" -- now, this is

7   a discussion of the DDMAC letters, Your Honor.  And the

8   concession relates to the fact that plaintiffs are not

9   suggesting the DDMAC letters, which were introduced through

10  Dr. Parisian both in the underlying case and in the punitive

11  damage case, are an element justifying punitive damages.  A huge

12  and important concession.  Your Honor asked counsel, and counsel

13  responded to the issue of, "Well, what about Dr. Parisian?"  We

14  adopt counsel's argument, but separately, as it relates to

15  Upjohn, they have acknowledged that her discussion, admission of

16  DDMAC letters in the punitive phase don't support punitive

17  damages.  Punitive damages can not be based on that.  This has

18  to be set aside.

19       Next slide, please.

20       So what plaintiffs are relying on, as it relates to Upjohn,

21  is a single fact, which Mr. Heard described well and applies to

22  them as well, that you should have done a very specific test.

23  We acknowledge you did testing.  We acknowledge you retained

24  experts.  But we think you should have done this.  And in the

25  absence of doing that one specific, unique test, you're

1   responsible for punitive damages.  And that's just plain wrong.

2   This is the instruction you gave the jury about what the

3   underlying duty was.  It originally related to a duty of

4   reasonable care, and it related to that the duty to warn may

5   include a duty to test or otherwise discover.  And that's a

6   critical element here.  And that's what I want to spend a minute

7   on.

8        Your Honor, I'm not talking about this in the context of

9   trying to reargue liability.  The jury has decided we didn't do

10  enough.  We're talking now about whether the conduct to test or

11  otherwise discover was such that it rose to a level of care that

12  punitive damages are not appropriate, and we believe that's

13  correct.  And I want to spend one minute or two minutes on some

14  things that happened.

15       Can you read this okay?

16       THE COURT:  Yes.

17       MR. GOODELL:  Now, these are uncontested facts,

18  admitted facts, and we have support and PowerPoints for you that

19  we would be happy to give to you that support -- each of these

20  are in our briefs, as well, so I'm not sure that's necessary.

21  But to the point Dr. Parisian concedes that as late as 1995,

22  there was an operating assumption and belief that progestins

23  would actually reduce the risk of breast cancer.  Undisputed.

24  Ms. Scroggin began in 1988-89.  Dr. Parisian concedes that 1989

25  is the first suggestion, through a particular article called

1    Bergkvist, of a possible increase in risk from the addition of

2    progestins.  For our purposes, we're looking at the issue of

3    does our product, a progestin, increase the potential risk that

4    may already exist with estrogen, to the extent it does, and that

5    is a disputed issue.  Immediately after Upjohn received that

6    study and evaluated that study, it retained a renowned entity,

7    the Degge Group, to study the worldwide medical literature.

8    They studied that medical literature.  Dr. Parisian conceded in

9    her cross, all undisputed in the record, that the hiring of the

10   Degge Group was a very good thing.  Degge concluded that there

11   is no conclusive evidence on either the direction of the risk or

12   the -- meaning it's an increased risk or a decreased risk -- or

13   the magnitude of any risk.  And they also said -- by the way,

14   this is not relevant for this.  But Upjohn did not wind up

15   actively promoting after that, if you'll look at the record.

16        Plaintiffs argue, and it is true, that Degge concluded more

17   study was needed.  Now, this is under the category of "otherwise

18   discoverable."  They also advised us that other case control

19   studies were then underway.  Dr. Colditz, in this same time, at

20   an FDA advisory committee, which Upjohn attended, indicated that

21   case control studies regarding E plus P were underway and that

22   more information would be forthcoming.  And the company became

23   aware that the WHI was in progress.  The company monitored and

24   followed, and in 1997 reported to the FDA on the results of all

25   of these studies.  Actively involved in otherwise discovering a

1   potential risk.

2       Your Honor heard testimony about each of these studies

3   during the trial, 1993, '95; a whole series of studies,

4   including case control studies, including a prospective study,

5   the Nurses' Health Study, all of these.  But many of the medical

6   literature studies during that time indicated that they did not

7   find an increased risk by adding progestins.  It wasn't uniform,

8   and we acknowledged that in trial.  These are the kinds of

9   information that the FDA evaluated when it made its labeling

10  decisions, which the plaintiffs concede were satisfactory.

11  Dr. Parisian conceded in her cross that based upon this

12  state of the art, another study, case control study, would not

13  have added anything.  And the FDA made that same comment to

14  Wyeth in 1997, another case control study was not necessary.

15          THE COURT:  Before you go to this, let me review

16  something here.

17          MR. GOODELL:  How is my time doing?

18          THE COURT:  I'm not counting this against your time.

19          MR. GOODELL:  That's okay.  I didn't mean it that way,

20  Your Honor.

21          THE COURT:  You have until about three after before

22  your 20 minutes is up.  I'll give you a little extra time.

23          MR. GOODELL:  No.  I'm fine.

24          THE COURT:  All right.

25          MR. GOODELL:  Okay.  We've talked about one of the two

24

1    prongs.  So the company followed the literature, the company

2    studied the literature, the company reported the literature to

3    the FDA.  The company did that in addition to what is undisputed

4    about its own testing.  And we've talked a lot about the 41

5    studies.  You'll remember that.  And the plaintiffs criticized

6    those studies, and they're certainly free to criticize those as

7    not having been long enough and not being solely related to

8    breast cancer.  Importantly, the evidence is uncontradicted in

9    this case that you couldn't have breast cancer as a primary

10   endpoint.  Breast cancer was, in fact, evaluated in these

11   studies, and we supported other studies.

12        But here's where the rubber meets the road on this, Your

13   Honor.  We mentioned to you that in 1998, or 1997, the company

14   gave to the FDA an application, another application, to market

15   Provera for the use of reducing endometrial cancer.  It's

16   undisputed that at that time the company provided an analysis --

17   and this document is in evidence -- of all of the medical

18   literature that it could determine and evaluate relating to

19   breast cancer.  No one in this case has suggested that the

20   company misrepresented that information, withheld information,

21   or anything else.  That's not in this case.  The FDA has an

22   obligation at that point, and the obligation is that if an

23   application does not include adequate testing to show whether or

24   not a drug is safe or effective, the application must be

25   rejected.  Now, there's been a lot of criticism about the FDA in

1    this case, in a general sense.  But when you look at the record,

2    it's clear that as it relates to HRT, the FDA was heavily

3    involved.  And they evaluated both the testing for efficacy and

4    safety and determined that it was sufficient to approve this

5    product.  Now, again, I'm not arguing negligence.  That's done.

6    This goes to the issue of what is the information, what is the

7    state of mind, what is the evidence of recklessness.  And to the

8    point that Mr. Heard made that it's not just a situation where

9    we're asking the Court to say, Well, gee, if you're reckless,

10    everybody's reckless.  The point is, people with independent,

11    academic, government, and private interests looked at this

12    issue, and the same issue that we looked at, in good faith, and

13    they came to the same conclusions.  That negates the requisite

14    maliciousness, recklessness for punitive damages.

15         Your Honor, the other thing I want to end on is this.  I've

16    been doing this a long time.  I know you've been doing this a

17    long time.  I've never been in a case where there's not an

18    absence of information, where there have been studies, where

19    there have been meetings evaluated, this is what happens here,

20    studies over a period of years, information developed over a

21    period of years.  Imperfect?  Sure.  That's the way medical

22    science is, to the point where there is an established state of

23    the medical science, an established state of the medical science

24    that plaintiffs acknowledge did not require a warning any

25    further than what we did.  And yet they come to you and say, We

1    think you should have done -- even though you've done all these

2    tests, and even though this case control study done in 1995

3    found no higher risk from progestins, and this study found no

4    higher risk from progestins, and this study, which looked at 51

5    studies, a meta-analysis, said no difference between estrogen

6    alone and progestin, and so did Colditz in the prospective study

7    (indicating), they want the Court to say that in light of this

8    medical standard (indicating), that we should be held liable for

9    punitive damages because we don't conduct a test which would

10   have upset the entire state of the medical art.  That's one

11   thing to make that argument for a negligence case, but to say,

12   in light of this information, that we were willful and intended

13   to injure anybody by not upsetting the established state of the

14   medical art.  What is the evidence?  This is pure speculation.

15   Suppose we had done a case control study in 1995.  The

16   plaintiffs ask you to speculate that the results would have been

17   different than the Stanford study, or the Newcomb study, which

18   support our position.  So they're asking you to speculate that

19   the results would have favored them.  They're asking you to

20   speculate that those results, in the face of these conflicting

21   results, would have been so definitive that the world would have

22   required a change.  And they want you to support a punitive

23   damage award on the basis of speculation upon speculation.

24       Your Honor, the one thing that is clear in this state, you

25   must have clear and convincing evidence, and this doesn't cut

1    it.

2        Thank you.

3            THE COURT:  All right.  Let's take a break until about

4    15 after by this clock over here so Mr. Walker can get ready for

5    his evangelical presentation.  We'll be in recess.  Be at ease.

6        (Recess at 10:04 a.m.; continuing at 10:18 a.m.)

7            THE COURT:  Are you ready?

8            MR. WALKER:  Yes, sir.

9            THE COURT:  Before you get your afterburners lit off,

10   let me run a couple of questions by you.  This won't count

11   against your time.

12       There's an argument by the plaintiff in the papers that

13   defendants didn't lodge a proper objection to Dr. Parisian

14   giving testimony regarding an article on causation.  Explain

15   that to me.

16           MR. WALKER:  That is, in fact -- if I can get out of

17   this (indicating), I actually have something on that, Judge.

18       The article is by a doctor named Kerlikowske.  And what

19   Dr. Kerlikowske did was to analyze the changing trends in breast

20   cancer and the changing trends in hormone therapy prescriptions

21   that she could attribute were a direct result of the WHI.  When

22   she calculated what reduction, what percentage reduction in

23   breast cancers were the result of declining prescription, she

24   was then able to calculate the number of excess breast cancers

25   that were prevented each year as a result of that.

1          THE COURT:  Well, what was wrong with Wyeth's

2    objection?  What was its objection?

3          MR. WALKER:  Well, first, it had no objection.  Here's

4    what Wyeth did.  When the issue came up of Dr. Kerlikowske's

5    testimony, Mr. Heard objected and asked for a bench conference.

6    And you may recall that at that time he said, "We don't think

7    any of this evidence should go in because under the Philip

8    Morris case and under State Farm, evidence of harm to other

9    parties doesn't come in, it shouldn't come in because it's not

10   limited to Arkansas."  The Court overruled that objection and

11   gave a limiting instruction.  There was no objection to the

12   substance of the testimony, to its accuracy.  There was no

13   hearsay objection of any kind raised.  And that's very

14   significant, Judge, because --

15          THE COURT:  Just a minute.  Does the defense concede

16   that, there was no specific objection?

17          MR. HEARD:  Your Honor, we concede that there was no

18   hearsay objection, but if I were arguing this, I would explain

19   the larger sequence of objections that led up to that.

20          THE COURT:  I don't understand.

21          MR. HEARD:  Your Honor, in other words, the evidence

22   that the plaintiffs were seeking to introduce here, about 17,500

23   additional breast cancers per year, was the subject of more

24   briefs before trial than anything else, except Dr. Naftalis's

25   testimony.  This was an effort to end-run all of those rulings.

1    But Mr. Walker's correct, there was not a specific hearsay

2    objection.

3            THE COURT:  Okay.

4            MR. WALKER:  Well, now, that's a very belated comment,

5    Judge.  There was a brief filed before trial that said that

6    excess breast cancer evidence would be too inflammatory for the

7    jury, and the Court did grant that motion and excluded the

8    evidence during the liability phase of the trial.  Once we got

9    to the punitive phase of the trial, the Court determined that

10   that evidence was relevant to reprehensibility, the very thing

11   that it was prejudicial for in the first trial relating to

12   malice or reprehensibility, it was no longer prejudicial to.

13   But the point is, that's the only objection Wyeth made; the

14   pretrial objection they made on it being too inflammatory and

15   then their objection about Arkansas.  There was no objection

16   about the substance of the testimony being unreliable, being

17   based on hearsay, or anything else.  And that's important

18   because if Wyeth had objected that Dr. Parisian's testimony was

19   going to be hearsay in nature, they know that we had excerpts

20   from Dr. Colditz's deposition that we had designated the day

21   before on precisely the same issue that we were prepared to show

22   that showed the excess breast cancers.

23           THE COURT:  All right.  Let me move to my next

24   question.

25           MR. WALKER:  Certainly.

1            THE COURT:  I didn't make a note of the page number,

2      but I believe in your opposition papers here, you state that

3      Wyeth participated in illegal off-label promotions.  What is the

4      evidence that there was something illegal done by the

5      defendants?

6            MR. WALKER:  What I said was, Wyeth's CEO, Bob Essner,

7      at a meeting of all the sales representatives at the Prempro

8      launch, encouraged them to engage in illegal off-label

9      promotion.  What Essner said at that speech was that the goal of

10     this entire force of sales representatives should be to hook

11     every woman -- he used the term "virtually," or "almost the

12     complete majority of women," hook them on -- he didn't use the

13     word "hook."  He said "get them on hormone therapy from the day

14     they enter menopause until the day they die."  And that was his

15     message to the sales force.  The label has always -- and Wyeth

16     has made a point of this repeatedly in this litigation --

17            THE COURT:  How does this relate to a failure to warn

18     claim?

19            MR. WALKER:  While he's getting the PowerPoint ready,

20     let me talk about that, Judge.

21          All of this evidence, including the dismiss and distract

22     strategy and the Upjohn advertisements and their failure to

23     react to the FDA's admonitions by studying it, is critical

24     evidence that the bad act was done with reckless disregard.  We

25     can not get punitive damages by talking about failure to warn in

1  a vacuum.  Well, they failed to warn.  But why was it reckless?

2  Well, because they really failed to warn.  That's not going to

3  get us punitive damages.  We have to establish that their

4  failure to warn was not the mere product of inadvertence, and

5  that their failure to warn was not merely something that was

6  pure negligence; that it was actually something that was

7  reckless that they did.  And there will never be an executive

8  that sits on the witness stand and says, "You know, I'm going to

9  break down and tell you, we didn't warn because we didn't want

10  to know the true breast cancer risk because we wanted women to

11  stay on our product."  They'll never say that on the witness

12  stand.

13         THE COURT:  Let me ask you this.  Suppose the CEO of

14  Wyeth or Upjohn, or the chief financial officer said, "We need

15  operating funds bad," and he went out and robbed a bank.  Would

16  you be able to introduce that in a failure to warn case?

17         MR. WALKER:  No, because it doesn't demonstrate their

18  failure to warn was made with conscious disregard.  They may

19  have had no desire to deceive women.  They may have had no

20  desire to get every woman in the country hooked on the drug,

21  even though the FDA had approved it for limited indications.

22  They may have had no desire to study the product long term, even

23  though they were going to encourage women to take it long term.

24  They just wanted money, they were going to steal.  But here what

25  we have is a company that has the goal of trying to get every

32

1   woman on it long term, yet to this day they've never studied the

2   product long term, and the FDA has never approved the product

3   long term.

4        THE COURT:  Seasons magazine.  This was a draft, and

5   defendant got scolded by the FDA.  And if it had been sent out

6   after the scolding, I can see.  But how does this go to punitive

7   damages since they didn't send it out?

8        MR. WALKER:  I don't think sending it out would have

9   made any difference because we can't prove that our client read

10  it or that her doctor read it.  The issue has nothing to do with

11  whether it was sent out or read by anybody.  It proves Wyeth's

12  state of mind.  Here they are reacting to negative breast cancer

13  information; not by studying, not by incorporating the negative

14  data in their label, but instead by using a magazine that

15  they're intentionally deceiving women into believing as a

16  magazine their doctors or pharmacists put out.  This is their

17  plan.  They didn't go through with the plan because the FDA

18  wouldn't let them.

19        THE COURT:  All right.  I'm going to start you on the

20  clock now.

21        MR. WALKER:  Again, let me just reiterate that the

22  only way that we can prove that these defendants acted with

23  conscious disregard, with conscious indifference or reckless

24  indifference to public safety is by showing how they reacted to

25  negative breast cancer information and how they reacted to

1   admonitions from the FDA.  If they simply didn't study and got

2   no warning signals, if they simply never heard anything, never

3   knew anything and just made no attempt to study, perhaps one

4   could argue their failures were mere negligence.  But if they

5   went out and actively attempted to discredit contrary

6   information, which is what they did, then it proves that their

7   failure to test and failure to warn was the result of conscious

8   disregard, because their actual goal was to keep women from

9   knowing the truth about the products.

10        And I want to talk a little bit about Mr. Heard's standard

11   that he argued for punitive damages.  He talked about how the

12   standard is whether or not there's some secrecy involved, and

13   only the defendant knows the truth about something, and yet

14   refuses to correct whatever this thing is he knows about, do you

15   have punitive damages?  I have read hundreds of punitive damages

16   cases, and I have never seen one court hold that that's

17   required.  It may be that in some examples of cases where

18   punitive damages are awarded there is a defect that is hidden or

19   there is something a defendant knows and doesn't share.  But

20   that has never been a requirement for punitive damages in this

21   state or any other.  And there are many instances where other

22   people knew about the harm besides just the defendant.

23   Cigarettes.  Tobacco companies weren't the only ones talking

24   about lung cancer.  There were hundreds of thousands of

25   activists, consumer rights activists who were arguing lung

1   cancer long before anybody else did.  There were doctors arguing

2   that cigarettes cause lung cancer long before the cigarette

3   companies ever added nicotine to their products.  That wasn't a

4   secret harm of tobacco that got the cigarette companies all

5   these punitive awards against them.  Automobile rollover

6   accidents.  Ralph Nader and his consumer groups have been

7   screaming about these defects in cars long before the first jury

8   awarded punitive damages.  It has never been a requirement that

9   it can't be something that's in the public knowledge at all.

10       The other doctors didn't miss the signals.  Wyeth missed

11   the signals.  Wyeth says, Well, apparently Dr. Pike and Dr. Ross

12   and Dr. Hoover missed these signals.  No.  They went out and

13   acted on the signals.  They did studies.  They couldn't do

14   comprehensive studies.  They couldn't do conclusive studies

15   because they were individual researchers operating with a grant.

16   But they actually did studies that led to a signal to Wyeth that

17   it was time to study.  And so Wyeth is the one who failed to act

18   on the signals, not anyone else.

19       The standard for punitive damages is not that Wyeth or

20   Upjohn had to know that their conduct would result in injury, as

21   Mr. Goodell said.  The standard is whether they knew or ought to

22   have known.  And what we argue is they ought to have known their

23   conduct would probably result in injury and would have known had

24   they studied.  And this is the standard that has been repeated

25   by Arkansas courts consistently:  Ought to have known you will

1    probably cause injury, not that you knew you would probably

2    cause injury.

3        I also want to talk a little bit before I get into the

4    facts about the standard Mr. Goodell said, which is there has to

5    be an absence of all care; if any defendant exercises even the

6    most modest degree of care, then you can't have punitive

7    damages.  And we started our brief against Wyeth by giving two

8    examples that clearly disprove that.  One would be a drunk

9    driver.  If you have a drunk driver who kills a family of four

10   when he's driving drunk one night, with a very high

11   blood-alcohol content level, and he's had six prior drunk

12   driving incidents and one of them resulted in injury, but on the

13   night in question he really didn't want to hurt somebody, so he

14   sat there and had a pot of coffee at the party before he got

15   behind his wheel and he drove under the speed limit.  Under

16   their standard of punitive damages, you couldn't award punitives

17   against that guy because he exercised some care, he did some act

18   of care.  Well, that can't be the law.  The mad cow disease

19   example Mr. Heard alluded to was an instance where if a rancher

20   discovered that his cow had mad cow disease and he slaughtered

21   that cow, but sold the rest of the herd for food and a bunch of

22   people died, he couldn't be hit with punitives because he

23   engaged in one act of care, he killed the bad cow.  The law has

24   never been that strict.  And the Aircraft Accident case out of

25   the Eighth Circuit, the case that had the MDL in this district,

1    addressed that issue.  They cite the Aircraft Accident case as

2    saying that you have to have an absence of all care.  That's not

3    what the case said.  The case noted that the PSC in that MDL had

4    disputed the standard of absence of all care, noting that it had

5    not been referenced by the Arkansas Supreme Court since 1987,

6    and that recent cases have never referred to that "absence of

7    all care" language.  The Eighth Circuit says, "There are these

8    two 1987 Supreme Court cases, but we don't really know whether

9    that's the standard today.  It's unclear from the cases whether

10   they were really saying there has to be no active care at all or

11   whether they were being illustrative in saying in this case

12   there was a complete absence of care, but not suggesting it is

13   an absolute requirement."  And they pointed out that in the most

14   recent Arkansas Supreme Court decision, there was no reference

15   at all to the "absence of all care" standard, and, therefore,

16   what the court says was it was going to assume, for the sake of

17   argument, that's not a requirement in Arkansas, and it's not

18   under the most recent Arkansas Supreme Court decision.

19        So the standard is whether or not they engaged in conduct

20   that they knew or should have known would probably cause injury,

21   and the evidence is substantial that they did.

22        Let me address Your Honor's concerns.  First, the

23   endometrial cancer crisis.  There are two very significant

24   reasons that this endometrial cancer crisis put them on notice,

25   severe notice of a need to test the breast cancer issue.

1        The first is because their own internal documents, Wyeth's

2   documents, show that Wyeth knew that the mechanism by which

3   estrogen caused endometrial cancer was the same mechanism that

4   suggested it may cause breast cancer.  Dr. Austin testified that

5   what the epidemiological evidence in the 1970s showed was that

6   the effect of estrogen use and the increases in estrogen use on

7   the incidence of endometrial cancer was rapid, and the decline

8   in endometrial cancer that occurred when prescriptions plummeted

9   was rapid.  And so he said that indicated, from an

10  epidemiological standpoint, that there's a promotion effect of

11  estrogen on endometrial cancer.  One year later, Wyeth noted the

12  same effect occurs in the breast from estrogen.  In a 1976

13  internal memo, Wyeth's own people note, "Recent reports have

14  found that estrogen is associated with increased risk of

15  endometrial cancer incidence.  There have been studies on breast

16  cancer which haven't borne this out, however, they've been very

17  small studies involving a very small number of people, obviously

18  not adequate to reach a definitive conclusion.  You should also

19  be aware that while estrogens may not bring about breast cancer,

20  they promote the growth of tumors.  They don't initiate it, but

21  they promote its growth."  Exactly what estrogen had done in the

22  endometrial cancer crisis.  Now, if that wasn't a reason that

23  any company with any modicum of care would go out and study the

24  breast cancer in issue to see if the two incidents, events were

25  the same, I don't know what would be.

1       Here you'll note that Dr. Perdue, in his paper, notes that

2   the way in which estrogen -- this is in 1976 -- increases the

3   growth of breast cancer is by using estrogen and progesterone

4   receptors, which is what we claim in our case.

5       The second reason this evidence is critical is because the

6   FDA told Wyeth to not do precisely what Wyeth then did for the

7   next 15 years.  Wyeth sent a "Dear Doctor" letter out when all

8   the evidence of endometrial cancer was coming in, and said, you

9   know, "We can't really believe all this stuff.  There are lots

10  of variables, there are lots of factors.  You can interpret the

11  data a lot of ways.  It would be real simplistic to say that our

12  estrogen was causing endometrial cancer."  And the FDA, as Mr.

13  Heard noted, was incensed and reacted with language that clearly

14  should have told Wyeth not to do what we know it did in this

15  case.  The letter considered it to be a misrepresentation of

16  science.  It has incensed the FDA at all levels.  They would

17  have expected a sound medical and scientific response from

18  Wyeth, rather than a letter that misrepresented scientific

19  findings.  They note that "Wyeth has got to do more than just

20  give a passive response to data about its drugs that show

21  they're harmful.  The above letter is warped in tone, obfuscates

22  the issues rather than highlighting information about risk.

23  Wyeth should be aware of developments and act on developments

24  regarding its drugs and not engage in the passive behavior it

25  did in this case."  The FDA said, "We are not impressed."  Yet,

1    that is precisely what Wyeth did after being put on notice time

2    and time again, as we'll see in a moment.

3        With respect to Dr. Parisian's testimony, the second

4    question the Court asked.  There was no objection not only to

5    the testimony about the 17,500 excess breast cancer deaths,

6    which, by the way, came from an article that Dr. Austin had

7    already proved up as a learned treatise as the first witness in

8    the trial.  The only thing Dr. Austin wasn't able to get to was

9    the number because the Court excluded it.  Dr. Parisian reported

10   on the number.  The study had already been proved up as a

11   reliable peer-reviewed learned treatise by Dr. Austin.  But,

12   anyway, with regard to her testimony in general, no objection

13   was made during the course of the testimony that was exceeding

14   the scope of any court order.  About 30 minutes into the

15   testimony, Your Honor, sua sponte, called a bench conference and

16   said, "You know, I thought she was going to talk about

17   regulations.  She's doing more reading of documents."  And Mr.

18   Urbanczyk said, "Oh, I agree, I agree, that's all she's doing."

19   Mr. Morris said, "No.  I've asked her about regulations.  I

20   asked her about regulations in the first phase of the trial.

21   She identified them all in the first phase.  Now we're just

22   getting to why the violations of these regulations were so bad."

23   No other objection made after that on the grounds that she was

24   running aground of the Court's orders.  That's just not a simple

25   waiver.  It was a very prejudicial waiver.  Because if Wyeth had

1  stood up at any particular point and said, "Objection, exceeds

2  the scope of the Court's order," Mr. Morris could have corrected

3  that.  He could have said, "Dr. Parisian, is this testimony

4  based on an FDA regulation?"  "Yes, it is."  "What regulation is

5  it based upon?"  Precisely what Mr. Heard says she should have

6  done.  But instead what Wyeth did is let the whole testimony go

7  without any objections on this, and then at the end said, "We

8  move to strike her entire testimony, in its entirety, despite

9  the absence of objections, because it exceeded the scope of the

10  Court's order," and by then she'd left the room and there was no

11  way Mr. Morris could have corrected her.  So this is waiver in

12  its worst form.

13      Secondly, she did testify about FDA regulations and

14  violations, both in the first phase, which we're entitled to

15  rely upon, and in this phase.  I've already cited -- I don't

16  have them on my PowerPoint.  I cited multiple excerpts from

17  Dr. Parisian's testimony in our brief in which she discussed why

18  each of these things violated or was inconsistent with FDA

19  regulations.

20      Now, with regard to her testifying about documents.  This

21  Court has already held that that is appropriate for a regulatory

22  expert.  It did so in the Reeves trial when the issue came up

23  over Dr. Gueriguian, and this Court said in its order denying

24  Wyeth's motion to exclude such testimony, "Distilling voluminous

25  documents is proper.  While it's true that jurors may read the

1    documents, the trial would last for months if they were required

2    to read every admissible document," and piece them together too.

3    The trial would have gone forever and the jury would have

4    deliberated for weeks, because what Dr. Parisian did was to tie

5    pieces of the puzzle together.  For instance, she didn't just

6    read a document.  She didn't just talk about it.  She would talk

7    about the dismiss and distract documents, and then note that the

8    public relations company that worked with Wyeth on those

9    documents was the same public relations company, Burson and

10   Marsteller, in a second set of documents where they list the

11   success of their dismiss and distract and other strategies and

12   tied the two together, rebutting Wyeth's argument, "Oh, well, we

13   never did dismiss and distract.  We never did any of these

14   things the PR people recommended.  Those were just

15   recommendations."  She was able to tie together the documents

16   from Burson and Marsteller that said, "Here are our successes

17   for you" with the dismiss and distract documents that Wyeth

18   claims were never implemented.  The jury would not have been

19   able to tie those documents together if it only had the

20   documents to look at.

21        The Welding Fume MDL case I think is dispositive of this in

22   which -- well, not dispositive, but persuasive.  The court said

23   that the documents are complicated in cases like these.  The

24   inferences that you can make from the documents are not that

25   simple.  Through the application of its expertise, the doctor in

1   that case can go through the documents and explain what they

2   mean and how they relate.  And I think that's a more telling

3   case than the Rezulin and Baycol cases, because those cases

4   involved drugs that were on the market less than four years.

5   This case involved a drug that's been on the market since 1942,

6   and documents all through that time period.  And the jury would

7   have been in a mess of a situation if they had to read all those

8   themselves.  Plus, Your Honor, don't forget, this Court

9   prohibited us from introducing a document without a sponsoring

10  witness, so we couldn't just introduce documents en masse and

11  let the jury read them.  We had to have someone discuss them on

12  the witness stand before the Court would even allow them.

13       Let me go through the evidence briefly of Wyeth's dismiss

14  and distract strategy.

15            THE COURT:  Let me ask you a question.

16            MR. WALKER:  Certainly.

17            THE COURT:  Earlier in your presentation you referred

18  to Plaintiff's Exhibit 0028.  And was that admitted into

19  evidence?

20            MR. WALKER:  Yes, I'm pretty sure.

21            MR. FARIES:  Yes.

22            MR. WALKER:  I was very careful, by the way, on making

23  sure that the exhibits that I put in these briefs were admitted

24  exhibits.  I thought there was another question.

25            THE COURT:  There is.  I might ask it, I might not.

1   But let me ask you this.  When Parisian was testifying, wasn't

2   there an objection at one point by one of the defense lawyers

3   who said, "All she's doing is reading documents"?

4           MR. WALKER:  That's what Your Honor said.  Your Honor

5   called a bench conference and said, "I thought she was going to

6   talk about the FDA.  She's just up here reading documents."  And

7   there was a ditto to that by the defense counsel.

8           THE COURT:  If it dittos me and I made a good

9   objection, would that not be a proper objection?

10          MR. WALKER:  An objection to what, the prior testimony

11  she'd already given?  The point is, if the objection isn't

12  contemporaneous with the testimony, then the basis of the

13  objection can't be corrected.  During the first phase of the

14  trial, if that objection was made, Mr. Morris was able to elicit

15  testimony from Dr. Parisian regarding what regulation she was

16  referring to and what regulation would prohibit the conduct.

17  But when it comes in just this global fashion at some odd point,

18  or when it comes at the very end when she's already been

19  excused, there's no way to correct any error that had been made.

20  It would be like objecting to a question being leading after the

21  witness is gone.  You can't re-ask the question in a nonleading

22  way if that occurs.  Well, here, how could we ask the question

23  so that we made certain that Dr. Parisian's answer included

24  reference to the FDA regulations if the objection wasn't made at

25  that time?

1        Wyeth knew in '76 that it was time to get to work on

2   looking at these drugs.  They knew from the documents in their

3   own files that estrogens were capable of accelerating the growth

4   of breast cancer.  The very next year, in 1977, their own

5   internal scientists told them that doctors are starting to use E

6   and P.  We should be concerned because there are virtually no

7   published, well-designed studies on E plus P.  That's clearly an

8   indication of the need to start studying.  They did nothing.

9        They had two opportunities to study.  Well, at least two

10  opportunities that really, really should have involved study.

11  One was in 1983 when they promoted their own Prem-Pak drug to

12  the FDA.  This was going to be E plus P in the same package.

13  But the concern was that they would be required by the FDA to go

14  out and do a benefit study on the two different drugs.  And what

15  the memo from Dr. Perdue says is, "We have to be careful about

16  that, because if we had to go out and study this, it would cost

17  a lot of money.  The results might not be successful, and it

18  could turn out embarrassing."  Now, Wyeth's argument is, oh, but

19  all he meant by that is we wouldn't establish an additional

20  benefit to progestin by itself because all progestin does is

21  protect the endometrium.  It doesn't increase the benefits of

22  estrogen.  But that's clearly not something that would embarrass

23  Wyeth because every doctor in the country knew that the only

24  reason progestin was being prescribed with estrogen was to

25  protect the endometrium.  No one thought that progestin had any

1   other benefit.  The only thing that could embarrass Wyeth would

2   be if the study revealed harms to progestin added to estrogen,

3   namely breast cancer.  At least that is a reasonable inference

4   the jury could make from the evidence.

5        There's also Wyeth's refusal to provide drugs to the ECOG

6   study, the Eastern Cooperative Oncology Group study, on breast

7   cancer survivors.  And what their own internal documents say is,

8   "We will not provide drugs for this study, consistent with

9   company policy."  Wyeth says, Well, no, the policy that's

10  talking about is a policy not to support studies of breast

11  cancer survivors because the drug is contraindicated for people

12  with breast cancer.  But the problem with that is, we've never

13  seen that policy.  Wyeth doesn't have a single piece of paper in

14  its files that says they have a policy of not giving the drug

15  only in studies in which there are breast cancer survivors.  The

16  jury had the right to infer, given the complete absence of any

17  proof, that that was how their policy was limited, to conclude

18  that this was a policy not to give drugs to breast cancer

19  studies.  The only time they ever gave drugs to a study was a

20  benefit study, like WHI where they were trying to prove cardiac

21  benefits so they could sell more drugs, not to breast cancer

22  studies.

23       Wyeth says, Well, all the information back then was real

24  conflicting and, also, one more case control study would have

25  done nothing.  Dr. Parisian specifically testified that the

1    information the WHI revealed was information that was knowable

2    prior to 1990, had these companies done the right studies.  She

3    talks also about how all of the studies that had been done,

4    despite their limitations, suggested a positive association with

5    breast cancer, not this mixed result bag that Wyeth and Upjohn

6    have been talking about.

7         The only studies Wyeth conducted were benefit studies.

8    None of those studies were breast cancer studies.  But Wyeth did

9    more.  They didn't just not study.  They made a conscious effort

10   to negate, to neutralize, to distract from any evidence that

11   suggested they should study, such as the Hoover study in 1976.

12   Dr. Hoover revealed a substantial relationship between estrogen

13   and breast cancer, and Wyeth's response was to say, "We've got

14   to mitigate the adverse effects, the publicity that this study

15   might generate."  Not "We need to read the Hoover study.  If

16   he's right, we need to incorporate it in our label, or at least

17   we need to go out and replicate his study and see if it's

18   correct."  It was instead, "Let's find a way to dismiss the

19   Hoover results."  The same of the Pike study which showed an

20   increase in the risk from E plus P of breast cancer.  This is

21   the instance where Wyeth said, Oh, Pike is at his old game

22   saying that our products cause breast cancer.  Our executives

23   are saying this might be the last meeting he's ever invited to.

24   Wyeth is fond of saying, Well, our documents show we eventually

25   invited him back to meetings really not that long afterwards.

1    But that's not the point.  The point is the fact that its

2    executives were considering making him persona non grata when

3    they hadn't even seen his study yet, rather than say, Well, when

4    the study comes out, let's look at it, let's carefully examine

5    it, let's put it on our label, let's replicate the results,

6    shows their reckless disregard for women's health.

7         The Colditz study.  Rather than saying, Let's wait until

8    the study comes out, let's look at it, they said, Let's have

9    media liaisons on hand to counteract anything that Dr. Colditz

10   says in this speech.  And that's a person who had worked with

11   Wyeth before.

12        When IARC was considering, the International Agency for the

13   Research of Cancer, the most respected cancer research

14   organization in the world, a branch of the World Health

15   Organization, was considering whether to classify estrogen as a

16   carcinogen, Wyeth developed a task force specifically to address

17   IARC.  Not a task force to find out if what IARC was finding was

18   correct, if the information IARC was gathering was true, but

19   instead, as Wyeth's memo says, The goal of the task force will

20   be to preempt any fallout from the press and to insure that IARC

21   does not develop a position linking estrogen to breast cancer.

22   We don't want the truth.  The task force isn't there to find out

23   the truth.  The task force is there to prevent the truth from

24   emerging.

25        When the FDA held its advisory committee meeting in 1991 --

1    this is the meeting that prompted Upjohn to hire the Degge Group

2    for that whopping sum of $12,500 -- Wyeth said, "Our goal is to

3    make the FDA meeting a nonevent.  Let them not find out anything

4    about E plus P causing breast cancer."  That was the subject of

5    the meeting, whether or not the combination product causes

6    breast cancer.  Wyeth even acknowledges in this

7    we-made-it-a-nonevent memo that while we made this one meeting

8    mean nothing, eventually there's going to be answers.  We better

9    be the ones providing the answers and not let the FDA find it

10   out from other sources.

11        When the Ross study came out, which --

12             THE COURT:  Would you go back to that last one?

13             MR. WALKER:  Yes, sir.

14             THE COURT:  Okay.  Go ahead.

15             MR. WALKER:  And, of course, they do say at the end,

16   "We've got to be the ones to provide the information so it will

17   be accurate and balanced."  But that's sort of in the quotation

18   mark phase.

19        The Ross study was another study that was indicting E plus

20   P as a possible cause of breast cancer.  The study had not even

21   come out yet, and what Wyeth said is, "We should start

22   discussing how to deal with this from a public relations point

23   of view and with our sales force when it does hit," not let's

24   embrace the data, whatever it is, let's look at it and make

25   sure, if it's correct, it goes in our label, or that we study

1    what they studied.  We have to deflect attention from it.

2         And, of course, there's the Cummings study.  This was such

3    an important study because the Cummings study was a National

4    Institutes of Health study, ten-year study that looked at

5    whether thin women, women with low body mass indexes, women who

6    were most vulnerable to osteoporosis were going to get breast

7    cancer from E plus P.  And that was significant because

8    osteoporosis was the only long-term benefit that Wyeth could

9    legitimately claim was a justification for keeping women on it,

10   in their minds, for a long time.  The label never said you

11   should take it for the rest of your life.  But this was at least

12   a long-term goal that could potentially be exploited by Wyeth.

13   So when the Cummings data showed that the risk of breast cancer

14   for thin women, those at risk of osteoporosis, was substantially

15   higher than the risk for other women, well, Wyeth just couldn't

16   hear of it.

17        The task force, the breast cancer task force, which was

18   headed by Jeff Buchalter, put out a memo, saying, "Confidential.

19   Don't discuss this with anyone outside of our company.  We must

20   prepare to deal with the press so the headlines don't read

21   'Warning.'"  And, of course, this is where we have the

22   handwritten memo that's already been verified to belong to Jeff

23   Buckhalter that says, "Dismiss and distract.  Keep the U.S.

24   press busy.  Detract attention from the Cummings study."  And it

25   wasn't just the public relations firm saying this.  Wyeth's own

1    minutes of the notes of the meeting of its task force show these

2    exact same suggestions that the public relations firm was giving

3    as things that they had planned to do.  Tap our friends, like

4    Nachtigall and Bush and Dupont, to go out and combat this study

5    and to attack it.  Tap all third parties we give all this money

6    to for support.  Show how the bundle of benefits the product

7    provides outweighs any breast cancer risk.  Put it into

8    perspective.  Shift attention to other issues.  Highlight flaws.

9    All of these were things that were part of the dismiss and

10   distract strategy.

11        The Burson-Marsteller documents are the ones that show the

12   dismiss and distract strategy.  This is the public relations

13   firm that created that strategy with Wyeth, along with many

14   others.  And they compliment Wyeth on implementing their

15   strategies, and even coming up with their own strategies for

16   preempting antiestrogen messages.  And when they list their own

17   results, they list the fact that they have been able to deflect

18   criticism of breast cancer by working with Wyeth.

19        So Wyeth didn't just listen to these public relations firms

20   and reject their message.  They implemented their strategies.

21   You won't find a document with Wyeth's handwriting, "Ooh, that

22   sounds a bit unethical.  We won't do that."  Instead you have

23   Burson and Marsteller saying, "We did it.  It worked.  Aren't we

24   great.  We worked well together."

25        And I put this one up (indicating) just because they even

1    tried to get Oprah Winfrey involved in this.  I mean, it's one

2    thing to get Patti LaBelle and Lauren Hutton, but Oprah Winfrey,

3    that's really too much.

4         Ghostwriting, Judge, is another reaction that they had to

5    adverse breast cancer information.  If a bad article came out,

6    they didn't look at the article and say, "This is breast cancer,

7    we need to put it in our label," or "We better go out and check

8    to see if this study is right with our own."  They said, "Let's

9    hire a doctor to say they're wrong," and that's what they did.

10   They hired DesignWrite, their public relations team, to draft an

11   outline that Wyeth approved.  Then DesignWrite wrote the

12   article.  Wyeth approved it.  Then they found a doctor to play

13   author.  The doctor signed off on it.  They said he wasn't paid.

14   I thought he was.  But, regardless, they found a doctor to sign

15   off on the article.  DesignWrite found a journal to publish it,

16   and it's published with no reference whatsoever to Wyeth or

17   DesignWrite.  And we showed a couple of instances where Wyeth

18   used that strategy to combat negative articles.  This is the

19   ultimate in deceit.  It is the ultimate in trickery.  Well,

20   Wyeth said, Well, you don't really have any evidence of deceit

21   because you dropped your fraud claim.  We dropped our fraud

22   claim because of issues like reliance.  That's not punitive

23   damages.  They were still deceptive.  The fact that we may not

24   have every element of a fraud claim doesn't deny that the first

25   element of fraud, being deceptive, is something that they were

1    certainly guilty of.

2         This is the Seasons magazine piece, and this is what the

3    FDA said to Wyeth.  They said that Wyeth had created this

4    magazine.  They were going to have articles about breast cancer

5    where they counteracted the publicity out there about their

6    product causing breast cancer, and the FDA said this is clearly

7    a house organ, that you are deceiving women, or attempting to

8    deceive women into believing it is something that their doctor

9    or their pharmacy gave them.  There's a lot of misleading

10   information in this thing, and we think it's inappropriate.  And

11   they didn't do it.  They stopped doing it, or they didn't do it,

12   they didn't publish the publication as a result of that.  But it

13   shows their mind-set.  This is reckless disregard for health.

14   Don't embrace the data against us.  Combat it.  And even combat

15   it with the company message disguised as legitimate science.

16        Money to all the organizations that might be influential on

17   breast cancer.  And these are significant because Dr. Kuperman

18   relied largely on ACOG and NAMS as his source of information

19   about the risks of E plus P, and Wyeth was right behind all of

20   those people.

21        And here is the Essner speech.  And I do think this is an

22   important piece of evidence.  Because when you have a CEO

23   saying, We're going to engage in a crusade to hook the majority,

24   the vast majority of women on our poison, or their drug, from

25   the time of menopause until the time of death, when the FDA has

1   only approved the drug for very limited indications, not for

2   every woman, and says you should re-evaluate every few months

3   and take it for a short duration, this was telling the sales

4   representatives to thumb their nose at the FDA and to go out and

5   to promote this drug in a way that it was not allowed to be

6   promoted.  They had never studied it long term, and that

7   demonstrates conscious disregard.  It's directly related to

8   breast cancer, and it's directly related to their failure to

9   study this drug long term.  No boundaries, no limits.  You don't

10  have anything to limit your selling efforts to these people.

11      The evidence we have very much mirrors the evidence in the

12  Boerner case, the cigarette case from the Eighth Circuit in

13  which punitive damages were affirmed.  We have the science

14  indicating that there's a link to cancer, just as the science

15  was indicating a potential link to cancer here.  Studies came

16  out confirming that link.  The defendant did no investigation of

17  those studies, just as the defendants here did not.  They

18  attempted to control the dissemination of negative studies and

19  discredit authors, just as Wyeth did here.  And the jury awarded

20  these damages.  We know that there was some remittitur later on.

21  But the facts, the egregious conduct that warranted the Eighth

22  Circuit affirming the punitive award in Boerner is very similar

23  to the conduct we have here.  The tobacco company attempted to

24  suppress research.  We have that here.  Made untruthful

25  representations of no cancer risk.  We have that here.  And the

1    jury was found to have given a proper verdict.

2         Now, I want to talk about Upjohn, the facts against Upjohn,

3    because, in a way, the story about Upjohn is even worse than

4    Wyeth, because whereas Wyeth engaged in reckless disregard for

5    public health, Upjohn engaged in no regard for public health.

6    None at all.  Complete disregard for public health.  They should

7    have been studying this drug since the 1960s, not since the time

8    that the one study came out in '89.  First of all, the beagle

9    dog studies in the '60s showed an increase in breast cancer.

10   Now, Upjohn acknowledged that there were beagle dog studies in

11   their label, but said, "You know, we don't know one way or the

12   other what this says about human breast cancer."  Well, they

13   should have found out what it says about human breast cancer by

14   studying it.  They were denied an application for Provera to be

15   used as part of hormone therapy in 1966.  The FDA said they

16   didn't have enough study of the safety and efficacy of the

17   product.  But they didn't study it.  Instead, they just kept

18   resubmitting their applications.  The FDA says, "Go out and do

19   clinical studies."  They didn't do them.  The endometrial cancer

20   crisis should have put them on notice, just as it did Wyeth.

21   The studies on estrogen and breast cancer should have indicated

22   you better be careful about adding a new hormone to the mix.

23   And the Bergkvist study that came out in 1989 that they

24   acknowledge is the first time they were on notice, but it

25   wasn't.  But the Bergkvist study gave them plenty of time to do

1    their own study.  We have testimony from Dr. Austin and

2    Dr. Parisian that it would have taken about two years to do a

3    well-designed case control study to establish the link between E

4    plus P and breast cancer.  They could have done that study after

5    Bergkvist came out in '89, and our client could have been off

6    this drug after two years instead of over ten years.

7        And the evidence, Judge, of the marketing is important

8    because it shows reckless disregard.  The jury might have looked

9    at the fact that Upjohn knew that doctors were prescribing E

10   plus P together and said, Well, you know, I guess maybe they

11   should have studied that, but I don't think they're really

12   guilty of conscious indifference to women for not studying just

13   because they knew their product was being used in a certain way.

14   But when the jury heard that they were advocating this very use

15   that they never studied, that shows they are unconcerned about

16   women's health.  It wasn't just they were aware of these sales.

17   They were benefiting from these sales and sought to promote the

18   use of the two products in combination without ever determining

19   whether it was safe to use the two products in combination.

20   They advertised progestin as the other half of hormone therapy.

21   The FDA repeatedly admonished them for these advertisements, at

22   least two times for ads that went out and a third time for a

23   proposed ad, and said, You can't do this, there's no proof of

24   the safety or benefits of it, and they just kept doing it.

25   Thumbed their nose at the FDA as well.

1    They applied for an indication for E plus P as menopausal

2   treatment in the '80s, as well, twice, and the FDA said, No,

3   there's no studies.  They did nothing.  They say, Well, we

4   conducted all sorts of studies.  But Dr. Parisian testified they

5   never did a breast cancer study.  So did Carlson, their

6   corporate representative.  So did Jolson, Dr. Heidi Jolson,

7   their FDA expert.  She said that none of the studies they did

8   were breast cancer studies.  What they did is they went out and

9   did dozens of studies to see whether or not progestin, Provera,

10   their product, protected the endometrial lining in a woman so

11   they could try to sell it with estrogen.  They did benefit

12   studies to see if they could make lots of money, but they didn't

13   do any breast cancer studies.  None of their studies could be

14   deemed breast cancer studies.  Thirty-four efficacy studies on

15   endometrial cancer.  Couldn't determine breast cancer link.  And

16   none of them were over two years.  Every study was less than two

17   years.  Breast cancer is a latent disease.  While hormone

18   therapy can cause breast cancer in some women in two years, you

19   won't see a large or sizable increase, enough to show a

20   statistically significant relationship in that short amount of

21   time.  And everybody agrees to that.  But none of their studies

22   were more than two years.  They involved sample sizes far too

23   small to ever detect as a secondary endpoint of breast cancer,

24   which is a rare condition.  They, in essence, did no breast

25   cancer studies at all --

1          THE COURT:  They couldn't do a breast cancer study,

2    per se, could they?

3          MR. WALKER:  And that's sort of my point, and I just

4    didn't state it very eloquently.  They could do case control

5    studies on breast cancer, cohort studies.  They could do

6    observational studies that looked at people already on the drug

7    or people who took drug in the past.  They couldn't do a random

8    clinical trial in which you recruit women to get on the drug

9    just to study breast cancer.  But a random clinical study could

10   never measure for a risk like breast cancer, unless it was the

11   size of WHI, because breast cancer is a fairly rare condition.

12   Randomized clinical trials can measure benefits, can detect

13   benefits, but they are not in any way desirable to quantify

14   risks.  WHI didn't even quantify the risk of breast cancer.  It

15   reached a certain point and they stopped the study.  But none of

16   these clinical trials that Upjohn engaged in had anywhere near a

17   sufficient sample size to even detect a secondary endpoint of

18   breast cancer.  None of the studies were looking at that, of

19   course.

20        The only thing Upjohn said they did was to hire the Degge

21   Group in 1990.  And what the Degge Group says is, there's just

22   not enough study out here.  But we know that even small

23   increases in the relative risk of breast cancer have great

24   public health significance.  This is a huge safety issue that

25   people need to be exploring.  And the Degge Group, by the way,

1    indicated that there were some ongoing studies, as Upjohn

2    pointed out, but they did not indicate those were sufficient.

3    There's nothing in the Degge report that says the current

4    studies going on were sufficient.  They suffered from the same

5    flaws as the study the Degge Group analyzed.  I think it's

6    interesting Wyeth talks about how there were 57 studies on E

7    plus P.  They weren't breast cancer studies.  Some of them were

8    studies like the PEPI trial or the Nurses' Health Study that

9    were not breast cancer studies at all.  They were designed to

10   detect a cardiac benefit; clinical trials to see if there's a

11   heart benefit.  But, in any event, when the Degge Group was

12   hired by Upjohn to go out and look at all the literature up to

13   1990, they found only seven relevant studies on E plus P and

14   breast cancer, and found that every one of those was seriously

15   flawed and couldn't be relied upon.  And still no study.  Then

16   at least there could have been a well-controlled, well-designed

17   case control study, and there was nothing at that point.

18        Upjohn also says, Well, by 1990, the WHI was underway.  No

19   one thought at the time, and no one to this day thinks the WHI

20   is adequate to quantify the breast cancer risk by itself.  There

21   had to be something else besides that.  Furthermore, now we know

22   that the WHI has established at least a sufficient risk to stop

23   using the drugs, but even it could not quantify accurately the

24   risk involved.

25        The defendants also say, Well, the FDA approved these

1    drugs, so apparently the FDA thought there was plenty of study

2    on them.  And that's not at all what the FDA said.  The FDA

3    repeatedly told Wyeth, We are reluctantly approving this drug,

4    even though we don't believe there's been sufficient study on

5    the long-term safety risks of it, sufficient study on the breast

6    cancer risk.  We're going to expect you to go out and conduct a

7    Phase IV study.  We are conditioning our approval on your

8    commitment to do a good study to show the breast cancer risk.

9    The notion that the FDA thought there was already enough data on

10   breast cancer is absolutely false.

11        So even at the time that the Prempro product was approved,

12   there had not been enough studies done on E plus P.  And, of

13   course, we know that Upjohn had no warning on their product at

14   all until the year 2007.  Not any warning of any kind.

15        There are a couple of things I wanted to point out.  One of

16   the things that Upjohn says is that Dr. Parisian conceded that a

17   case control study wouldn't have helped, and that's not --

18   that's not exactly what she said.  What she really said was that

19   there had to be a Phase IV case control study that was different

20   from the prior studies, that one more of the flawed studies that

21   occurred before would not be sufficient to show the breast

22   cancer link.  She also testified that Upjohn could have

23   conducted a study that would have answered the breast cancer

24   question, just as the WHI eventually answered the breast cancer

25   question.

1        Let me just check my notes here, Judge.

2        THE COURT:  Okay.

3        MR. WALKER:  Well, I have a little bit of time left,

4   and what I'd like to do -- if Wyeth and Upjohn do nothing but

5   rebut what I just said, we're over.  But I would appreciate

6   having a few minutes if they bring up new things that have been

7   held back until now.  But, otherwise, I don't see any reason to

8   go on.

9        I guess the bottom line is, what does it take to establish

10  justification for punitive damages in a case that doesn't

11  involve intentional harming of another person?  Well, it

12  establishes that the people engaged in such a reckless disregard

13  of public health that it is the equivalent of doing something

14  bad, because they didn't care, and as a result of them not

15  caring, many people were hurt.  We had two companies here that

16  had every chance, every chance, for decades, to do something to

17  help women.  One of them did absolutely nothing in the face of

18  signal after signal.  The other one not only didn't do their own

19  studies, but went out and tried to bad-mouth all the other

20  studies that might have protected women's health.  That evidence

21  is not an attempt to punish Wyeth or Upjohn for these other bad

22  acts like dismissing and distracting.  It just shows that if

23  they will go to the lengths of, instead of incorporating adverse

24  data into their label, instead of following up on adverse data

25  with their own study, of dismissing and distracting from that

1    study, they really, truly, hold a reckless disregard for public

2    health.

3             THE COURT:  Of course, there's two different

4    instructions, one for intentional harm and another one for

5    reckless disregard.  I assume I gave the reckless disregard.

6             MR. WALKER:  That's the only one you gave, Judge.

7             THE COURT:  I thought I did, but I've given a few

8    other instructions since I gave that one.

9         All right.  Just a minute before you start.  I'm writing a

10   note.

11            MR. HEARD:  Your Honor, passion is no substitute for a

12   direct response to Your Honor's questions or to the necessity of

13   accurately stating the evidence in the record.  Your Honor's

14   first question had to do with what was the evidence to support

15   the claim in plaintiff's brief that Wyeth knew that the addition

16   of progestin could increase the risk of breast cancer, or the

17   second statement, if E alone causes cancer in one reproductive

18   organ, the addition of a new hormone, progestin, could cause

19   cancer in another organ.  Those were the two claims unsupported

20   by any reference to the transcript.  In his response of an hour,

21   Mr. Walker did not refer you to any evidence that Wyeth knew

22   that the endometrial cancer episode put Wyeth on notice that

23   estrogen plus progestin created a risk of breast cancer.  On the

24   contrary, he pointed you to evidence that the endometrial cancer

25   episode put Wyeth on notice that estrogen alone might cause

1    cancer in the breast.  And you will remember what Mr. Morris

2    said in opening and closing and throughout the trial:  "Sure,

3    Wyeth did studies of estrogen, but they did not do studies of E

4    plus P, and they did not do E plus P studies long enough."  So

5    Mr. Walker still hasn't given you the evidence.  What he's given

6    you is the old sleight of hand.

7        Has he done any better in referring to your question about

8    Dr. Parisian?  An hour of argument, no reference to a single

9    question and answer, no identification of a single FDA

10   regulation, much less a testing regulation, that Wyeth violated.

11   Your Honor, look at the testimony cited in the footnotes in

12   plaintiff's brief, and determine whether in looking at any of

13   that testimony you can answer this question as to any document,

14   any of the 14 documents introduced in Phase II.  Can you answer

15   from Dr. Parisian's testimony, what regulation did this

16   document, or the conduct in this document violate?  I put it to

17   you, the question was never put to her, she never answered it as

18   to any one of those documents.  The record is silent.  Your

19   Honor, if forced to address that question, couldn't do so in an

20   opinion.  And one of the reasons you cannot is that all of those

21   documents, almost every one involved internal discussion, not

22   external conduct, and it's external conduct that's regulated by

23   the FDA.

24       Mr. Walker says -- and I must say, this is extreme -- Wyeth

25   did not object to Dr. Parisian's testimony.  Well, to begin

1    with, we filed a Daubert challenge to exclude her testimony

2    altogether.  And before she took the stand in Phase I, we

3    renewed the Daubert challenge, narrowed it to say, even as Your

4    Honor was limiting her testimony, it did not satisfy Daubert,

5    and we pointed out she was not purporting to testify about

6    testing regulations.

7         THE COURT:  What earlier rules of the F.R.E., Federal

8    Rules of Evidence, 103 or -4, says if the court makes a

9    definitive pretrial ruling, it stands?  In my Daubert ruling, is

10   that a definitive ruling?  I mean, I would assume it is.

11        MR. HEARD:  Your Honor, we thought it was, and even

12   though we thought that, we came back again before she testified

13   and tried to get a second bite at the apple.  And then during

14   the course of her testimony -- Mr. Walker is wrong -- at page

15   2683, she's just four or five pages into her testimony, Mr.

16   Urbanczyk objects that it's speculation and it goes beyond the

17   scope of anything said in her reports or testimony.  And then

18   Your Honor objected, in effect, took us to a sidebar, said she's

19   just reading the documents, she's not talking about the

20   regulations.  Mr. Urbanczyk repeated his objection.  And then at

21   the close of the plaintiff's case, we said, "Judge, look back at

22   her testimony and we ask you to move to strike."

23        THE COURT:  To the things she testified to that

24   plaintiffs are relying on primarily in punitive damages, were

25   those specifically covered in your Daubert motion?  I simply

1    don't remember.

2            MR. HEARD:  Well, Your Honor, at the time we filed the

3    Daubert motion, we couldn't address the 14 documents because we

4    didn't know, of course, what documents she was going to use.

5    The Daubert motion was addressed to her general opinion, first

6    of all, that a reasonable company would have done appropriate

7    testing and that Wyeth didn't do that, which encompasses almost

8    all of these documents.  Then the more focused attack was, if

9    Your Honor's limiting her to testimony that Wyeth violated FDA

10   regulations, her testimony is a window dressing, she doesn't

11   really do that, and these regulations really don't have to do

12   with testing.  And then our objection during her testimony was

13   even more specific that she was going beyond that ruling.  And,

14   of course, our motion to strike then said let's look back at

15   these 14 documents, has she really tied any of them to FDA

16   regulations.

17       So, Your Honor, as to the two questions you asked, they

18   haven't supplied in this hour of argument any evidence -- they

19   haven't pointed you to any of the evidence in the record.  What

20   Mr. Walker used most of his time to do is the same as how he

21   used most of the pages in his brief, to recapitulate the

22   evidence that was presented in the Rush case, the dismiss and

23   distract evidence, the evidence that was the theme of

24   Mr. Weisbrod in the Rush case.  And lest there be any question

25   that there is an almost direct one-for-one correlation between

1    the evidence there and the evidence here, at pages 7 and 8 of

2    our reply brief we have correlated each of these issues, Hoover,

3    Ross, Cummings, ghostwriting, IARC, to the pages in the Rush

4    transcript.  That evidence was not sufficient in Rush, and the

5    evidence that Dr. Parisian submits, the 14 documents, don't add

6    evidence of malice and don't add evidence that satisfies

7    Williams v. ConAgra that there's a close nexus between the

8    conduct that harmed Ms. Scroggin and the conduct that

9    Dr. Parisian was talking about.

10        Your Honor, Mr. Walker does say one thing that's quite

11   correct.  He says, you know, no one is going to come out and say

12   we acted maliciously.  Let's look at how Wyeth reacted to the

13   evidence that did come out.  Well, consider two things.

14   Consider, first of all, the enormous irony that exists between

15   the way plaintiffs argue Phase I and the way they argue Phase

16   II.  Their theme in liability, for negligence, is to say, Wyeth

17   was passive.  They did not do testing in the face of signals.

18   They should have been proactive.  They should have been

19   involved.  But when we get to Phase II and you look at the way

20   they spin the dismiss and distract evidence, what is it that

21   they say?  Wyeth should have been passive.  Wyeth should have

22   embraced whatever findings came out from whatever study and

23   taken them at face value.  Wyeth should not have participated in

24   the ongoing scientific debate.  Make no mistake, there's a

25   two-sided debate here about the relationship between hormone

1    therapy and breast cancer.  But consider what they say about

2    Cummings.  And this is almost a quote from their brief.  Wyeth

3    set out to show that there were very few participants in the

4    study and that there were wide confidence intervals.  Wyeth set

5    out to make a presentation to IARC about whether hormone therapy

6    should be considered carcinogenic.  Wyeth showed up at the FDA

7    advisory committee and made an argument about what the science

8    showed.  So that the great irony is that when we participate in

9    the debate, that has spun into evidence that we acted

10   maliciously and willfully.  And one of the most striking

11   examples, Your Honor, is the evidence about Mr. Essner.

12           THE COURT:  Technically, you have about a minute left,

13   but I'll give you a little more time.

14           MR. HEARD:  Give me about three or four minutes, Your

15   Honor.

16           THE COURT:  Sure.

17           MR. HEARD:  I'd like to draw you to this speech,

18   because what is quoted is what Mr. Essner said at the very end.

19   "We can make real the full promise of HRT to create in the near

20   future a world where the majority of women will start HRT at

21   menopause and continue on it for the rest of their lives."  And

22   the plaintiffs say, What better evidence that they were trying

23   to do something nefarious and off-label?  But, Your Honor, look

24   at this document, one of the 14 that Dr. Parisian talked about,

25   and see how that all started.  "On Monday of last week,"

1    Mr. Essner says, "I attended a talk by Dr. Bernadine Healey who

2    was, up until recently, the head of the National Institutes of

3    Health.  In her talk, Dr. Healey made predictions about the

4    nature of healthcare and healthcare delivery in the United

5    States.  The part of her speech that interested me was her

6    prediction regarding women's healthcare.  Dr. Healey, who was

7    the prime impetus behind the Women's Health Initiative, made the

8    prediction that in the very near future there is going to be a

9    revolutionary increase in the use of hormones to prevent and

10   treat a variety of conditions in older women.  She said that

11   women starting on HRT at menopause and staying on it for the

12   rest of their lives will become the rule, and that this will

13   have a dramatic and positive effect on women's health.  Dr.

14   Healey asked the audience to imagine what it means for women to

15   be taking HRT.  This revolution in the use of HRT that

16   Dr. Healey predicts is starting right here in this room."  What

17   this shows, Your Honor, is not only the great confidence that

18   Wyeth had, the state of mind that the benefits of this product

19   greatly exceeded the risks, but he was reflecting a view that he

20   had heard the week before in public from the former head of NIH,

21   who herself spoke about a revolution, who herself spoke about

22   the benefits greatly exceeding the risks.  And that was the

23   state of the scientific community's knowledge.  That was what

24   the scientific establishment thought.

25        And, so, Your Honor, I leave you with this further

1    consideration about the state of play at the crucial point in

2    the early 1990s when the plaintiffs say we were acting

3    maliciously because we didn't do this quick, simple, easy case

4    control study that no one else was doing.  At that point, the

5    WHI was about to begin enrolling patients.  This was to be an

6    $800 million study, involving at least 40 study centers around

7    the United States and hundreds of researchers.  There had been a

8    paper published that said, We expect the risk of breast cancer

9    coming out of WHI to be 1.3, roughly what all the other studies

10   have shown, but there is an enormous prospect that there will be

11   an enormous benefit from cardiovascular health, and it is, in

12   fact, the promise of that benefit that justifies us doing this

13   randomized clinical control trial.  And who is the one person in

14   the United States who is more responsible for that state of

15   thinking that launched WHI?  It is Dr. Graham Colditz, who

16   himself did the studies that said the risk of breast cancer is

17   small, who performed the meta-analysis in 1993 that said the

18   risk is small, the addition of progestin doesn't seem to change

19   the risk, who over a ten-year period, as principal investigator

20   for the Nurses' Health Study, an observational study, printed at

21   least three papers in the New England Journal of Medicine saying

22   there appears to be an enormous cardiovascular benefit.

23   Dr. Colditz, it's fair to say, launched the Women's Health

24   Initiative.  His thinking defined the state of play, and today,

25   today the plaintiffs are saying not just that Dr. Colditz should

1    be able to walk away from that and that Wyeth and Upjohn should

2    be punished because the Women's Health Initiative came out

3    differently than everyone expected, but that Dr. Colditz will

4    serve as a plaintiff's expert, who will collect $900 an hour for

5    his testimony, to now tell us that we are wanton and malicious

6    because we believed what he told everybody to believe in 1992

7    and '93 and '94.

8         Your Honor, clear and convincing evidence is lacking of

9    malice, the clear and direct nexus required by Williams v.

10   ConAgra is missing in the evidence that Dr. Parisian supplied,

11   and that's the only evidence over and above what you heard and

12   rejected as sufficient in Rush.

13        MR. GOODELL:  Thank you, Your Honor.

14        I made clear, I thought, in the opening remarks to my

15   presentation that while we believe that the appropriate standard

16   is the absence of all care, that even under the standard that

17   plaintiffs are proposing, they fail.  And we believe that to be

18   clear in this case.

19        Whichever standard you apply --

20        THE COURT:  I don't believe the absence of all care is

21   Arkansas law.

22        MR. GOODELL:  That's fine.  And I don't agree, but it

23   doesn't matter for purposes of our discussion, Your Honor,

24   because they cannot meet the burden they're proposing.

25        THE COURT:  I understand.

1          MR. GOODELL:  But the fact of the matter is, even

2    under their standard, or any standard that Your Honor would

3    apply, there is an element of state of mind; a state of mind

4    exhibiting a recklessness to the point of malice.  And my

5    question to the plaintiffs is, as to Upjohn, where's the beef?

6          I showed you some slides, or some posters.  The plaintiffs

7    keep wanting to say -- and it reflects an absence of their

8    evidence -- they keep wanting to say that Upjohn did nothing.

9    Well, we know that's not true.  We know that Upjohn did its own

10   testing, which we walked through, Your Honor.  We know it

11   otherwise tried to discover the risks from following the

12   literature, to retaining Degge.  We know that it followed

13   studies and reported those studies to the FDA.  And there's no

14   claim in this case that we inaccurately did so.  So what we're

15   now talking about is the plaintiffs, although they don't want to

16   admit it, have to acknowledge that the company did act, and then

17   the question becomes, they're saying we didn't do enough.  Fine.

18   That was fine for the compensatory award, but it is not the

19   stuff of punitive damages.

20         There is absolutely no evidence in this case -- and trust

21   me, we think the evidence against Wyeth is completely

22   insufficient to justify punitive damages.  But there isn't even

23   any evidence that they've introduced in this entire case of any

24   claim of an intentional effort to do anything.  In other words,

25   no effort to control science, no nothing.  It is not sufficient

1    as to Wyeth, and it is not even evidence against us --

2          THE COURT:  Well, they don't have to show intent, do

3    they?  What they've got to prove is a reckless disregard, isn't

4    it?

5          MR. GOODELL:  They have to prove a reckless disregard,

6    but how do you prove it?  They have no proof.  And I want to

7    spend a minute on what they claim is the notice that establishes

8    that.  In other words, they don't have anything from us that

9    says, Gee, we should do this, but we're not going do it.  We're

10   going to hide this.  We're not going to tell anybody this.  The

11   evidence against Upjohn is we had information, we disclosed it

12   to the FDA, we acted appropriately.  So there are a couple of

13   things where they claim, Here's the evidence we're relying on.

14   The 1960's beagle dogs.  And Your Honor will recall that

15   Dr. Parisian acknowledged that the World Health Organization and

16   the FDA determined that beagle dogs were not a good model for

17   humans.  That's undisputed.  And as a result, and irrespective

18   of that, we put information in our label.  They say the FDA

19   denied our applications several times before it approved our

20   application in 1998.  True.  They say that the FDA denied our

21   application because there was an absence of safety studies.

22   Untrue.  The only thing that the FDA wanted additional

23   information on in earlier applications related to efficacy.  Did

24   it work to reduce endometrial cancer?  Plaintiffs say the

25   endometrial cancer crisis should have been notice to us.

1    Actually, it's exactly the opposite.  Because the endometrial

2    cancer crisis, according to what actually happened, reflected

3    that progestins were then given to reduce the risk of

4    endometrial cancer.  And as Dr. Parisian has acknowledged, the

5    prevailing view was that not only would they reduce the risk of

6    endometrial cancer, but the addition of progestins would reduce

7    the risk of breast cancer.  Bergkvist, they say, should have

8    been noticed.  It was notice.  It was notice.  1989, while the

9    WHI is in the planning processes.  And what do we do?  We go out

10   and retain the Degge Group.  And we've talked about it.  I don't

11   need to talk about it anymore.  There's no failure to act.

12        The marketing documents -- can you pull up the ELMO for me

13   for a second?

14             COURTROOM DEPUTY:  Sure.

15             MR. GOODELL:  I want to go back to the concession

16   that's in the plaintiff's opposition brief, and I hope that --

17   what do I need to do?

18             COURTROOM DEPUTY:  I don't know.

19             MR. GOODELL:  I'll tell you what.  We'll do it with

20   this.  Andy, can you pull up concession No. 2?  That's all

21   right.  We'll do it this way.  I'll use this, Your Honor.

22        This is from the plaintiff's opposition brief, pages 4 and

23   19.  "From the perspective of punitive damages, the issue is not

24   the improper advertising, as troubling as that was.

25   Ms. Scroggin does not claim the ads were untrue or that they

1    influenced her decision to ingest E plus P."

2         If these are the claims of notice that plaintiffs are

3    relying on and have articulated to justify punitive damages

4    against Upjohn, Your Honor, your course is clear.

5         The last point I want to make goes back to the studies.

6    Counsel keeps mixing up case control studies and the WHI.  Case

7    control studies are studies which start now and look back at

8    people who have already taken the medicine.  Case control

9    studies had already been done.  They had had mixed results.

10   Another case control study would not answer the question.  And

11   it gets into the very speculation that we've talked about.

12   Counsel up here, interestingly, said, you know, the WHI didn't

13   even completely answer the question.  So what counsel wants us

14   to do, going back to their first concession, is to say even

15   though the state of the medical art, based upon studies that had

16   been conducted, demonstrate that the breast cancer risk had not

17   been accepted by the medical community or the FDA, and,

18   therefore, Upjohn's warning was appropriate based on what was

19   known, we should find punitive damages against them on the basis

20   of what ought to have been known.  And the typical and standard

21   case law says what that means is that there is information which

22   is available which the defendant does not avail itself of.  We

23   do not believe, Your Honor, it contemplates a situation where

24   there is an established state of the medical science and we're

25   liable for punitive damages unless we upset that with a study,

1   which is not guaranteed in any way to come to a particular

2   conclusion or to be viewed as definitive on the issue.

3        Thank you.

4            THE COURT:  Mr. Walker, do you feel like they pulled a

5   new card out on you?

6            MR. WALKER:  I do.

7            THE COURT:  I suspected as much.

8            MR. WALKER:  They brought the Rush issue up, and I

9   want to talk briefly about that.

10       The Rush case did not have a punitive damages phase.  The

11   only phase it had was the liability phase.  And this Court

12   restricted the evidence that could be introduced in that phase,

13   just as it has in all three bellwether trials.  Here are just

14   some examples of the very powerful evidence introduced in this

15   trial, in this punitive phase that was not introduced in Rush.

16       The "Dear Doctor" letter that Wyeth sent about the

17   endometrial cancer crisis in which it told doctors that there's

18   nothing to worry about when these studies come out saying we

19   cause cancer.  There's too many variables.  Nobody knows what

20   causes cancer.  The FDA's strongly worded response to that

21   letter saying, You can't react to science in that fashion,

22   Wyeth.  You have to embrace science; not embrace it to accept

23   it, but embrace it by looking at it, studying it, and if it is

24   true, putting it in your label.  The Essner speech in which he

25   encouraged his sales force to go start this revolution and get

1    all the women on hormone therapy for the rest of their lives,

2    even though there had been no long-term studies, that was not in

3    the Rush trial.  The Burson-Marsteller public relations

4    documents, I know those weren't in the trial because they

5    weren't produced until a few months ago in a state court case in

6    San Antonio because Wyeth, for some reason, did not deem the

7    custodial file of Jeff Buchalter to be something they should

8    produce in this litigation.  The documents saying when an

9    oncologist was going to head one of the breast cancer symposia

10   Wyeth was putting on:  No, no, no, no, no, no, no, to an

11   oncologist, because, as we all know, oncologists see the link to

12   breast cancer from E plus P more than OB-GYNs who have been

13   prescribing the drug for decades.  The money to organizations

14   like NAMS and ACOG that Dr. Kuperman relied on.  None of that

15   was in the Rush case.  The Seasons magazine reprimand from

16   Wyeth.  So there were a number of pieces of evidence in this

17   trial that were not introduced in the Rush trial.  So you can't

18   compare the two trials in terms of the rulings the Court made.

19        And let me just say in conclusion on all of this, if a jury

20   had accepted all of these inferences that Mr. Heard has given

21   from the evidence, and Mr. Goodell has given from the evidence,

22   I don't think we'd have a leg to stand on in appealing or

23   challenging a finding of no punitive damages.  But the jury

24   spoke the other way.  And the standard is not was the jury

25   right.  The standard is, is there any evidence to support the

1    verdict?  Could any reasonable person have made the inferences

2    that they made and that we have supported from this evidence?

3    And I would encourage the Court to affirm a jury verdict based

4    on this evidence, unless the Court is convinced that no

5    reasonable person could look at any inferences from the

6    evidence, except the ones that these attorneys have given.

7         MR. GOODELL:  Your Honor --

8         THE COURT:  One thing is --

9         MR. GOODELL:  I'm sorry.  Would it benefit you to have

10   the slides we used and the boards in a slide form for your use?

11   If it doesn't, that's fine.

12        THE COURT:  Any objection?

13        MR. MORRIS:  No objection.

14        MR. WALKER:  We'll do the same.  That's fine.

15        THE COURT:  All right.  Well, it's obvious to me that

16   all the lawyers in this case have worked as hard as Jacob worked

17   for his bride in the Old Testament.  I hope you don't have to

18   wait seven or 14 years to find out whether you got Leah or the

19   right one or not.  I'm going to write an order in the case, and

20   I'll get it out just as quickly as I can.  It won't be

21   immediately.  Despite how clear and simple this case appears to

22   the lawyers for the respective sides, it's not quite that clear

23   and simple to me, so I'm going to have to studify it some more.

24   I'll get a written order out just as quickly as I can.  It won't

25   be too long, but it won't be too quick.

1      Costs.  Let me just ask the plaintiff here, the defendants

2  have said that the plaintiffs didn't have to pay costs when they

3  lost, and since the plaintiffs have a pool in the MDL expense

4  fund, why should the defendants have to pay since y'all have a

5  fund of money.

6          MS. LITTLEPAGE:  That I can address, Judge.

7      The fund is actually governed by an order you entered that

8  doesn't permit Mr. Morris to go to the fund and get paid money

9  for this trial.  You have very specific restrictions as to what

10  the money can be used for.  It's pretrial only.  It's getting

11  the documents at seven cents a page.  Those sorts of things.  It

12  doesn't permit Mrs. Scroggin to go apply and get money for this

13  trial at this point.

14          THE COURT:  Okay.  I've got that issue under

15  consideration.

16      How did the hearing in Florida come out yesterday?

17          MR. URBANCZYK:  As I understand it, Your Honor, no

18  decision was arrived at.  I was not there, and I don't have the

19  transcript.  But I understand that counsel argued various

20  motions to compel, and did not really address the Sunshine Act.

21  The judge is going to continue the hearing to another date,

22  understands, I believe, the issue of confidentiality and how

23  important it is to us.  But I think at this point everything has

24  been held even, we're treading water, and we'll keep you

25  advised.  I don't know whether the court ever did call you.

1             THE COURT:  No.

2             MR. URBANCZYK:  I did learn, Your Honor, that on the

3    day that the letter was sent to his chambers, the judge was out

4    at lunch at a point when someone was shot and killed in the

5    courthouse, and the judge probably never went back to the

6    courtroom.  So I'm not sure that he's had time to look at your

7    letter and think about it.  But right now, there has been no

8    ruling.

9             MS. LITTLEPAGE:  Judge, my report from the hearing was

10   that the judge -- the hearing didn't finish.  There wasn't

11   enough time to get it all done.  But that he did indicate that

12   he had received your letter, but did not feel like he was going

13   to be calling you.  That's my report.

14            THE COURT:  Okay.  If he doesn't want to, he doesn't

15   want to.  I'm not even going to be offended.  All right.

16        Anything else before we recess?  Thank you very much.

17   We're in recess.

18        (Whereupon, the hearing concluded at 11:43 p.m.)

19                 C E R T I F I C A T E

20        I, Eugenie M. Power, Official Court Reporter, do hereby

21   certify that the foregoing is a true and correct transcript of

22   proceedings in the above-entitled case.

23

24   _____        Date:  May 15, 2008
     Eugenie M. Power, RMR, CRR, CCR
25   United States Court Reporter